2024-1504, 2024-1566

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

**CVB, INC.,**
*Plaintiff-Appellant*

v.

**UNITED STATES,**
*Defendant-Cross-Appellant*

**BROOKLYN BEDDING, LLC, CORSICANA MATTRESS CO., ELITE COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES, INC., LEGGETT & PLATT, INC., INTERNATIONAL BROTHERHOOD OF TEAMSTERS, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO,**
*Defendants-Appellees*

---

Appeals from the United States Court of International Trade in
No. 1:21-cv-00288-SAV, Judge Stephen Alexander Vaden

---

### CORRECTED NONCONFIDENTIAL PRINCIPAL BRIEF OF CVB, INC.

Geoffrey M. Goodale
Andrew R. Sperl
Lauren E. Wyszomierski
**DUANE MORRIS LLP**
901 New York Avenue NW
Suite 700 East
Washington, DC 20001
(202) 776-5211

Dated: July 1, 2024                    *Counsel to Plaintiff-Appellant CVB, Inc.*

FORM 9. Certificate of Interest

Form 9 (p. 1)<br>March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2024-1504, 2024-1566 |
| **Short Case Caption** | CVB, Inc. v. US |
| **Filing Party/Entity** | CVB, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/01/2024

Signature: /s/ Geoffrey M. Goodale

Name: Geoffrey M. Goodale

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| CVB, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable          ☑     Additional pages attached

| See Attachment A | | |
|---|---|---|
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)     ☐   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable          ☐     Additional pages attached

| | | |
|---|---|---|
| | | |

# ATTACHMENT A

## Attachment A to Certificate of Interest
## CAFC No. 2024-1504, 2024-1566

The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

*Appearing before this Court*:

**Duane Morris LLP**
Geoffrey M. Goodale, Partner
Andrew R. Sperl, Partner
Lauren E. Wyszomierski, Associate
Taylor J. Hertzler, Associate

*Before trial court or agency*:

**Duane Morris LLP**
Geoffrey M. Goodale, Brian H. Pandya, Andrew R. Sperl, Ryan M. Eletto, Nathan J. Heeter, and Lauren E. Wyszomierski

**Larson LLP**
Stephen G. Larson, Robert C. O'Brien, and Paul A. Rigali

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT ........................................................2

STATEMENT OF THE ISSUES...........................................................3

STATEMENT OF THE CASE ..............................................................4

I.     Procedural Background ............................................................4

II.    Factual Background ..................................................................6

      A.     The U.S. mattress industry and U.S. mattress market are highly segmented between boxed mattresses and flat-packed mattresses. ......................................................................6

            1.     MiBs and FPMs are significantly different products.................6

            2.     There is significant specialization between domestic producers of boxed mattresses and flat-packed mattresses. ......................10

            3.     Purchasers of boxed mattresses and flat-packed mattresses are specialized and have distinct preferences between mattress types. ........................................................................11

      B.     Subject imports have not had adverse effects on U.S. producers, including U.S. producers who exclusively manufacture boxed mattresses. ........................................................14

SUMMARY OF THE ARGUMENT ....................................................20

ARGUMENT ....................................................................................23

I.     Legal Standard and Standard of Review ....................................23

II.    The Commission ignored and manipulated the evidence in determining that the U.S. Market is not sharply segmented and that competition between the MiB and FPM segments is not highly attenuated. ..................................................................25

A.    The Commission manipulated data to minimize the specialization that exists between domestic producers of FPMs and MiBs. .......................................................................27

B.    The Commission ignored evidence establishing significant specialization among purchasers of FPMs and MiBs and purchaser preferences for either FPMs or MiBs. ................................30

C.    The Commission was misleading in its discussion of survey data ...................................................................................32

D.    The Commission's manipulation and disregard of evidence is fatal to its affirmative injury determination. ........................................33

III.   The Court of International Trade erred in affirming the Commission's affirmative injury determination on the basis of its cursory, alternative holding. .............................................................................................38

A.    The alternative holding ignores substantial evidence that demonstrates the health of domestic MiB production. .......................39

B.    The Commissions' alternative holding does not allow its errors to be dismissed as harmless.......................................................48

CONCLUSION ...............................................................................................54

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on page 10 describes specific numbers of producers providing particular U.S. Producer Questionnaire responses. The material omitted in footnote 1 on page 10 is the names of two mattress producers. The material omitted on page 11 is a descriptor of specific mattress production figures, and a specific percentage of relative market share. The material omitted on page 12 is the names of specific purchasers. The material omitted on page 14 is specific percentages of mattress consumption across the period of investigation. The material omitted on page 15 is specific market share percentages. The material omitted on page 16 is a descriptor of the size of a share of U.S. consumption. The material omitted on page 17 is descriptors of shares and specific percentages of shares of the boxed mattress and flat-packed mattress market segments. The material omitted on page 29 is a descriptor of specific mattress production figures. The material omitted on page 31

is the name of a specific purchaser. The material omitted on page 33 is a percentage from a proprietary sleep study. The material omitted on page 41 is specific percentage declines of certain domestic sales prices. The material omitted at the top of page 42 is a specific product number, and a descriptor of a specific quantity of mattresses imported. The material in the middle of page 42 is specific percentage changes in certain sales prices, the corresponding product numbers that experienced the sales price changes, and a description of the magnitude of the sales price change. The material omitted on page 44 is specific percentages of U.S. consumption of boxed mattresses and specific percentages of shares of boxed mattress shipments.

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Ludlum Corp. v. United States*
    287 F.3d 1365 (Fed. Cir. 2002) .......................................................... 25

*Allentown Mack Sales & Serv., Inc. v. NLRB*
    522 U.S. 359 (1998) ..................................................................... 29, 34-35

*Altx, Inc. v. United States*
    370 F.3d 1108 (Fed. Cir. 2004) .................................................... 25, 35

*Anshan Iron & Steel Co., Ltd. v. United States*
    358 F. Supp. 2d 1236 (Ct. Int'l Trade 2004) ........................................ 37

*Blast Furnace Coke from China and Japan*
    Inv. Nos. 731-TA-951-952, USITC Pub. 3619 (Aug. 2003) ........................ 26

*Bratsk Aluminum Smelter v. United States*
    444 F.3d 1369 (Fed. Cir. 2006) .......................................................... 34

*Chung Ling Co., Ltd. v. United States*
    805 F. Supp. 45 (Ct. Int'l Trade 1992) ............................................. 25

*Comm. for Fair Coke Trade v. United States*
    28 C.I.T. 1140 (Ct. Int'l Trade 2004) ............................................. 26

*Consol. Edison Co. v. NLRB*
    305 U.S. 197 (1938) ..................................................................... 24-25

*Consolo v. Fed. Maritime Comm'n*
    383 U.S. 607 (1966) ..................................................................... 24

*CP Kelco US, Inc. v. United States*
    24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014) ........................................ 35

*CVB, Inc. v. United States*
    675 F. Supp. 3d 1324 (Ct. Int'l Trade 2023) ....................................... 6

*Hermes Consolidated, LLC v. EPA*
    787 F.3d 568 (D.C. Cir. 2015) ........................................................ 52

*Intercargo Ins. Co. v. United States*
    83 F.3d 391 (Fed. Cir. 1996) ..........................................................48, 50

*Kotteakos v. United States*
    328 U.S. 750 (1946)...........................................................................49

*Luoyang Bearing Factory v. United States*
    288 F. Supp. 2d 1369 (Ct. Int'l Trade 2003) .....................................24

*Micron Tech., Inc. v. United States*
    117 F.3d 1386 (Fed. Cir. 1997) ..........................................................24

*Mid Continent Nail Corp. v. United States*
    846 F.3d 1364 (Fed. Cir. 2017) ....................................................48, 50

*Mittal Steel Point Lisas Ltd. v. United States*
    542 F.3d 867 (Fed. Cir. 2008) ...........................................................24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*
    463 U.S. 29 (1983)..............................................................................35

*Nevinnomysskiy Azot v. United States*
    31 C.I.T. 1373 (2007) .........................................................................51

*Outboard Engines from Japan*
    Inv. No. 731-TA-1069, USITC Pub. 3752, 2005 WL 630159 (Feb. 2005) ............................................................................................. 36-37

*Pohang Iron & Steel Co., Ltd. v. United States*
    23 C.I.T. 778, 1999 WL 970743 (Ct. Int'l Trade Oct. 20, 1999) ......................35

*Rhone-Poulenc, Inc. v. United States*
    927 F. Supp. 451 (Ct. Int'l Trade 1996) ............................................37

*Salt River Project Agric. Improvement & Power Dist. v. United States*
    762 F.2d 1053 (D.C. Cir. 1985)..........................................................52

*Shinseki v. Sanders*
    556 U.S. 396 (2009)...................................................................... 48-49

*SolarWorld Americas, Inc. v. United States*
    962 F.3d 1351 (Fed. Cir. 2020) ..........................................................49

*Suntec Indus. Co., Ltd. v. United States*
    857 F.3d 1363 (Fed. Cir. 2017) ..........................................................48

*Taiwan Semiconductors Indus. Ass'n v. Int'l Trade Comm'n*
    266 F.3d 1339 (Fed. Cir. 2001) ..........................................................24

*U.S. Steel Grp. v. United States*
    162 F. Supp. 2d 676 (Ct. Int'l Trade 2001) .......................................34

*Uncoated Groundwood Paper from Canada*
    Nos. 701-TA-584, 731-TA-1382, USITC Pub. 4822, 2018 WL
    5292180 (Sept. 2018).................................................................. 36-37

*United States v. Nat'l Semiconductor Corp.*
    496 F.3d 1354 (Fed. Cir. 2007) ..........................................................49

*United States v. Schwarzbaum*
    24 F.4th 1355 (11th Cir. 2022) .................................................... 52-53

*Wire Decking from China*
    Inv. Nos. 701-TA-466, 731-TA-1162, USITC Pub. 4172, 2010 WL
    4778779 (July 2010) ...........................................................................40

**STATUTES**

5 U.S.C. § 706.................................................................................................48

19 U.S.C. § 1516a(b)(1)(B)(i)........................................................................24

19 U.S.C. § 1671d(b)(1) .................................................................................23

19 U.S.C. § 1673d(b) ......................................................................................23

19 U.S.C. § 1677(7) ........................................................................................40

19 U.S.C. § 1677(7)(A)...................................................................................23

19 U.S.C. § 1677(7)(B)...................................................................................23

19 U.S.C. § 1677(7)(B)(i)...............................................................................40

19 U.S.C. §1677(7)(B)(i)(III) .........................................................................43

19 U.S.C. § 1677(7)(B)(ii)..............................................................................23

19 U.S.C. § 1677(7)(C)(iii) ............................................................ 23, 40-41, 43, 51

19 U.S.C. § 1677(9)(A) ............................................................................ 4

19 U.S.C. § 1677f(i)(3)(B) .................................................................. 24, 51

28 U.S.C. § 1295(a)(5) ............................................................................ 2

28 U.S.C. § 1581(c) ................................................................................ 2

## OTHER AUTHORITIES

11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2883 (3d ed. June 2024) .................................................. 49

Court of International Trade Rule 56.2 .................................................. 6

H.R. Rep. 96-317 ................................................................................ 24

*Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia*, 86 Fed. Reg. 26,460 (Dep't Commerce May 14, 2021) .................................................. 5

*Mattresses From the People's Republic of China: Countervailing Duty Order*, 86 Fed. Reg. 26,463 (Dep't Commerce May 14, 2021) ................. 5

*Mattresses From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 85 Fed. Reg. 56,216 (Dep't Commerce Sept. 11, 2020) ...................... 4

Roger J. Traynor, *The Riddle of Harmless Error* 35 (1970) ................... 50

S. Rep. 96-249 (1979) ........................................................................ 24

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1 (1994) .............................................. 24

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5 of the Rules of the United States Court of Appeals for the Federal Circuit, counsel for Plaintiff-Appellant CVB, Inc. identifies the following related cases, as previously noticed in CVB, Inc.'s Notice of Related Case Information:

1. *PT Zinus Global Indonesia v. United States,* Consol. Court No. 2021-00277 (Ct. of Int'l Trade); opinion issued February 20, 2024; Jennifer Choe-Groves, Judge; 686 F. Supp. 3d 1349

2. *Best Mattresses International Company Limited et al v. United States,* Consol. Court No. 2021- 00281 (Ct. Int'l Trade); opinion issued May 16, 2024; Gary S. Katzmann, Judge; 2024 WL 2206461

3. *Ashley Furniture industries, LLC, et al.,* Court No. 2021-00283 (Ct. Int'l Trade); opinion issued November 28, 2022; Timothy M. Reif, Judge; 607 F. Supp. 3d 1210

4. *Brooklyn Bedding, LLC, et al. v. United States,* Court No. 2021-00285 (Ct. Int'l Trade); opinion issued December 22, 2023; M. Miller Baker, Judge; 2023 WL 8866582

## JURISDICTIONAL STATEMENT

The International Trade Commission issued its final affirmative injury determination on May 14, 2021, and CVB timely filed its complaint in the Court of International Trade on July 13, 2021. The Court of International Trade had jurisdiction pursuant to 28 U.S.C. § 1581(c).

The Court of International Trade sustained the Commission's final affirmative injury determination by order and opinion dated December 19, 2023, and CVB timely appealed to this Court on February 15, 2024. Appx001, Appx669. The Court of International Trade's order sustaining the Commission's final affirmative injury determination was a final order that disposed of all parties' claims. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## STATEMENT OF THE ISSUES

1.     Was the affirmative injury determination of the International Trade Commission unsupported by substantial evidence and contrary to law where the Commission did not fairly address all of the record evidence establishing significant market segmentation between boxed mattresses ("Mattresses in a Box" or "MiBs") and flat-packed mattresses ("FPM"), and where the Commission manipulated data to avoid a finding of significant market segmentation?

2.     Was the Commission's cursory alternative holding that domestic manufacturers of MiBs were injured by subject imports sufficient by itself to support the Commission's affirmative injury determination, such that the Commission's multiple errors were harmless?

## STATEMENT OF THE CASE

### I.     Procedural Background

Petitioners Brooklyn Bedding, Corsicana Mattress Co., Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Inc., the International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (collectively, "Petitioners"), filed petitions with the U.S. Department of Commerce ("Commerce") and the International Trade Commission ("Commission") seeking the imposition of antidumping and countervailing duties on imports of mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam (the "Subject Countries") on March 31, 2020. Appx80000-80004. Appellant CVB, Inc. ("CVB") is an importer of subject merchandise and participated in proceedings before the Commission as an interested party pursuant to 19 U.S.C. § 1677(9)(A). Appx095.

The Commission made a preliminary affirmative injury determination on May 15, 2020. *See* Appx9046. Commerce then published its preliminary affirmative countervailing duty determination on mattresses from China on September 11, 2020, and its preliminary affirmative determinations on sales at less than fair value for mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam on November 3, 2020. *See Mattresses From the People's Republic of China:*

*Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 85 Fed. Reg. 56,216 (Dep't Commerce Sept. 11, 2020); *see also* 85 Fed. Reg. 69,594 (Cambodia), 69,597 (Indonesia), 69,574 (Malaysia), 69,589 (Serbia), 69,568 (Thailand), 69,571 (Turkey), 69,591 (Vietnam) (Dep't Commerce Nov. 3, 2020).

Following the Commission's final phase investigations, five Commissioners made an affirmative determination that an industry in the United States is materially injured by reasons of imports of mattresses from the Subject Countries. The Commission published its final determinations on May 14, 2021. *See* Appx124041-124044. On that same date, Commerce published its antidumping duty order on mattresses from the Subject Countries, as well as its countervailing duty order on mattresses from China. *See Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia*, 86 Fed. Reg. 26,460 (Dep't Commerce May 14, 2021); *Mattresses From the People's Republic of China: Countervailing Duty Order*, 86 Fed. Reg. 26,463 (Dep't Commerce May 14, 2021).

CVB sought judicial review of the Commission's final affirmative injury determination. It timely filed a complaint on July 13, 2021 in the Court of International Trade. Appx083. The case was assigned to Judge Stephen Alexander Vaden.

Appx084. Petitioners were granted leave to intervene in the Court of International Trade as Defendant-Intervenors. Appx084. CVB filed its Motion for Judgment on the Agency Record on March 29, 2022, pursuant to Court of International Trade Rule 56.2. Appx087. After the Motion was fully briefed, the Court of International Trade heard argument on December 15, 2022. Appx090. Just over one year later, on December 19, 2023, the Court issued its opinion sustaining the Commission's final affirmative injury determination. Appx091-092. *See CVB, Inc. v. United States*, 675 F. Supp. 3d 1324 (Ct. Int'l Trade 2023) (Vaden, J.).

## II.    Factual Background

### A.    The U.S. mattress industry and U.S. mattress market are highly segmented between boxed mattresses and flat-packed mattresses.

#### 1.    MiBs and FPMs are significantly different products.

The Commission's affirmative injury determination was predicated on the Commission's refusal to recognize the attenuated competition between two types of mattresses: "Mattresses in a Box", or "MiBs", on the one hand, and "Flat-Packed Mattresses", or "FPMs", on the other hand. As described below, the Commission's failure to analyze FPMs and MiBs as distinct market segments undermined most of its reasoning and was rightly criticized by the Court of International Trade.

In general, "{m}attresses are defined by the industry as a resilient material or combination of materials generally enclosed by ticking that is intended or promoted for sleeping upon by people." Appx124051. As the Commission defined them, FPMs

6

are mattresses that are "packaged for shipment and delivery flat", while MiBs are "rolled and boxed." Appx124052. However, contrary to the Commission's reasoning, MiBs and FPMs differ in much more than packaging. Although their consumer uses may be similar, the products differ significantly in their overall business model, including design, production, transportation, and sale.

Mattresses that are rolled and compressed as MiBs are designed and produced differently than FPMs. Whereas FPMs do not need to be rolled, MiB mattresses are rolled, which requires particular equipment and production steps (such as drying and roll packing) oriented toward ensuring that MiB products return to their original form once unpacked. Appx95110. To achieve successful recovery from compression and avoid breakage issues, an entirely new product must be engineered, and the MiB-specific production steps can take years of trial and error to perfect. Appx95111. MiB production requires investments in "capital intensive machines that enclose the foam mattress in plastic, compress the mattress, then roll the mattress to be put into a box." *See* Appx124140.

In the Commission's previous investigation of mattresses from China, Ashley Furniture's Vice President of Procurement, International Sourcing Operations and Regulatory Affairs explained the design and production differences, stating that:

> {T}ransitioning to production of MiBs is not as simple as purchasing a rolling machine and flipping the switch. We invested millions of dollars, not just in the machinery to compress, roll-pack, bale, wrap, and box the product, but

> also to reengineer the product all together. . . It also re-
> quires the perfect engineering of pocketed coil manufac-
> turing, fabric and foam layer application and sewing in
> quilting in a way that is able to feed efficiently into the
> compression machine. In order to make this production
> work, we had to completely redesign the products we sold
> to be compatible with this process.

Appx94480-94481.

CVB likewise noted in the preliminary phase of the Commission's investiga-

tion that:

> {O}n mattresses made to be roll compressed, foam must
> be a certain quality and cured for a longer duration before
> it can be reliably compressed. After curing, the smart pro-
> ducers also pre-compress the foam in bulk through large
> compression machines to remove air and make certain the
> rebound is sufficient. If the foam is not made to specific
> certifications, the mattress will not decompress. This
> means that a mattress stays in a flattened state, would not
> provide any cushioning, and doesn't return to the original
> pre-compressed height.

Appx95151.

Testimony during the Commission hearing further highlighted the physical

differences between MiBs and FPMs. *See* Appx12437-12438; *see also*

Appx115233-115235 (providing full specifications of foam and coil design for

MiBs). The Commission ignored this evidence in concluding simply that "MiBs and

FPMs can be produced to the same specifications using the same springs and foam,

with the exception that innerspring MiBs must omit the border wire that innerspring

FPMs may possess." Appx124008.

8

Additionally, public statements from companies within the petitioning group showed that such companies view the MiB segment as distinct and requiring significant investment. After investing roughly $9 million to open a 165,000-square-foot manufacturing facility in La Porte, Indiana, the CEO of Corsicana Mattress Co., Michael Thompson, stated that Corsicana has had "significant growth in our boxed bed business and require{s} a facility that is appropriately equipped with well-trained employees to provide the manufacturing efficiency to support that growth." Appx113912. The company also explained that the new facility would allow it to access "key markets and provide same day shipping for customers." Appx113912. In its 2019 annual report, Leggett & Platt, Inc. described MiBs as products that have "revolutionized the U.S. bedding industry and created tremendous opportunities." Appx114240. The report describes the growth in online compressed mattress brands as transforming the industry by providing "{p}roducts that are easily shippable, efficiently stored by retailers, and easily carried home by consumers." Appx114247.

If the product differences between FPMs and MiBs were limited to the packaging, then FPM producers would quickly and easily shift to selling more preferable MiBs. Indeed, from the perspective of the MiB producer, the efficiencies generated by the MiB model make the transition to MiB, if possible, a "no-brainer." Appx94476. The fact that producers have not made that transition suggests that the differences between FPMs and MiBs extends beyond their packaging material.

9

**CONFIDENTIAL INFORMATION REDACTED**

> **2.    There is significant specialization between domestic produc-
> ers of boxed mattresses and flat-packed mattresses.**

Domestic producers tend to focus on either FPM or MiB production. As de-
scribed above, the production of MiBs requires capital-intensive investments in spe-
cific assets and operations. These include rolling and compression machinery
(Appx124140 ("{f}or compressed mattresses, U.S. producers use capital intensive
machines that enclose the foam mattress in plastic, compress the mattress, then roll
the mattress to be put into a box.")), as well as development of components which
are compatible with the MiB production process. *See* Appx94480-94481. Compa-
nies cannot merely flip a switch and begin producing MiBs. *See* Appx94480.

In fact, almost all firms specialize in production of either MiB or FPM mat-
tresses. Of the 53 U.S. producers submitting usable U.S. Producers' Questionnaire
responses, [  #  ] produce only MiBs, and [ # ] produce only FPMs (and [  #  ] more
produce 90 percent or more FPMs).[1] *See* Appx114520. Further, out of 53 responding
U.S. producers, only 12 produced both MiBs and FPMs. Appx114520;
Appx124195-124198. The Court of International Trade found that despite the Com-
mission's insistence that the domestic producers that produced both MiBs and FPMs
"represented a majority of domestic boxed mattress production in 2019", they in fact

---

[1]  The compilation chart appearing at Appx114520 omits producers [name] (which
makes exclusively MiBs) and [ name ] (which makes exclusively FPMs). *See*
Appx124195-124198.

CONFIDENTIAL INFORMATION REDACTED

represent "less than a quarter" of such production when, as described further below, the data are analyzed fairly. Appx027. In fact, the top producers of each product have little if any production of the other product. With respect to manufacturers of MiBs, "*all three* of the largest domestic boxed mattress producers manufactured no flat-packed mattresses." Appx026. Conversely, each of the "three largest domestic producers of flat-packed mattresses" produced only a "[description]" volume of MiBs, with their "market share in flat-packed mattresses . . . at least [ # ] times greater than its share of the domestic boxed mattress market." Appx028-029. *See also* Appx124195-124198.

### 3. Purchasers of boxed mattresses and flat-packed mattresses are specialized and have distinct preferences between mattress types.

Consumer preferences for one style of mattress or the other are also articulated at the wholesaler level, when retailers—be they online, brick and mortar, or omni-channel[2]—place their orders for products. Even if their customers have the ability to choose between an MiB and an FPM, retailers have already committed to one of the two types, and the data demonstrate significant bifurcation in wholesale purchasing decisions. "Eight of the nineteen purchasers buy only one kind of mattress packag-

---

[2] An "omni-channel" retailer sells through both brick and mortar and online channels. Appx10378.

CONFIDENTIAL INFORMATION REDACTED

ing; and eight of the remaining eleven wholesale mattress purchasers are highly specialized." Appx031. For instance, "[ name ] purchases one type of mattress more than another at nearly a 10-to-1 ratio"; "[ name ] at a 15-to-1 ratio"; "[ name ] at a 50-to-1 ratio"; "[name] at a 13-to-1 ratio"; "[ name ] at a 62-to-1 ratio"; and "[ name ] at a 6.5-to-1 ratio." Appx031. *See also* Appx115148. Amazon is perhaps the best example. Amazon has a very specific set of requirements—a "physical profile"—for which its distribution is optimized. Appx12400. MiBs fit that profile, and FPMs do not. To a purchaser like Amazon, MiBs and FPMs are not remotely competitive, even though its customer may be comparing an MiB on Amazon with an FPM at Mattress Firm. The Commission ignored this evidence in concluding that "{c}onsumer indifference toward mattress packaging is reflected in purchasing behavior at the wholesale level." Appx124009. Further, as the Court of International Trade recognized, the preference for MiBs is not limited to Amazon. Indeed, "{s}ixteen of nineteen wholesale purchasers either purchase only one kind of mattress packaging or purchase overwhelmingly one kind of packaging." Appx032 (commenting that "{n}o reasonable person could review this data and determine that it shows wholesaler purchasers are 'indifferent' to packaging.")

In concluding simply that "MiBs and FPMs are also functionally interchangeable once unpackaged", (Appx124084), the Commission likewise ignored substantial evidence of benefits to consumers, which are myriad. Consumers are allowed to

avoid in-store sales pitches in favor of valuable peer-to-peer reviews. *See* Appx94543. A plurality of purchasers indicated that the ability to ship via common carrier was a "very important" purchase factor. Appx124180. Given these benefits, it is "{n}o surprise that 71 {percent} of consumers between 18 and 35 years old prefer to buy online." Appx114232. Indeed, Petitioners themselves admitted the fact that individual customers prefer one format to the other, despite their argument that MiBs and FPMs are entirely and completely fungible with each other. *See* Appx12251-12252 (Corsicana Bedding LLC's Vice President testifying that "{d}ifferent end user consumers have different expectations for their mattresses. Some prefer to buy a mattress that is packaged and delivered to their doorstep as an MiB. Others will always prefer full white-glove delivery of a flat mattress into their bedroom and removal of their old mattress."); *see also* Appx12309 (Petitioners' counsel arguing that "{s}ome people want it to be in a box, either the consumer themselves or the retailer. Some don't."). Indeed, Petitioners also recognize that companies like Casper, Leesa, and Tuft & Needle have spent millions *specifically to promote MiBs* in order to generate more customer demand in that segment of the market. Appx12225-12226 (argument of Petitioners' counsel); *see also* Appx12356 (testimony of Ashley Furniture Industries' Vice President). The Petitioners themselves specifically advertise MiBs as a feature for their consumers, an unnecessary advertising expense for a mere packaging distinction. Appx114394-114396.

CONFIDENTIAL INFORMATION REDACTED

**B.     Subject imports have not had adverse effects on U.S. producers, including U.S. producers who exclusively manufacture boxed mattresses.**

U.S. producers focused in the MiB market segment and competing most directly with subject imports showed strong and significant improvements by increasing production, shipments, market share, and profitability for domestically-produced MiBs.

Overall apparent U.S. consumption of mattresses increased over the period of investigation by [ # ] percent from 2017 to 2019 and by a further [ # ] percent across the interim periods. Appx124461-124463. The Commission observed that "FPMs accounted for a larger share of apparent U.S. consumption than MiBs." Appx124002. However, the increase in overall consumption was entirely driven by strong growth in consumption of MiBs, which increased by [ # ] percent from 2017 to 2019, and by a further [ # ] percent in the interim periods. Appx124263. The growth in MiBs was obscured by a decline in consumption of FPMs, which fell by [ # ] percent from 2017 to 2019, before falling by [ # ] percent across the interim periods. Appx124267. Indeed, by interim 2020 the change in market preference is evident, with MiBs reaching [ # ] percent of total mattress consumption (up from [ # ] percent in 2017) and FPMs falling to [ # ] percent (down from [ # ] percent in 2017.) Appx124265, Appx124269.

**CONFIDENTIAL INFORMATION REDACTED**

The cumulative performance of the U.S. mattress industry camouflages the robust performance of the growing domestic MiB segment, reflecting instead the poor performance of the larger domestic share of FPM producers losing out to the paradigm shift towards MiBs. In 2017, U.S. producers' U.S. shipments were 8.8 percent MiB and 91.2 percent FPM, and by interim 2020 were 23.6 percent MiB and 76.4 percent FPM. Appx124263, Appx124267. As such, the apparent [ # ] percentage point decline in U.S. producers' share of the total U.S. mattress market between 2017 and interim 2020 (Appx124461-124463) is in fact a tale of two trends: an [ # ] percentage point *increase* in market share by U.S.-produced MiBs and a [ # ] percentage point *decrease* by U.S.-produced FPMs, as that segment declined as a share of total consumption. Appx124265, Appx124269. Indeed, the Commission reported that "U.S. production of MiBs increased by 133.2 percent from 2017 to 2019, while U.S. production of FPMs declined by 16.1 percent over the same period." Appx124210. Thus, despite increases in subject import volume during the period of investigation, those volumes did not prevent U.S. producers from gaining share in the burgeoning MiB market. Therefore, the volume and market share of subject imports were not significant and did not produce any adverse effects in the MiB segment of the mattress market, which is the only market segment in which there is a meaningful competitive overlap with the domestic industry.

**CONFIDENTIAL INFORMATION REDACTED**

U.S. producers have significantly increased MiB capacity and production since 2017. As detailed in Table 1 below, the absolute increases in U.S. MiB capacity and production mirror the reductions in FPM capacity and production over the same periods. This shows that the domestic industry responded to shifts in market demand away from FPMs toward MiBs by reorienting its production to serve the MiB market segment.

**Table 1: U.S. Producers' Shift in Production from FPMs to MiBs**

|  | 2017-2019 Change in: | | PY 2019-PY 2020 Change in: | |
|---|---|---|---|---|
|  | **Units** | **Percentage** | **Units** | **Percentage** |
| **MiB** |  |  |  |  |
| Capacity | 3,408,513 | 121.2 | 2,126,803 | 48.6 |
| Production | 2,141,716 | 133.2 | 405,372 | 14.3 |
| **FPM** |  |  |  |  |
| Capacity | -3,417,473 | -15.1 | -1,559,727 | -10.5 |
| Production | -2,823,056 | -16.1 | -427,289 | -3.8 |

*See* Appx124211.

MiB production now represents a sizeable portion of total U.S. production and nearly [size] of apparent U.S. consumption overall. Appx124265. Between 2017 and 2019, U.S. producers' MiB production grew by over 2 million units. Appx124263. In terms of absolute volume, U.S. shipments of MiBs more than doubled during the full years of the period of investigation, and increased by a further 19.6 percent between the interim periods. Appx124263. MiBs grew from representing 8.4 percent of the domestic industry's production at the beginning of the POI to 20.3 percent of

CONFIDENTIAL INFORMATION REDACTED

all U.S. mattress production in 2019 and 22.9 percent in part-year 2020. Appx124211. Domestic producers' share of the MiB market segment also [action] from [ # ] percent in 2017 to [ # ] percent in interim 2020. Appx124263. In other words, as a share of apparent U.S. consumption of MiBs, U.S. producers [action # ] percentage points between 2017 and interim 2020. Domestic producers' 119.9 percent growth in MiB shipments from 2017 to 2019 far outpaced the growth in U.S. shipments of subject imports to the MiB segment, which registered 53.9 percent growth during the POI. Appx124263. Simultaneously, U.S. producers maintained their near-exclusive hold on the FPM market segment, with a market share of [ # ] percent in 2017 and [ # ] percent in interim 2020. Appx124267.

The domestic industry has made these inroads into the MiB sector through significant investment. The questionnaire responses gathered by the Commission in the final phase describe notable changes in operations. *See* Appx124202-124206. Public information likewise reveals additional investment in production facilities in the MiB segment and other adjustments to operations to account for the market shift to MiBs:

- Corsicana invested $22 million in a new, 376,000 sq. ft. headquarters and manufacturing center. Appx114479-114480.

- Corsicana invested $8.6 Million in a new Indiana MiB production facility. Appx114483-114484.

- Purple invested in a new MiB production facility in Georgia. Appx114475-114477; *see also* Appx114486-114487.

17

- MLILY USA opened a 650,000-square-foot facility in December 2019 and expanded production to more than 6,000 units per day in 2020. Appx114489-114490.

- Bedding Industries of America scheduled opening a new 80,000-square-foot manufacturing facility. Appx114501-114503.

- Brooklyn Bedding invested more than $72 million to expand its U.S. manufacturing footprint with a new MiB factory located in Arizona. Appx114510-114511.

- Zinus announced plans to build a new production facility in McDonough, Georgia. Appx114513-114514.

- President of Diamond Mattress Shawn Pennington stated: "we increased our boxed bed product offering to enable more e-commerce and to ship nationwide." Appx114426.

- CEO of Englander, Kevin Toman stated: "We're also enhancing our ability to serve the retailers with bed-in-a-box programs and will strengthen our social media programs that have become important for brand awareness among consumers." Appx114469-114470.

This shift from FPMs to MiBs is not new. "In recent years, including since 2017, the mattress market has seen an increase in the popularity of mattresses sold via e-commerce, particularly mattresses-in-a-box ('MiBs')." Appx124147. Multiple firms have confirmed "a continuing trend away from innerspring mattresses and toward {non-innerspring, hybrid, and MiB mattresses}, especially those sold online." Appx124173. "A majority of purchasers reported a decrease in demand for innerspring mattresses and an increase in most other types of mattresses (except FPMs)." Appx124171. Compared to FPMs, producers cited that the growth in MiBs "stem{s}

from the ease with which suppliers can store, package and ship such mattresses."
Appx124173. Other factors such as continued increase of direct-to-consumer sales,
advertising of MiBs, consumer acceptance of e-commerce, digital sales and market-
ing and variety of brands also contributed to the shift from FPMs to MiBs.
Appx124149.

Responses from U.S. producers to the Commission's questionnaires further
confirmed that the demand for MiBs is here to stay. A U.S. producer stated that MiBs
sold over the internet are already accounting for an increasing share of all mattresses
sold and that consumers have become more comfortable making internet purchases.
Appx124173. Likewise, as CEO of Culp Home Fashions, Sandy Brown, stated, "We
continue to see favorable growth trends in our sewn mattress cover business, with
current and expected demand exceeding pre-Covid-19 levels. *This demand is pri-
marily driven by the ongoing growth in the boxed bedding space*." Appx114442
(emphasis added).

In other words, domestic MiB producers are successfully competing with im-
ported MiBs, while FPM producers are failing to keep up with either. Domestic pro-
ducers engaged in MiB production have experienced robust sales growth and finan-
cial performance, while domestic FPM producers' sales and financial performance
languished during the period of investigation. The shift from FPM to MiB is an in-
dustry paradigm change of speed and impact rarely observed by the Commission

that disproportionately affected domestic producers wedded to FPM production, resulting in apparent declines having nothing to do with subject imports.

## SUMMARY OF THE ARGUMENT

The Commission's affirmative injury determination, and the Court of International Trade's affirmance of that determination, are both premised on a failure to recognize significant segmentation within the mattress market. *See* Appx124111 (Commission stating "we base our impact analysis entirely on the domestic industry as a whole"). The Commission's determination was therefore unsupported by substantial evidence and not in accordance with law, and the Court of International Trade erred when it strained to find an alternative basis to affirm it.

The U.S. mattress industry and the U.S. mattress market are split into two segments – one segment focusing on mattresses-in-a-box ("MiBs") and one focused on flat-packed mattresses ("FPMs"). Competition between these two segments is highly attenuated, and the MiB segment has experienced impressive market growth during the period of investigation ("POI") while the FPM segment is in decline. MiBs are mattresses of any size or type (*e.g.*, foam, innerspring or hybrid) that are compressed, rolled, and placed into a box after production, and FPMs constitute the remainder. The segment of the U.S. industry producing MiBs is the segment of the industry in greatest competition with subject imports yet is also the segment of the industry with the strongest financial performance. It is indisputable that the MiB

segment of the market is growing and the domestic industry is increasing its share of that segment. By contrast, the FPM segment is experiencing contraction in terms of production capacity, production and shipments. But this downturn was not caused by subject imports, since they are nearly absent from the FPM segment; rather, this downturn has occurred because FPMs are falling out of favor with U.S. consumers. Because the FPM segment is relatively larger than the MiB segment, its contraction has a disproportionate negative impact on the entire U.S. industry. When the industry and the market are analyzed on a segmented basis, however, the conclusion is clear: subject imports did not injure the domestic industry.

Nonetheless, the Commission largely failed to address CVB's arguments on market segmentation and attenuated competition. To the extent the Commission considered these arguments at all, its conclusions were not supported by substantial evidence, lacked a rational connection to the facts in the record, were divorced from the inferences fairly demanded by the facts, and were otherwise not in accordance with law. In fact, as the Court of International Trade found, the Commission did not just ignore or overlook relevant evidence. It engaged in what the Court of International Trade described as "legerdemain" to actively avoid a finding of market segmentation that necessarily would have resulted in a negative injury determination. Appx443.

The "mathematical obfuscation and statistical chicanery" that the Court of International Trade recognized in the Commission's determination should have resulted in a remand. *See* Appx024. Instead, the Court of International Trade relied on the Commission's cursory finding that domestic MiB manufacturers were harmed by Subject Imports. That finding—comprising four pages at the end of the 73-page Views—was an afterthought by the Commission. *See* Appx124035-Appx124039. Because it was not supported by substantial evidence and not in accordance with law, it was not sufficient to justify the Commission's determination. Accordingly, this Court should reverse the decision of the Court of International Trade and remand to the Commission.

## ARGUMENT

## I.    Legal Standard and Standard of Review

In the final phase of antidumping and countervailing duty investigations, the Commission must determine whether an industry in the United States is materially injured or threatened with material injury "by reason of" the subject imports. *See* 19 U.S.C. §§ 1671d(b)(1), 1673d(b). "'{M}aterial injury' means harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A). In making this determination, the Commission must consider the volume of subject imports, their effect on prices for the domestic like product, and their impact on domestic producers of the domestic like product. *See* 19 U.S.C. § 1677(7)(B). Additionally, the Commission must "evaluate all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). Such economic factors might include changes in demand, consumer tastes, non-subject imports, or management decisions by domestic producers. The Commission must "explain its analysis of each factor," as well as "such other economic factors as are relevant to the determination." *See* 19 U.S.C. § 1677(7)(B)(ii).

Material injury to the domestic industry must be "by reason of the subject imports." *See* 19 U.S.C. §§ 1671d(b)(1), 1673d(b). That is, there must be a causal link between the subject imports and the material injury. The Commission "must

examine other factors to ensure that it is not attributing injury from other sources to the subject imports." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, at 851-52 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4184-85 ("SAA")); *accord* S. Rep. 96-249 at 75 (1979); H.R. Rep. 96-317 at 47; *Mittal Steel Point Lisas Ltd. v. United States,* 542 F.3d 867, 877 (Fed. Cir. 2008); *Taiwan Semiconductors Indus. Ass'n v. Int'l Trade Comm'n*, 266 F.3d 1339, 1345 (Fed. Cir. 2001). The statute directs the Commission to include in a final determination of injury an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties. 19 U.S.C. § 1677f(i)(3)(B).

In turn, the Court of International Trade ("CIT") reviews the Commission's determinations in antidumping duty proceedings to determine whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The "substantial evidence" standard requires more than "a mere scintilla" of evidence, *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), but is satisfied by "something less than the weight of the evidence," *Luoyang Bearing Factory v. United States*, 288 F. Supp. 2d 1369, 1370 (Ct. Int'l Trade 2003) (quoting *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966)). It is such evidence that "a reasonable mind might accept as adequate to support a conclusion." *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir.

1997) (quoting *Consol. Edison Co.*, 305 U.S. at 229). Where the Commission's find-

ings are not supported by substantial evidence, the CIT will remand the case to the

Commission for reconsideration. *See Chung Ling Co., Ltd. v. United States*, 805 F.

Supp. 45, 50, 54 (Ct. Int'l Trade 1992).

This Court reviews the CIT's "evaluation of the Commission's factual deter-

minations 'by stepping into the shoes of the Court and duplicating its review, eval-

uating whether Commission determinations are unsupported by substantial evidence

or otherwise not in accordance with law.'" *Altx, Inc. v. United States*, 370 F.3d 1108,

1116 (Fed. Cir. 2004) (quoting *Allegheny Ludlum Corp. v. United States*, 287 F.3d

1365, 1370 (Fed. Cir. 2002)).

## II. The Commission ignored and manipulated the evidence in determining that the U.S. Market is not sharply segmented and that competition between the MiB and FPM segments is not highly attenuated.

The Commission erred as a matter of law in failing to consider alternative

methods of analyzing subject imports, in particular, by distinguishing between the

MiB and FPM market segments. The Commission fundamentally erred in finding

that "subject imports of MiBs competed with domestically produced FPMs" without

recognizing that any competition is highly attenuated. Appx124007.

As described above, competition is now split, with domestic and imported

MiBs competing against each other in the MiB segment, and domestic FPM manu-

facturers having the (diminishing) U.S. FPM segment more or less to themselves.

Competition between subject imports and the domestic like product is therefore highly attenuated. *See Blast Furnace Coke from China and Japan*, Inv. Nos. 731-TA-951-952, USITC Pub. 3619 at 3 (Aug. 2003) (Prelim.) (Remand), *aff'd* by *Comm. for Fair Coke Trade v. United States*, 28 C.I.T. 1140 (Ct. Int'l Trade 2004) (holding that "{a}ttenuated competition does not refer to a lack of direct competition between subject imports and the domestic product. Rather, attenuated competition indicates competition that has reduced force or effect.").

The Commission improperly ignored and manipulated record evidence that clearly demonstrated that MiBs and FPMs are segmented in relevant aspects of the mattress industry, including that MiBs and FPMs are designed and engineered differently and that FPM producers cannot quickly and easily shift to MiB production. Consequently, mattress producers significantly focus on either one type of product or the other. The Commission also erred in failing to consider record evidence showing that purchasers prefer one format to the other, which makes it clear that the differences between MiBs and FPMs go beyond packaging. As explained above, the record in this case draws but one logical conclusion: that the U.S. mattress industry and the U.S. mattress market are split into the MiB and FPM segments, and that competition between these segments is highly attenuated.

It is not just CVB's view that the Commission's determination is unsupported by substantial evidence. The CIT reached the same conclusion. Judge Vaden expressly found that "{f}or much of its Views, the Commission employed mathematical obfuscation and statistical chicanery to make the mattress industry appear less segmented than it is." Appx024. Judge Vaden focused on three aspects of the "Commission's unfortunate attempt to paint a perfect picture of an unsegmented market" (Appx025): (1) producer specialization statistics, (2) consumer specialization statistics, and (3) the Commission's analysis of purchaser surveys. Each of those aspects of the Commission's Views is discussed below, with an explanation of the errors that Judge Vaden correctly found as well as why, absent the Commission's data manipulation, the evidence clearly demonstrates market segmentation.

### A. The Commission manipulated data to minimize the specialization that exists between domestic producers of FPMs and MiBs.

As the Court of International Trade found, "{t}he Commission's first error is its analysis of producer specialization." Appx025. At the heart of its analysis were the Commission's findings that (1) "two of the three largest domestic producers of boxed mattresses produced no flat-packed mattresses"; (2) "the three largest producers of flat-packed mattresses also produced boxed mattresses"; and (3) that "{n}early a quarter (12) of responding domestic producers produced both flat-packed mat-

tresses and boxed mattresses in 2019." Appx025-026 (quoting Appx124080). How-

ever, as the Court of International Trade recognized, those findings are based on

manipulation and selective examination of the data.

First, the Commission's findings that "two of the three largest domestic pro-

ducers of boxed mattresses produced no flat-packed mattresses" and that "the twelve

producers that produced both kinds of mattresses represented a majority of domestic

boxed mattress production in 2019" are based on a "statistical gimmick." Appx026-

027. That is because "{t}hroughout the Views, the Commission treated" two pairs

of domestic producers, which had merged, "as four separate companies." Appx025.

But in "its analysis of producer specialization, it treated the producers that merged

as two companies instead of four; and it gave no explanation for making the change."

Appx025. The effect was to give "the impression that more domestic producers man-

ufacture both boxed and flat-packed mattresses." Appx025.

In fact, if the Commission had treated the companies at issue as separate en-

tities, it is immediately obvious that "*all three* of the largest domestic boxed mattress

producers manufactured no flat-packed mattresses in 2019." Appx026 (emphasis in

original). The Commission's "statistical gimmick" also underlies its finding that "the

twelve producers that produced both kinds of mattresses represented a majority of

domestic boxed mattress production in 2019." Appx027. In fact, if the producers are

treated consistently throughout the Commission's analysis, those producers that

manufacture both FPMs and MiBs manufacture "less than a quarter" of domestic MiB production in 2019. Appx027.

Second, the Commission's finding "that the three largest domestic producers of flat-packed mattresses also produced boxed mattresses" is based on a selective review of the data. Appx028. Although it is "strictly true", that finding "fails to tell the whole story" because "{a}lthough the three companies produced both boxed and flat-packed mattresses, each produced multiples more flat-packed mattresses." Appx028. Ultimately, "{t}he Commission's statement that the three largest domestic producers of flat-packed mattresses also produced boxed mattresses obscured the fact that their boxed mattress production was [description]." Appx028-029. As such, the Commission "failed" to "draw from the evidence all inferences the evidence reasonably demands, not just those that are convenient{,}" as it was required to do. Appx029 (citing *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378 (1998)).

Third, in finding that "{n}early a quarter (12) of responding domestic producers produced both flat-packed mattresses and boxed mattresses in 2019, with these producers accounting for a majority of boxed mattress production that year", the Commission ignored the actual numbers of mattresses produced by these companies and painted a misleading picture of the market. Appx029. In reality, "{o}f the twelve companies that produced both mattress types in 2019, five produced virtually none

of one kind"; "{o}f the remaining seven domestic manufacturers, four have stark production differences{,}"; and of the "remaining three companies" only one had a relatively "balanced" ratio of MiB to FPM production. Appx029.

Indeed, as the Court of International Trade observed during the hearing, "if you look through every purchaser that {the Commission} looked at, there are only two … that had anything close to parity in their purchases of mattresses in a box and flat-pack mattresses." Appx444. Beyond these two purchasers, every other purchaser's ratio, "were verging on the comical." Appx445. "{T}he Commission failed to provide necessary context by drawing all those inferences fairly demanded by the evidence." Appx030. "Because the Commission opportunistically combined production figures only when it found it useful to avoid CVB's market segmentation objections, the Commission has failed to support its findings on producer specialization with substantial evidence." Appx030.

### B. The Commission ignored evidence establishing significant specialization among purchasers of FPMs and MiBs and purchaser preferences for either FPMs or MiBs.

Just as it selectively considered data to support its preferred view of producer specialization, the Commission also "ignored or failed to provide important context in its analysis of purchaser specialization" and thereby "gave the false impression that purchasers are indifferent about mattress packaging." Appx030.

30

**CONFIDENTIAL INFORMATION REDACTED**

The Commission started with the finding that "eleven of nineteen responding purchasers reported purchasing and/or importing both boxed and flat-packed mattresses." Appx031. However, as with its findings on producer specialization, this technically-true statistic paints a false picture. The fact that *some* brick and mortar stores sell *some* MiBs, and *some* online retailers sell *some* FPMs, does not change the fact that there is significant polarization in those sales channels. Appx031. As described above, in fact, "{t}he data demonstrate significant bifurcation in wholesale purchasing decisions." Appx031. That is well-illustrated by a seller like [name

]. Although [ name ] sold both MiBs and FPMs during the period of investigation, it purchased MiBs and FPMs "at a 15-to-1 ratio." Appx031. [ name's ] negligible purchases of FPMs only serves to illustrate the degree of polarization in the market, and the same is true with other significant wholesalers. Appx031. Moreover, the share of subject imports, which the Commission concedes were predominantly MiBs, that were sold to brick and mortar retailers was only 14.8 percent to 20.0 percent of total shipments during the POI. *See* Appx251.

The Court of International Trade was therefore correct to find that "{t}he data demonstrate significant bifurcation in wholesale purchasing decisions" with eight of nineteen purchasers buying only one kind of mattress packaging and eight of the remaining eleven being highly specialized. Appx031. As the Court put it, "{n}o rea-

sonable person could review this data and determine that it shows wholesale pur-

chasers are 'indifferent' to packaging." Appx032. The Commission's failure to

"acknowledge{} this data and provide{} its views . . . {was} error." Appx032.

### C.    The Commission was misleading in its discussion of survey data

Finally, the Court of International Trade correctly determined that "the Com-

mission ignored or failed to provide important context" in its analysis of purchaser

surveys. Appx033. In particular, the Commission found that "{a}lthough 11 pur-

chasers reported that packaging was very important to their purchasing decisions,

only two purchasers ranked packaging among the top three factors driving their pur-

chasing decisions, consistent with the large number of purchasers reporting pur-

chases of both boxed and flat-packed mattresses." Appx033 (quoting Appx124086).

It also asserted that "{a}lthough responding purchasers were free to rank 'Packaging

(i.e., boxed or flat packed mattresses)' among their top three purchasing factors, as

among the purchasing factors enumerated in the purchasers' questionnaire, only two

did so." Appx033 (quoting Appx124086).

However, as the Court of International Trade recognized, the Commission's

explanation falsely suggested "that the question involved ranking from a pre-se-

lected list", which it did not. Appx033. Moreover, the Court noted that the question-

naire responses "told a more nuanced story about what drove {purchasers'} deci-

sions." Appx033. In fact, the purchaser questionnaires—when considered in their

CONFIDENTIAL INFORMATION REDACTED

totality, as the Commission was required to do—reflect the importance that consumers place on packaging. Even respondents who did not identify "packaging" as one of their top factors revealed either through their narrative responses or their data that they considered packaging to be important. *See* Appx034.

The Commission's selective reliance on consumer survey data was similarly misleading. For instance, the Commission found that "sleep studies" suggest that packaging is relatively unimportant to consumers. Appx124085. However, with respect to the study cited by the Commission, the Commission ignores that the study indicated that [ # ] percent of consumers reported that a retailer's selling of a mattress in a box was a decision driver in their purchase, as well as the importance of other factors that are closely correlated with sales of MiBs. Appx114990.

As the CIT recognized, the Commission was required to "weigh *all* the evidence in the record—not just the evidence that supports its decision." Appx034 (emphasis in original). Therefore, "{i}t was error" and not in accordance with law for the Commission "to not examine this data on the record and explain what it meant for the Commission's ultimate decision." Appx034.

### D. The Commission's manipulation and disregard of evidence is fatal to its affirmative injury determination.

It necessarily follows from the Court of International Trade's analysis that the Commission's findings were unsupported by substantial evidence and not in accord-

ance with law. *See* Appx023 ("The Court first analyzes three sections of the Commission's Views that were not supported by substantial evidence."); Appx024 ("The Commission's Views contain errors{.}"); Appx030 ("The Commission must fairly analyze the data. *See Allentown Mack Sales & Serv.,* 522 U.S. at 378. Here, the evidence demanded acknowledgement that nearly every producer is highly specialized. The Commission's failure to do so was not merely 'inartful.' It misread the data in question."). Indeed, Judge Vaden's description of the Commission's Views is exactly how the Commission should not approach its task: The Commission's statistical summaries were "misleading"; the Commission "employed mathematical obfuscation and statistical chicanery"; its description of purchaser surveys "omitted important context"; and it "opportunistically combined production figures only when it found it useful", all in an "unfortunate attempt to paint a perfect picture of an unsegmented market." Appx020; Appx024; Appx025; Appx030. As Judge Vaden put it, "{t}he only thing the Commission has proven is the truth of the adage that '{t}here are three kinds of lies: Lies, Damned Lies, and Statistics.'" Appx035.

There is no way to square the Commission's approach with the requirement that its Views must include "an examination of the relevant data and a reasoned explanation supported by a stated connection between the facts found and the choice made." *U.S. Steel Grp. v. United States*, 162 F. Supp. 2d 676, 678 (Ct. Int'l Trade 2001) (quotation omitted); *see Bratsk Aluminum Smelter v. United States*, 444 F.3d

1369, 1375 (Fed. Cir. 2006) (vacating affirmative injury determination where "the Commission did not sufficiently explain . . . its causation analysis" and address the possibility "that the elimination of the subject imports from the domestic market might simply have increased the market share of the non-subject imports"); *Altx*, 370 F.3d at 1119-20 (criticizing the Commission for its "inconsistent weighing of subject and non-subject imports," its "failure to consider all relevant arguments," and its failure "to address the possible relationship between the bankruptcy of a large domestic producer . . . and the poor performance of the domestic industry"). The Commission "is not free to prescribe what inference from the evidence it will accept or reject, but must draw all those inferences that the evidence fairly demands." *Pohang Iron & Steel Co., Ltd. v. United States*, 23 C.I.T. 778, 1999 WL 970743, at *11 (Ct. Int'l Trade Oct. 20, 1999) (quoting *Allentown Mack*, 522 U.S. at 378). The Commission must address significant arguments and evidence which seriously undermine its reasoning and conclusions. *CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337, 1344 (Ct. Int'l Trade 2014) (quotation omitted); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (noting that an agency's "fail{ure} to consider an important aspect of the problem" is arbitrary and capricious).

The Commission's mandate to fairly consider all the record evidence is particularly important where, as here, there are other explanations for any adverse impact to the domestic industry. For instance, in *Outboard Engines from Japan*, there were alternative factors that accounted for adverse impacts to the domestic industry. *Outboard Engines from Japan*, Inv. No. 731-TA-1069, USITC Pub. 3752, 2005 WL 630159 (Feb. 2005) (Final). In particular, in *Outboard Engines*, demand for emissions-compliant two-stroke direct injection and four-stroke engines increased during the POI, and the demand for non-compliant two-stroke carbureted and two-stroke EFI engines, mainly produced by the domestic industry, decreased during the same period. 2005 WL 630159, at *8, *10-11. Although domestic industry did not fully keep up with overall consumption increases over the POI, the Commission found that imports did not have a significant effect on the domestic industry's performance because the growing demand for four-stroke engines was in fact the cause of the declines in financial performance of the domestic industry. *Id.* at *22-24. Thus, *Outboard Engines* makes clear that a decline in share for a domestic product (here, FPMs) is not necessarily a sign of injury by reason of subject imports (here, MiBs).

*Uncoated Groundwood Paper from Canada* is another example of a case in which alternative factors were the primary cause of harm to the domestic industry, as opposed to subject imports. *See generally* Inv. Nos. 701-TA-584, 731-TA-1382, USITC Pub. 4822, 2018 WL 5292180 (Sept. 2018). There, the Commission found

no material impact from subject imports because certain losses in market share were due to an inability of domestic producers to produce enough of the product to meet demand, not due to subject imports. *Id.* at 36-38. And although some share had been lost to imports, the Commission determined those losses were due to a shift in corporate strategy. *Id.* at 37. The Commission's failure to engage in an analysis similar to those it performed in *Outboard Engines* and *Uncoated Groundwood Paper* is fatal to its affirmative injury determination here.

To be sure, the errors that the Court of International Trade identified are not the only reasons that the Commission's determinations were unsupported by substantial evidence or contrary to the law. But they are enough to undermine the entire affirmative injury determination, because the lynchpin of that determination is that the market is not segmented between FPMs and MiBs. *See, e.g.*, Appx124035 ("There is no discrete segment of the domestic industry that produces only MiBs. . . {a}ccordingly. . . we base our impact analysis entirely on the domestic industry as a whole"). Where, as here, the Commission fails to carry out its duties properly or neglects to provide an adequate basis for its conclusions, the Court of International Trade is required to find the Commission's determination unlawful. *See Rhone-Poulenc, Inc. v. United States*, 927 F. Supp. 451, 454 (Ct. Int'l Trade 1996); *see also Anshan Iron & Steel Co., Ltd. v. United States*, 358 F. Supp. 2d 1236, 1239, 1243 (Ct. Int'l Trade 2004) (remanding for these reasons). That was clearly the case here,

and the Court of International Trade should have remanded. Rather than doing so, however, the Court found what it perceived as a basis to affirm the Commission's Views in a cursory explanation in the last pages of its report. That was error, as described next.

### III.   The Court of International Trade erred in affirming the Commission's affirmative injury determination on the basis of its cursory, alternative holding.

Despite its findings that the Commission manipulated data and relied on incomplete evidence, the Court of International Trade nevertheless affirmed. It did so based on the Commission's finding of injury to "the domestic boxed mattress industry as a distinct segment." Appx035. The Court's reliance on that abbreviated analysis—which comprised a mere four pages of the Commission's 73-page Views—is an implicit rejection of the bulk of the Commission's Views, which are predicated on competition between FPMs and MiBs. That left the Court to affirm the Commission's Views on the basis of what was really an afterthought. And, in fact, the Commission's brief, alternative finding of injury to domestic MiB manufacturers is unsupported by substantial evidence, not in accordance with law, and cannot justify the Commission's final affirmative injury determination. For that reason, the Commission's multiple errors, described above, were not "harmless" as the Court ultimately concluded.

A.    **The alternative holding ignores substantial evidence that demonstrates the health of domestic MiB production.**

The Court affirmed the Commission based entirely on its finding that subject imports injured domestic manufacturers of MiBs—despite the fact that "domestic boxed mattress manufacturers 'improved their performance' during the period of investigation"—because the Commission found that the "these manufacturers could have performed even better if not for the subject imports." Appx037 (citing Appx124111-Appx124114).

Indeed, the record evidence establishes that domestic manufacturers of MiBs are healthy and, as the Commission acknowledged, have improved their performance by most measures over the period of investigation. *See* Appx124035. As described above, to the extent U.S. producers' volume and market share appear to have declined over the POI, those losses were limited to the FPM segment, where market demand has been in decline for several years because of shifts in consumer preferences, not because of subject imports. In the MiB segment, U.S. producers increased production and shipments of MiBs during the period of investigation, gaining share over subject imports as a share of U.S. MiB consumption. Appx124036. To put it in simple terms, MiBs are growing as a segment of the overall mattress market (Appx124265), and U.S. producers are growing as a share of the MiB segment for the full year periods from 2017-2019. Appx124263.

In order to make a finding, supported by substantial evidence and in accordance with law, that the domestic MiB producers experienced material injury "by reason of" the subject imports, the Commission should have considered the factors set forth in Section 771 of the Tariff Act (19 U.S.C. § 1677(7)). Those include "(I) the volume of imports of the subject merchandise, (II) the effect of imports of that merchandise on prices in the United States for domestic like products, and (III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States." *Id*. § 1677(7)(B)(i). In evaluating "impact," the Commission is required by law to "evaluate all relevant economic factors which have a bearing on the state of the industry in the United States." *Id.* § 1677(7)(C)(iii). Economic factors that the Commission often considers include, *inter alia*: non-subject imports, changes in technology, demand or consumer tastes, competition among domestic producers, or management decisions by domestic producers. *See, e.g.*, *Wire Decking from China*, Inv. Nos. 701-TA-466, 731-TA-1162, USITC Pub. 4172, 2010 WL 4778779, at *8 (July 2010) (Final).

The Commission must consider all factors in rendering its decision regarding impact, and no one factor is dispositive. 19 U.S.C. §1677(7)(C)(iii). These factors include, but are not limited to:

CONFIDENTIAL INFORMATION REDACTED

> (I) actual and potential ___decline___ in output, sales, market share, gross profits, operating profits, net profits, ability to service debt, productivity, return on investments, return on assets, and utilization of capacity; (II) factors affecting domestic prices; (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment; (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product."

19 U.S.C. § 1677(7)(C)(iii)(I)-(IV) (emphasis added).

The Commission claimed that "the performance of domestic MiB producers would have been appreciably stronger" but for the "significant volume and increase in volume of low-priced subject imports that displaced domestic industry shipments from the U.S. market and depressed domestic like product prices to a significant degree, including the prices of MiB products." Appx124036. To support this claim, the Commission stated that "domestic sales prices still declined [ # ] percent for product 1, [ # ] percent for product 3, and [ # ] percent for product 5."[3] Appx124098. However, the Commission's calculations do not accurately reflect the price effects on MiB products for the majority of Subject Countries entering the market because, for all but China, there is virtually no pricing data until Q1 of 2019 at the earliest. Appx116051-116054; Appx116057-116061; Appx116063-116067. The only pricing data that predates Q1 of 2019 for the Subject Countries other than

---

[3] Products 1, 3, and 5 are mattresses shipped as a MiB.

CONFIDENTIAL INFORMATION REDACTED

China is imports of Product [#] from Vietnam in Q4 of 2018. However, the quantity of mattresses imported from Vietnam during that time period was [description]. Appx116051-116054. Any pricing data for domestic like products *before* Q1 of 2019 is thus irrelevant to demonstrate how domestic prices responded to increased quantities of imports from the Subject Countries other than China.[4] Recalibrating the calculation to evaluate prices for the domestic like product beginning in 2019 (when all Subject Countries other than China entered the market), the domestic MiB market experienced a price ***increase*** of [ # ]% for Product [#], an ***increase*** of [ # ]% for Product [#], and a much more [adjective] decrease of [ # ]% for Product [#] from Q1 2019 to Q3 2020. Appx116051-116054, Appx116057-116061, Appx116063-116067. Therefore, the evidence reflects that there was no "significant" depression of domestic MiB prices caused by imports from the Subject Countries.

Next, the Commission attempted to support its contention that the domestic MiB industry would have performed even better but for subject imports by citing to the domestic MiB producers' low capacity utilization rates over the POI. Appx124036. Domestic MiB producers' capacity utilization was 57.2 percent in

---

[4] It is necessary and appropriate to focus on the price effects of imports from the Subject Countries *other than* China because the adverse price effects of less than fair value imports from China have already been remedied by the imposition of anti-dumping duties on mattresses from China that went into effect on December 16, 2019. Appx115901-Appx115902.

2017, 62.0 percent in 2018, 60.3 percent in 2019, 64.7 percent in interim 2019, and 49.8 percent in interim 2020. Appx124036. Although the Commission acknowledged in passing in a footnote that the domestic MiB producers' reduced rate of capacity utilization in interim 2020 partly reflects raw material shortages, the Commission did not properly take into account the full context of domestic production operations when considering the capacity utilization rates, as discussed below. Appx124036. According to the Commission, the unused capacity is evidence that but for subject import competition, domestic MiB producers could have increased their U.S. shipments and market share *more* than they did during the POI. Appx124037.

Of all the factors that the Commission must analyze in rendering its decision regarding impact, only capacity utilization actually declined; and again, the Commission acknowledged that the domestic MiB producers' reduced rate of capacity utilization in interim 2020 reflects raw material shortages. *See* 19 U.S.C. §1677(7)(C)(iii) (listing factors). The Commission supported its reliance on these low capacity utilization rates by noting that the rates "remained low both in absolute terms and relative to domestic FPM producers throughout the period of investigation." Appx124036. The Commission, however, improperly ignored the full "context of production operations within the United States" when focusing on these capacity utilization rates. 19 U.S.C. §1677(7)(B)(i)(III).

CONFIDENTIAL INFORMATION REDACTED

The record evidence provides relevant details regarding the full context of domestic production operations, and explains:

> The domestic industry made substantial investments to expand its capacity to produce MiBs during the period of investigation, increasing such capacity by 121.2 percent between 2017 and 2019 and by another 48.6 percent in interim 2020 compared to interim 2019. At the same time, the industry's capacity to produce FPMs declined by a similar quantity.

Appx124005. Thus, in the same period from 2017 to 2019 where domestic MiB producers increased their capacity by 121.2 percent; their capacity utilization not only kept pace with this rapid growth, but also increased by an additional 5.4 percent (from 57.2 percent in 2017 to 60.3 percent in 2019). Appx124036. On the other hand, when this growth is compared to FPM producers' capacity utilization, which remained essentially stable despite *decreasing* capacity in this same period, *see* Appx124211, this is not evidence of injury to MiB producers, but rather evidence of the MiB segment's strength.

Further, in this same period, "{a}pparent U.S. consumption of MiBs increased [ # ] percent between 2017 and 2019 and was [ # ] percent higher in interim 2020 compared to interim 2019." Appx124078. In this time of growth, U.S. producers' share of combined U.S. MiB shipments increased by [ # ] percent from 2017 to 2019. Appx124262. Meanwhile, the share of MiB shipments held by imports from all Subject Countries combined declined by [ # ] percent from 2017 to 2019. Appx124262. Therefore, when the full context of production operations within the

United States is considered — as it must be — the allegedly injuriously low capacity utilization rates of the domestic MiB industry are not indicative of injury by reason of subject imports; rather, they reflect the rapid expansion of the MiB segment of the market.

The Commission also ignored factors other than subject imports that explain the capacity utilization rates. For instance, the record reflects that seven importers "indicated that subject imports … were superior to product from the United States, describing imported mattresses as superior to U.S. mattresses in terms of quality, design, packaging, durability, reliability, and/or communication." Appx124189. In addition, the Commission did not sufficiently consider the impact of raw material shortages. The volume of domestic MiB shipments would have been even greater but for supply-related factors. First, U.S. producers experienced substantial foam shortages throughout the period of investigation, which affected their ability to produce MiBs in particular. Appx115065-115066, Appx115079-115084, Appx115092-115093. In interim 2020, 17 U.S. producers indicated supply constraints linked to the pandemic (Appx124163), with leading U.S. MiB producers reporting reduced production in interim 2020 either because of local regulations, a lack of adequate raw materials, a repurposing of their production facilities toward PPE materials, or a combination thereof. Appx124477-124480. These factors adversely affected the

domestic industry's ability to take even greater advantage of the growth in MiB demand during the period of investigation, and to increase its shipment volume even more than it did. And, domestic producers had even greater difficulties with severe weather in Texas that further hampered their ability to produce product in a timely manner. *See*, *e.g.*, Appx12237-12238 (testimony of Karl Glassman, Chairman and CEO of Leggett & Platt); Appx12245 (testimony of John Mervin, CEO of Brooklyn Bedding). None of these supply-related difficulties can be laid at the feet of subject imports.

Domestic MiB producers likely would have increased their volumes even more than they did if not for these supply constraints on raw materials. The Commission was mistaken when it attributed the domestic industry's inability to capitalize on strong demand growth to an increase in low-priced subject imports, *see* Appx124100, when in fact, the raw material shortage was the culprit for such an inability to capitalize. Foam is a critical component of mattress construction, and although foam capacity was abundant in the domestic industry, the chemicals that would be necessary in order to actually produce foam were in short supply. Appx12458 (Jim Dougan, respondents' economist, noting there was "plenty of foam capacity" but domestic producers "weren't able to get the chemicals"); Appx12395 (Dougan analogizing restrictions on raw material inputs to an automobile: "…{T}hat's a little bit like saying, you know, I have no constraint on how far I can

46

drive because I have a 15-gallon tank, but if I can't get gas, that's irrelevant."). With these other factors in mind, and noting that "the high variable cost nature of mattress production would enable domestic producers to operate at rates of capacity utilization that would be considered low in other industries," the capacity utilization rates alone are not substantial evidence that the domestic MiB industry was injured by reason of subject imports. Appx124037.

The remainder of the Commission's cursory, four-page determination regarding the MiB segment is likewise unsupported by substantial evidence. The Commission attempts to downplay the strength of the domestic MiB producers' performance by countering the fact that "the domestic industry increased its share of apparent U.S. consumption of MiBs during the period of investigation" with an observation that "subject imports of MiBs increased their share of *overall* apparent U.S. consumption by more than domestically produced MiBs during the period." Appx124113 (emphasis added). This abrupt shift from the universe of MiBs only to a comparison with *overall* mattress consumption is inappropriate and misleading in a section of the analysis that purports to address the MiB segment alone, not the domestic industry as a whole. Otherwise, the Commission supports its finding with conclusory statements such as, "domestic producers of MiBs could have had greater sales revenues and operating and net income than they did during the period of investigation but for subject import competition." Appx124113-Appx124114. The

Commission attempts to support this conclusion with a footnote that again concedes the growth and strength of the MiB segment during the POI. Appx124114.

For the reasons stated above, the Commission's alleged "alternative holding," covering a mere four pages, is not supported by substantial evidence and is not in accordance with law.

### B.    The Commissions' alternative holding does not allow its errors to be dismissed as harmless.

Although the Court of International Trade recognized the Commission's serious errors, it dismissed them as harmless and affirmed on that basis. That was a misapplication of the doctrine of harmless error, and the Court erred by affirming on that basis.

"{W}hen a court hears a challenge to an agency action, 'due account shall be taken of the rule of prejudicial error.'" *Suntec Indus. Co., Ltd. v. United States*, 857 F.3d 1363, 1368 (Fed. Cir. 2017) (quoting 5 U.S.C. § 706). "The Supreme Court has held that the Section 706 'rule of prejudicial error' command requires application of a traditional harmless-error analysis and that the person seeking relief from the error has the burden of showing prejudice caused by the error." *Id.* (citing *Shinseki v. Sanders*, 556 U.S. 396, 406, 409 (2009)). Prejudice in this context "means injury to an interest that the statute, regulation, or rule in question was designed to protect." *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1383-85 (Fed. Cir. 2017) (quoting *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 396 (Fed. Cir. 1996)).

The burden of showing prejudice does not impose "a particularly onerous requirement." *Shinseki*, 556 U.S. at 410. "Often the circumstances of the case will make clear to the appellate judge" that an error was prejudicial, "and nothing further need be said." *Id.* "{I}f one cannot say, with fair assurance . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected," and the harmless error doctrine should not be applied. *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946).

Accordingly, the harmless error doctrine properly applies to mere technical defects that have no bearing on the outcome, but it does not apply to situations where the outcome would have been different but for the error. *Compare SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1359-60 (Fed. Cir. 2020) (finding that any mathematical error in Department of Commerce's use of certain data to calculate antidumping duty rates was harmless because "the effect of the alleged error was so small as to be negligible" and it "had essentially no impact on {the party's} antidumping duty rate"), *with United States v. Nat'l Semiconductor Corp.*, 496 F.3d 1354, 1361 (Fed. Cir. 2007) (holding that error was not harmless where the Court of International Trade erroneously awarded compensatory interest to government because this significant "error was based upon a misapplication of the law and resulted in an award to the government in excess of that authorized by . . . statute"), *and* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2883

(3d ed. June 2024) ("{E}rrors that are more than mere technicalities and that affect a substantial right" render "the judgment below . . . suspect" such "that 'unless the appellate court believes it highly probable that the error did not affect the judgment, it should reverse.'") (quoting Roger J. Traynor, *The Riddle of Harmless Error* 35 (1970)).

The Commission's errors identified by the Court of International Trade and discussed in Section II, above, are not harmless "technical" errors. To the contrary, (1) they undermined the Commission's finding that the mattress market is not segmented, which formed the basis nearly all of its Views; and (2) the Commission's alternative observations about domestic boxed mattress manufacturers were unsupported by substantial evidence, as described in Section III.A above. That left no basis for the Commission's affirmative injury determination. As such, the Commission's errors impaired CVB's interest(s) "that the statute, regulation, or rule in question was designed to protect." *Intercargo*, 83 F.3d at 396; *see also Mid Continent Nail Corp.*, 846 F.3d at 1383-85 (discussing *Intercargo* and holding that the Department of Commerce's "failure to comply with the {notice-and-comment requirements of the} APA was not a mere technical defect" constituting harmless error). Specifically, the relevant statutes at issue are designed to protect CVB's interest in a final determination that fairly addresses relevant arguments made by CVB and evaluates all

relevant economic factors within the mattress industry. *See* 19 U.S.C. § 1677f(i)(3)(B); 19 U.S.C. § 1677(7)(C)(iii).

The Commission's failure to adequately acknowledge both the evidence in favor of and against a negative injury determination is the same type of error that required remand to the Commission in *Nevinnomysskiy Azot v. United States*, 31 C.I.T. 1373 (2007). In that case, the Commission considered whether subject imports of urea would depress U.S. urea prices. *Id.* at 1390. The Commission rendered an affirmative injury determination. *Id.* at 1374, 1376. On appeal, the Court of International Trade observed that the Commission only cited data supporting its position. *See id.* at 1392, 1394. Due to the Commission's "total failure to consider or discuss record evidence" that "provide{d} significant support for an alternative conclusion," the Court remanded the Commission's determination "for further analysis of whether the subject imports likely would depress U.S. urea prices." *Id.* at 1392 (quotation omitted). On remand, the Commission was ordered to "look at the evidence as a whole and not draw conclusions from isolated points of data while ignoring the context of the industry's business cycle." *Id.* at 1394. Similarly, in this case, the Commission *ignored considerable record evidence* — not only in its market segmentation analysis (*see* Section II above) but also in its analysis of supposed injury to domestic boxed mattress manufacturers (*see* Section III.A above).

Appellate courts have likewise held that similar errors by other agencies were not harmless. For example, in *Hermes Consolidated, LLC v. EPA*, 787 F.3d 568, 579-80 (D.C. Cir. 2015), the Court of Appeals for the D.C. Circuit held that the harmless error rule did not apply where the EPA denied an economic hardship exemption to an oil company because of mathematical errors the EPA made in evaluating the company's financial data, which "resulted in a substantial overstatement of {the company's} net income." The court stated that it would affirm the EPA's decision despite these errors if "'it {was} clear that . . . the agency would have reached the same ultimate result' had the errors not been made." *Id.* at 579 (quoting *Salt River Project Agric. Improvement & Power Dist. v. United States*, 762 F.2d 1053, 1061 n.8 (D.C. Cir. 1985)). But "because the conceded errors significantly alter{ed} important figures in {the} EPA's independent analysis of {the company's} financial data," the court could not "conclude with sufficient certainty that the agency would have made the same decision absent its errors." *Id.*

Similarly, in *United States v. Schwarzbaum*, 24 F.4th 1355, 1366-67 (11th Cir. 2022), the Court of Appeals for the Eleventh Circuit held that the IRS's error in "starting with the wrong numbers" to calculate an individual's tax penalties was not harmless. This error "flowed through {the IRS's} calculations from beginning to end," preventing the court from concluding with sufficient certainty that the IRS would have reached the same result notwithstanding the error. *See id.* ("{T}he fact

that the IRS *may* reach a different result when it recalculates {the individual's} penalties . . . is enough to justify remand."). Indeed, the "{a}bsence of . . . prejudice . . . must be clear for harmless error to be applicable." *Id.* at 1366 (quotation omitted).

Here, too, the Commission's errors identified by the Court of International Trade and discussed in Section II, above, are not harmless because it is impossible to conclude with sufficient certainty that the Commission would have reached the same conclusion notwithstanding its errors. As the Court of International Trade has already explained in great detail, the Commission's errors render the bulk of its Views "not supported by substantial evidence." Appx023. Further, the Commission's cursory, four-page "alternative holding" regarding the domestic boxed mattress industry is insufficient to save its affirmative injury determination, because as described above in Section III.A, it was likewise unsupported by substantial evidence and not in accordance with law. This Court therefore cannot conclude that the Commission would have reached the same ultimate result had the errors not been made. For these reasons, the errors are not harmless, and the determination should have been remanded to the Commission.

## CONCLUSION

For the foregoing reasons, this Court should reverse the Court of International Trade, vacate the Commission's affirmative injury determination, and remand to the Commission for further proceedings.

Respectfully submitted,

/s/ Geoffrey M. Goodale

Geoffrey M. Goodale
Lauren E. Wyszomierski
**DUANE MORRIS LLP**
901 New York Avenue, NW
Suite 700 East
Washington, DC 20001
(202) 776-5211

Dated: July 1, 2024                *Counsel to Plaintiff-Appellant CVB, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1504, 2024-1566

**Short Case Caption:** CVB, Inc. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✓] the filing has been prepared using a proportionally-spaced typeface and includes 11473 words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 07/01/2024

Signature: /s/ Geoffrey M.Goodale

Name: Geoffrey M. Goodale

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2024-1504, 2024-1566

**Short Case Caption:** CVB, Inc. v. US

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains __48__ number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 07/01/2024

Signature: /s/ Geoffrey M. Goodale

Name: Geoffrey M. Goodale

FORM 30. Certificate of Service

Form 30
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number**   2024-1504, 2024-1566

**Short Case Caption**   CVB, Inc. v. US

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system.  See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e).  Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on 07/01/2024

by  ☐  U.S. Mail   ☐   Hand Delivery   ☐ Email   ☐ Facsimile
    ☑  Other:  Court's electronic filing system

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Jane Dempsey | Court's electronic filing system |
| Andrea C. Casson | Court's electronic filing system |
| Yohai Baisburd | Court's electronic filing system |
| Mary Jane Alves | Court's electronic filing system |
|  |  |

☐   Additional pages attached.

Date: 07/01/2024

Signature:  /s/ Geoffrey M. Goodale

Name:   Geoffrey M. Goodale

## <u>ADDENDUM OF REQUIRED DOCUMENTS</u>

### TABLE OF CONTENTS

| Tab No. | Document | Appendix Pages |
|---------|----------|----------------|
| 1 | Opinion and Order sustaining the International Trade Commission's final affirmative injury determination (with proposed bracketing) | Appx001-047 |
| 2 | Opinion denying the Defendant's Joint Motion to Retract the Court's Public Slip Opinion and Accord Confidential Treatment to Alleged Business Propriety Information Contained Therein | Appx048-066 |
| 3 | International Trade Commission's Final Determination in Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam (as published in Federal Register) | Appx067 |

# Tab 1

**Opinion and Order sustaining the International Trade Commission's final affirmative injury determination (with proposed bracketing)**

Slip Op. No. 23-184

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CVB, INC.,<br><br>        *Plaintiff,*<br><br>v.<br><br>UNITED STATES,<br><br>        *Defendant,*<br><br>    and<br><br>BROOKLYN BEDDING, LLC, *et al.,*<br><br>        *Defendant-Intervenors.* | Before: Stephen Alexander Vaden,<br>Judge<br><br>Court No. 1:21-cv-00288 (SAV) |

## <u>OPINION</u>

[Sustaining the International Trade Commission's final affirmative injury determination.]

Dated:  December 19, 2023

*Geoffrey M. Goodale*, Duane Morris LLP, of Washington, DC, for Plaintiff CVB, Inc. With him on the briefs were *Andrew R. Sperl*, *Nathan J. Heeter*, and *Lauren E. Wyszomierski*, Duane Morris LLP, and *Stephen G. Larson*, *Robert C. O'Brien*, and *Paul A. Rigali*, Larson LLP, of Los Angeles, CA.

*Jane C. Dempsey*, Office of the General Counsel, United States International Trade Commission, of Washington, DC, for Defendant United States.  With her on the briefs were *Dominic Bianchi*, General Counsel; *Andrea C. Casson*, Assistant General Counsel for Litigation; and *Brian R. Soiset*, Attorney-Advisor.

*Mary Jane Alves*, Cassidy Levy Kent (USA) LLP, of Washington, DC, for Defendant-Intervenors Brooklyn Bedding, LLC; Corsicana Mattress Company; Elite Comfort Solutions; FXI, Inc.; Innocor, Inc.; Kolcraft Enterprises, Inc.; Leggett & Platt, Inc.; the International Brotherhood of Teamsters; and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO.  With her on the briefs were *Yohai Baisburd* and *Sydney Reed*.

 

**Vaden, Judge:** CVB, Inc. (CVB) challenges the International Trade Commission's (ITC or the Commission) final affirmative injury determination in its antidumping and countervailing duty investigations of mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam. *See* Compl. ¶ 1, ECF No. 8; *Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam*, 86 Fed. Reg. 26,545 (ITC May 14, 2021), J.A. at 14,715, ECF No. 60; *Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam* (Final Determination), Inv. Nos. 701–TA–645 and 731–TA–1495–1501 (Final), USITC Pub. No. 5,191 (May 2021), J.A. at 124,040, ECF No. 66. Defendant-Intervenors in support of the Commission's final affirmative injury determination are Brooklyn Bedding, LLC; Corsicana Mattress Co.; Elite Comfort Solutions; FXI, Inc.; Innocor, Inc.; Kolcraft Enterprises, Inc.; Leggett & Platt, Inc.; the International Brotherhood of Teamsters; and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (collectively, Defendant-Intervenors). *See* Def.-Ints.' Resp. to Pl.'s Mot. for J. on the Agency R. (Def.-Ints.' Resp.) at 1, ECF No. 53. Before the Court is CVB's Motion for Judgment on the Agency Record. Pl.'s Mot. for J. on the Agency R. (Pl.'s Br.), ECF No. 48. CVB contends that the Commission's final affirmative injury determination is unsupported by substantial evidence. *Id.* at 1–2. For the reasons set forth below, the Court **SUSTAINS** the Commission's determination.

## BACKGROUND

### A. Procedural History

On March 31, 2020, the Defendant-Intervenors petitioned the Department of Commerce and the Commission to impose antidumping and countervailing duties on imports of mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam (the Subject Countries). *See Petition: Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam: Antidumping and Countervailing Duty Petitions*, J.A. at 1,000–3,951, ECF No. 60. The Commission's period of investigation covered calendar year 2017 through September 2020. Def.'s Resp. to Pl.'s Mot. for J. on the Agency R. (Def.'s Resp.) at 6, ECF No. 51. On May 15, 2020, the Commission issued its preliminary determination. *See Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam*, 85 Fed. Reg. 30,984 (ITC May 21, 2020), J.A. at 9,046, ECF No. 60; *Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam*, Inv. Nos. 701–TA–645 and 731–TA–1495–1501 (Preliminary), USITC Pub. No. 5,059 (May 2020), J.A. at 9,048–373, ECF No. 60. Nearly one year later, on May 14, 2021, the Commission published its final determination. *See* Final Determination, J.A. at 124,040–570, ECF No. 66.

### B. Prior Mattresses from China Investigation

In December 2019, three months before the underlying petition in this case, the Commission published its final affirmative injury determination in an

investigation of Chinese mattress imports.  *Mattresses from China*, Inv. No. 731–TA–1424 (Final), USITC Pub. No. 5,000 (December 2019), J.A. at 6,505–62, ECF No. 60.  In 2017 and 2018, Chinese imports accounted for roughly ███████ of cumulated subject imports.  Final Determination at 39, J.A. at 124,081, ECF No. 66. In 2019, Chinese imports constituted less than ████████ of all imports while subject imports from other countries rose by ███████████ percent.  *Id.* at 39–40, J.A. at 124,081–82.  Between interim 2019 and interim 2020, Chinese imports declined to almost nothing; but subject imports from other countries rose a further ████████████ percent.  *Id.* at 40, J.A. at 124,082.  These imports from other countries were often from companies related to Chinese producers that no longer exported their products to the United States.  *Id.* At 39 n. 165, 40 n.168, J.A. at 124,081–82.

### C. The Present Factual Record

The Commission began its material injury investigation by defining the "domestic like product."  Final Determination at 7–9, J.A. at 124,049–51, ECF No. 66; *see also* 19 U.S.C. § 1677(10).  The Commission defined the domestic like product as:

> The products covered by this investigation are all types of youth and adult mattresses. The term "mattress" denotes an assembly of materials that at a minimum includes a "core," which provides the main support system of the mattress, and may consist of innersprings, foam, other resilient filling, or a combination of these materials. Mattresses may also contain (1) "upholstery," the material between the core and the top panel of the ticking on a single-sided mattress, or between the core and the top and bottom panel of the ticking on a double-sided mattress;

and/or (2) "ticking," the outermost layer of fabric or other material (e.g., vinyl) that encloses the core and any upholstery, also known as a cover.

The scope of this investigation is restricted to only "adult mattresses" and "youth mattresses." [. . . .] All adult and youth mattresses are included regardless of size or size description.

The scope encompasses all types of "innerspring mattresses," "non-innerspring mattresses," and "hybrid mattresses." [. . . .]

Mattresses covered by the scope of this investigation may be imported independently, as part of furniture or furniture mechanisms (e.g., convertible sofa bed mattresses, sofa bed mattresses imported with sofa bed mechanisms, corner group mattresses, day-bed mattresses, roll-away bed mattresses, high risers, trundle bed mattresses, crib mattresses), or as part of a set in combination with a "mattress foundation." [. . . .]

Excluded from the scope of this investigation are "futon" mattresses. [. . . . ]

Also excluded from the scope are airbeds (including inflatable mattresses) and waterbeds, which consist of air- or liquid-filled bladders as the core or main support system of the mattress. Also excluded is certain multifunctional furniture that is convertible from seating to sleeping [. . . .] Such furniture may, and without limitation, be commonly referred to as "convertible sofas," "sofa beds," "sofa chaise sleepers," "futons," "ottoman sleepers" or a like description.

Also excluded from the scope of this investigation are any products covered by the existing antidumping duty orders on uncovered innerspring units from China or Vietnam.

Also excluded from the scope of this investigation are bassinet pads with a nominal length of less than 39

> inches, a nominal width less than 25 inches, and a
> nominal depth of less than 2 inches.
>
> Additionally, also excluded from the scope of this
> investigation are "mattress toppers." [. . . .]

Final Determination at 7–9, J.A. at 124,049–51, ECF No. 66 (internal citations
omitted). No party challenges the like product definition, which includes many
mattress varieties. *See* Def.'s Resp. at 7, ECF No. 51 ("During the final phase, CVB
did not argue for another domestic like product definition or against cumulation,
and it does not challenge the Commission's findings on these issues."); Pl.'s Reply at
6–7, ECF No. 58 (agreeing that CVB did not challenge the domestic like product
determination and distinguishing its argument from a challenge to the domestic
like product determination).

Mattresses are either boxed or flat-packed. Both packaging methods are
included in the domestic like product definition. *See* Def.'s Resp. at 6–7, ECF No.
51; Pl.'s Reply at 4, ECF No. 58. Boxed mattresses are compressed and rolled into a
box for shipping, while flat-packed mattresses are boxed as-is and not compressed.
Statement of Brian Adams at 143:7–13, J.A. at 7,569, ECF No. 60. Shipping boxed
mattresses is typically cheaper and easier than shipping flat-packed mattresses
because boxed mattresses are smaller when packaged. *Id.* at 144:7–17, J.A. at
7,570. Consumers can transport boxed mattresses themselves or have them
delivered to their door, whereas flat-packed mattresses require specialized delivery.
*Id.* at 144:13–45:11, J.A. at 7,571–72. CVB argued throughout the administrative

proceeding that the two packaging methods represent distinct, segmented markets with little direct competition. *See, e.g.*, Pl.'s Reply at 6, ECF No. 58 ("[C]ompetition between the [flat-packed] and [boxed mattress] segments is highly attenuated").

The Commission based its U.S. industry data on responses from fifty-three domestic producers that represented the vast majority of domestic production in 2019. Final Determination at III-1, J.A. at 124,193, ECF No. 66. It based its U.S. import data on questionnaire responses from forty-nine companies that represented the majority of U.S. imports from the subject countries. *Id.* at IV-1, J.A. at 124,223. The foreign producer and exporter data was based on nineteen questionnaire responses from companies that represent a significant portion of subject imports. *Id.* at 4–5, J.A. at 124,046–47.[1]

The Commission may issue an affirmative injury determination when it concludes that an industry in the United States is materially injured or threatened with material injury by reason of certain imports. 19 U.S.C. §§ 1671d(b), 1673d(b). In making this determination, the Commission must consider the volume of subject imports, their effect on prices for the domestic like product, and their impact on producers of the domestic like product. 19 U.S.C. § 1677(7)(B). The statute defines "material injury" as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A). In assessing material injury, the

---

[1] The Commission noted that sixteen responses were received to the final phase questionnaires, and the Commission relied on three more preliminary phase questionnaires in the absence of better data from Cambodia, Serbia, and Thailand. *See* Final Determination at 4–5, J.A. at 124,046–47, ECF No. 66.

Commission considers all relevant economic factors that bear on the state of the industry in the United States. 19 U.S.C. § 1677(7)(C)(iii). No single factor is dispositive, and all relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." *Id.*

The Commission began its Views by discussing the conditions of competition in the industry. It found that mattress demand "is tied to housing sales and economic activity, particularly new home sales, housing starts, home resales, interest rates, gross domestic product ("GDP") growth, and consumer sentiment." Final Determination at 35, J.A. at 124,077, ECF No. 66. The Commission found that demand trends were mixed, but up overall, with different types of mattresses having different sales trends. *Id.* at 36, J.A. at 124,078. Demand for boxed mattresses increased, but demand for flat-packed mattresses decreased. *Id.*

Turning to supply, the Commission noted that domestic production served about ██████ of the domestic needs; subject imports served less than ██████; and non-subject imports served the remainder. *Id.* at 37, J.A. at 124,079. The Commission found that many domestic producers specialize in certain kinds of mattresses, but a little less than a quarter of producers overlap between boxed mattresses and flat-packed mattresses. *Id.* at 38, J.A. at 124,080. After discussing industry consolidation and new investment, the Commission noted that domestic production capacity for boxed mattresses increased by 121.2 percent during the

period of investigation and a further 48.6 percent in interim 2020. *Id.* at 38–39, J.A. at 124,080–81. The Commission concluded its discussion of supply by describing the near-total shift in subject imports away from China and toward other countries during the period of investigation. *Id.* at 39–40, J.A. at 124,081–82.

The Commission also considered substitutability. *Id.* at 41, J.A. at 124,083. The Commission found a "moderately high degree of substitutability between domestically produced mattresses and subject imports." *Id.* It further found that subject imports of boxed mattresses competed with flat-packed mattresses. *Id.* at 41–42, J.A. at 124,083–84. Although most domestic production was flat-packed mattresses and most imports were boxed mattresses, the Commission found "the vast majority of responding purchasers reported that domestically produced mattresses were interchangeable with and comparable to subject imported mattresses." *Id.* at 42, J.A. at 124,084. From reviewing the provided data, the Commission concluded that: (1) boxed and flat-packed mattresses can usually be made to the same specifications and are functionally interchangeable once unpackaged; (2) packaging is unimportant to end consumers; (3) online retailers do not provide search filters for packaging; and (4) "[c]onsumer indifference towards mattress packaging is reflected in purchasing behavior at the wholesale level." *Id.* at 42–43, J.A. at 124,084–85.

The ITC observed that "price is an important factor in purchasing decisions for mattresses, although non-price factors are also important." *Id.* at 44, J.A. at

124,086.  Among those non-price factors, the Commission found that domestically produced mattresses and subject imports were "comparable in terms of lead times and channels of distribution" and "sold through the same channels of distribution." *Id.* at 45, J.A. at 124,087.  The Commission noted that the domestic industry faced about a ten percent increase in raw material costs during the period of investigation.  *Id.* at 46, J.A. at 124,088.

Having considered the prevailing conditions of competition, the Commission moved to the other statutory factors:  the volume, price effect, and impact of subject imports.  19 U.S.C. § 1677(7)(B)(i).  In considering these factors, the Commission must establish a causal connection between the subject imports and the material injury.  *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997).  The statute ensures the Commission cannot "attribut[e] to subject imports an injury whose cause lies elsewhere."  *OCP S.A. v. United States*, 47 CIT __, 2023 Ct. Intl. Trade LEXIS 139 at *64 (citing *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1222 (2006)).

Each of the factors requires the Commission to consider the effects of subject imports on the domestic industry.  In its volume inquiry, the Commission must consider the significance of the quantity of imports, not just the absolute number.  *Id.* at *39 (citing *USX Corp. v. United States*, 11 CIT 82, 85 (1987)).  In its price inquiry, the Commission must consider whether there has been "significant price underselling" and whether "the effect of imports . . . otherwise depresses prices to a

significant degree[.]"  19 U.S.C. § 1677(7)(C)(ii).  Finally, in its impact inquiry, the

Commission must consider "all relevant economic factors which have a bearing on

the state of the industry[.]"  19 U.S.C. § 1677(7)(C)(iii).

The Commission found the volume of subject imports was significant, both in

absolute terms and relative to consumption.  Final Determination at 48, J.A. at

124,090, ECF No. 66.  For price effects, the Commission found that subject imports

sold for less than domestically produced mattresses in nearly every quarterly

comparison.  *Id.* at 50, J.A. at 124,092.

> Based on the moderately high degree of substitutability between
> subject imports and the domestic like product, the importance of price
> in purchasing decisions, and the pervasive underselling, as well as the
> purchase cost data, we find that subject import underselling was
> significant during the period of investigation.  The significant
> underselling by cumulated subject imports contributed to subject
> imports gaining sales and market share at the domestic industry's
> expense during the period of investigation.

*Id.* at 52, J.A. at 124,094.  The Commission therefore determined that imports had

significant adverse effects on domestic like product prices.  *Id.* at 56, J.A. at

124,098.

In its impact analysis, the Commission found that low-priced subject imports

kept prices low despite rising U.S. consumption.  *Id.* at 58, J.A. at 124,100.  The

Commission based its determination that imports significantly impacted the

domestic industry on reduced capacity utilization, high end-of-period inventories,

slight reductions in sales, and changes in research and development and capital

expenditures.  *Id.* at 58–73, J.A. at 124,100–15.  Having found that all three

statutory factors were satisfied under the prevailing conditions of competition, the Commission concluded that the domestic industry was "materially injured by reason of imports of mattresses" from the subject countries.  *Id.* at 73, J.A. at 124,115.

### D. The Present Case

On July 13, 2021, CVB filed a complaint with this Court, alleging that the Commission's injury determination was unsupported by substantial evidence or otherwise not in accordance with law.  Compl. ¶ 39, ECF No. 8.  CVB argues that the Commission's determination is unsupported by substantial evidence because: (1) The Commission improperly ignored record evidence that the U.S. mattress market is sharply segmented and that competition in it is highly attenuated; (2) it improperly ignored record evidence showing significant non-price reasons for increases in subject imports; (3) its determination that subject imports depressed or suppressed the prices of domestic like products is unsupported without either price convergence or signs of falling domestic prices; and (4) its determination that subject imports had a significant impact on the domestic industry improperly failed to consider the mattress industry's segmentation between boxed and flat-packed mattresses.  Pl.'s Br. at 2–4, ECF No. 48.  CVB filed its Motion for Judgment on the Agency Record on March 28, 2022; the Commission filed its response on June 13, 2022; Intervenors filed their response on July 1, 2022; and CVB filed its reply on

August 1, 2022. Pl.'s Br., ECF No. 48; Def.'s Resp., ECF No. 51; Def.-Ints.' Resp., ECF No. 53; Pl.'s Reply, ECF No. 58.

The crux of CVB's argument is that boxed mattresses and flat-packed mattresses occupy different segments of the mattress market — with producers and purchasers concentrating on one or the other and only highly attenuated competition existing between the two. CVB argues that any domestic industry injury reflected a demand shift away from flat-packed mattresses toward boxed mattresses and was not a consequence of unfairly priced imports. The parties agree that boxed mattresses are, as a general matter, cheaper than flat-packed mattresses. Oral Argument Transcript (Oral Arg. Tr.) at 7:21–22; 37:19, ECF No. 75. Because the domestic industry produced mostly flat-packed mattresses and subject imports consisted almost exclusively of boxed mattresses, this demand shift resulted in an increased market share for imports at the expense of the domestic industry. *See* Pl.'s Br. at 9, ECF No. 48.

At oral argument, the Court focused on the Commission's use of statistics to support its conclusion that a significant share of producers and purchasers of mattresses overlapped between flat-packed and boxed mattresses. If true, this would tend to undermine CVB's claim of market segmentation and attenuated competition. First, the Court noted that the Commission opportunistically treated companies that merged during the period of investigation as single companies in order to reach the conclusion that "[n]early a quarter (12) of responding domestic

producers produced both [flat-packed] and [boxed mattresses] in 2019, with these
producers accounting for [a majority] of [boxed mattress] production that year[.]"
Final Determination at 38, J.A. at 124,080, ECF No. 66; Oral Arg. Tr. at 25:1–20,
ECF No. 75. Tempur Sealy acquired Comfort in 2018, and Leggett & Platt acquired
Elite in 2019. In each case, the acquiring company produced primarily flat-packed
mattress; and its merger target predominately produced boxed mattresses. The ITC
treated them as four separate entities throughout its Final Determination — *except*
the one time it found it convenient to treat the four companies as only two entities
to inflate the market share of producers that manufactured *both* flat-packed and
boxed mattresses. *See id.* Second, the Court noted the Commission's questionable
purchaser data summary, which concluded that "[c]onsumer indifference toward
mattress packaging is reflected in purchasing behavior at the wholesale level" in
part because "[e]leven of [nineteen] responding purchasers reported purchasing
and/or importing both [boxed and flat-packed mattresses]." Final Determination at
43, J.A. at 124,085, ECF No. 66; *see also* Oral Arg. Tr. at 27:22–28:1, ECF No. 75.
The Court noted that most purchasers who reported buying both packaging types
purchased vastly more of one mattress type than the other and that "there are only
two . . . that had anything close to parity in their purchases of [boxed mattresses]
and flat-pack mattresses." Oral Arg. Tr. at 27:22–28:1, ECF No. 75. The Court
characterized the Commission's use of statistics as "legerdemain." *Id.* at 26:16. The
Commission responded that, although these portions of its Final Determination

were "very inarticulately written," they amounted only to "harmless error." *Id.* at 65:2–3.

The Court recognized that the ITC changed its approach in the final pages of its Views. *Id.* at 41:16–25 (characterizing the last portion of the Views as an "alternative holding."). After spending much of the document struggling against the evidence for a polarized mattress market, the Commission directly answered CVB's rejoinder. It found that the domestic boxed mattress sector, considered separately from the domestic flat-packed mattress sector, was injured by subject imports. *See* Final Determination at 69–73, J.A. at 124,111–15, ECF No. 66. Specifically, the Commission found that, although domestic boxed mattress producers "improved their performance by most measures during the period of investigation," their performance "would have been appreciably stronger during the period of investigation but for the significant volume and increase in volume of low-priced subject imports that displaced domestic industry shipments from the U.S. market and depressed domestic like product prices to a significant degree, including the prices of [boxed mattress] products." *Id.* at 69–70, J.A. at 124,111–12. The Commission cited record evidence in support of this finding, including: (1) low factory capacity utilization despite increased U.S. boxed mattress consumption, (2) "subject imports of [boxed mattresses] increased their share of overall apparent U.S. consumption by more than domestically produced [boxed mattresses] during the period[,]" and (3) questionnaire responses from domestic boxed mattress producers

indicated that imports adversely impacted returns on their investments.  *See id*. at 70–72, J.A. at 124,112–14.  In other words, imports of boxed mattresses retarded the growth of domestic boxed mattress manufacturers' sales.

The Court ordered the parties to submit supplemental letter briefs addressing whether the Commission's "alternative holding" that considered the domestic boxed mattress industry in isolation allowed for the Commission's mishandling of market polarization statistics to be harmless error.  *See* Minute Order, ECF No. 71.  In its supplemental brief, the Commission argued (1) "there has been no error" with respect to its handling of statistics; (2) "any lack of perfect clarity is unfortunate, but not deceptive"; and (3) were the Court to find that the Commission's statistics were in error, "such error is harmless and does not warrant a remand."  Def.'s Supp. Br. at 2, ECF No. 79.  The Commission asserted that it derived its finding of a high degree of overlap between boxed and flat-packed mattress manufacturers from a table that used data from 2019 only, and the relevant corporate acquisitions took place in 2018 and 2019.  *See id*. at 2–4; *see also* Final Determination at III-3–6, J.A. at 124,195–98, ECF No. 66 (tabulating U.S. producer shares of flat-packed and boxed mattresses in 2019).  Although the table treated the four producers separately and the Commission combined them to make its finding, the Commission "indicat[ed] in the corresponding footnote (n. 156) that 'although [boxed mattress] producers Comfort and Elite completed separate domestic producers' questionnaire responses, Tempur Sealy acquired Comfort in

2018 and Leggett & Platt acquired Elite in 2019.'" Def.'s Supp. Br. at 3–4, ECF No. 79; *see also id.* at 38 n.156, J.A. at 124,080. The Commission explained that it included this footnote "specifically to inform how it had tabulated the data and to provide its reasoning" and that "it was a factually accurate finding, which reasonably accounted for company acquisitions[.]" Def.'s Supp. Br. at 4, ECF No. 79.

The ITC next addressed the standard for harmless error. It cited case law in support of its argument that errors are harmless where, even including the error, substantial evidence supports the Commission's determination. *Id.* at 4–5 (citing *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1363–65 (Fed. Cir. 1996) for the proposition that errors are harmless where other evidence, taken as a whole, was sufficient to support the conclusion). The Commission argued that substantial evidence still supports its material injury finding because it defined a single domestic like product that encompassed all mattresses within the scope of its investigation, which CVB did not challenge. *Id.* at 5–6. Because the Commission analyzed the domestic industry as a whole, it was not legally required to analyze different segments of the domestic industry and assess the impact to each independently. *Id.* In a footnote, the Commission also asserted that, even if it treated Elite and Comfort — the two boxed mattress producers that merged with flat-packed mattress producers — separately, "there would still be the same 12 domestic producers that produced both [flat-packed] and [boxed mattresses] in

2019, accounting for a smaller but not insignificant portion of U.S. [boxed mattress]

production . . . that year." *Id.* at 4–5, n.6. The Commission concluded by once again

noting that it

> addressed [CVB's] arguments with respect to the performance of
> [boxed mattress] producers and found that subject imports had an
> impact on this subset of the domestic industry, negatively affecting
> their capacity utilization rates, sales revenues and operating and net
> income, and returns on investments as subject imports surged into the
> U.S. market and displaced domestically produced [boxed mattresses]
> and significantly depressed prices for this product.

*Id.* at 9.

The Defendant-Intervenors' supplemental brief endorsed the Commission's

brief. *See* Def.-Ints.' Supp. Br. at 1–2, ECF No. 81. Defendant-Intervenors

similarly argued that the Commission's statistical summary "while inartful, is

accurate and does not constitute an error"; and even if the Court were to find that

the Commission was in error, such error was harmless. *Id.* The Intervenors

acknowledged that the Commission changed its "tabulation methodology" when

summarizing Table III-1 but claimed that "[i]n footnote 156 on page 38 of its Views,

the Commission attempted to alert the reader" of the change. *Id.* at 4. Although

"this footnote might have been phrased more artfully . . . it still shows that the

Commission did try to be transparent about this limited instance where it combined

U.S. producer data due to the Leggett & Platt/Elite and Tempur Sealy/Comfort

transactions." *Id.* at 4–5. Further, the table "only presented data for 2019 and

given that the transactions had occurred in mid-2018 and January 2019, it was not

unreasonable to point to combined data in this instance." *Id.* at 5.

Invoking the harmless error standard, Defendant-Intervenors assert that

"Courts have previously affirmed Commission determinations containing an error,

where the outcome would have been the same because the error did not detract from

the substantial evidence as a whole supporting the Commission's decision." *Id.* at

8–9.  They claim that "the path of the Commission's decision here is discernible

even without" the misleading statistical summary because the Commission's Views

"set forth all issues material to its conclusion[.]" *Id.* at 9.  Defendant-Intervenors

contend that, even if the Commission's creative statistics detract from its

conclusion, the Commission's decision was "otherwise reasonable and supported by

the record as a whole." *Id.* at 10.

CVB had the last word.  Its brief argued that (1) the Commission was in

error; (2) the error was not harmless because it prejudiced CVB and because, after

correcting the error, the Commission's material injury determination is not

supported by substantial evidence; and (3) the final pages of the Final

Determination were not supported by substantial evidence and therefore do not

function as an alternative holding.  Pl.'s Supp. Br. at 1–2, ECF No. 84.  CVB first

offered its standard of harm, writing without citation to authority that "[e]rror is

not harmless if the Commission cannot say for certain that its ultimate injury

finding would not have changed in light of the error." *Id.* at 4.  CVB then explained

how it believed it had been harmed by the Commission's misleading statistical summary, as "the error contributed to the Commission's refusal to meaningfully engage with CVB's market polarization argument and to evaluate properly the conditions of competition in the mattress industry." *Id.* at 3.

CVB rejected the Commission's and Defendant-Intervenors' assertion that the Commission did not need to address CVB's attenuated competition argument, claiming that the law requires the Commission to evaluate "all relevant economic factors within the context of the business cycle and conditions of competition that are distinctive to the affected industry." *Id.* at 3 (citing 19 U.S.C. § 1677(7)(C)(iii)). CVB wrote that "the Commission must comply with the statute no matter how a respondent allegedly structures its arguments." *Id.* Plaintiff acknowledged that there may be situations where the Commission is not required to engage in a market segmentation analysis but argued that § 1677(7)(C)(iii) made it necessary here. *Id.* at 5. It also criticized the Commission's and Defendant-Intervenors' attempts to "justify the Commission's mathematical legerdemain" and argued that "the record clearly supports a finding of market polarization when the error is removed." *Id.* at 6. CVB invoked the Commission's purchaser data summary for support. *Id.*

CVB closed by arguing that the Views' final pages could not function as an "alternative holding" because they were not supported by substantial evidence. *See id.* at 7. Plaintiff asserted that the domestic boxed mattress industry suffered no

injury, noting that the domestic industry gained market share during the period of

investigation.    *See id.*    It quoted the Commission's admission that "'domestic

producers of [boxed mattresses] improved their performance by most measures

during the period of investigation.'"    *Id.* at 8 (quoting Def.'s Resp. at 45, ECF No.

51).    CVB cited cases where this Court sustained the Commission's finding of no

material injury when the domestic industry's performance improved during the

period of investigation. *Id.* at 8–9.    It faulted the Commission for "merely

assum[ing] that the cause of the unused capacity was subject imports, and not some

other cause such as raw material shortages . . . or an inability to produce [boxed

mattresses] to the same standard as importing producers." *Id.* at 9 (citing to record

evidence that seven importers indicated that subject imports were superior in

quality).

With briefing and argument concluded, the Court considers the claims of the

parties.

### JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).

The Court must assess the factual and legal findings underpinning the

Commission's determinations and "hold unlawful any determination, finding or

conclusion . . . unsupported by substantial evidence on the record, or otherwise not

in accordance with law."    19 USC § 1516a(b)(1)(B)(i).    Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938).  It

must be "more than a scintilla, and must do more than create a suspicion of the

existence of the fact to be established." *NLRB v. Columbian Enameling &

Stamping Co.*, 306 U.S. 292, 300 (1939).  However, "the possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative

agency's finding from being supported by substantial evidence." *Matsushita Elec.

Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

This Court's review of the Commission's determination is limited to the

administrative record that was before the agency.  19 U.S.C. § 1516a(b)(2)(A).  To

determine if substantial evidence exists, the Court considers "the record as a whole,

including evidence that supports as well as evidence that 'fairly detracts from the

substantiality of the evidence.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373,

1379 (Fed. Cir. 2003) (quoting *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556,

1562 (Fed. Cir. 1984)).  The Court assesses whether the Commission succeeded in

putting forward a reasoned explanation by "mak[ing] the necessary findings and

hav[ing] an adequate evidentiary basis for its findings." *In re NuVasive, Inc.*, 842

F.3d 1376, 1382 (Fed. Cir. 2016) (internal citations omitted).  To meet this

threshold, the Commission must not only "examine the relevant data and articulate

a satisfactory explanation for its action," it must also provide "a rational connection

between the facts found and the choice made." *Id.*

## DISCUSSION

At the heart of CVB's argument lies the claim that the Commission unreasonably determined that boxed mattresses and flat-packed mattresses are not a segmented market. *See* Pl.'s Br. at 2–4, ECF No. 48 (summarizing argument as containing four distinct claims, but with the first, second, and fourth claims being dependent on distinguishing data about boxed and flat-packed mattresses). CVB argues that boxed mattresses experienced most of the competition from subject imports, but the domestic boxed mattress industry thrived during the period of investigation. *Id.* at 9. In contrast, the domestic flat-packed mattress industry contracted; but there were relatively few imports of flat-packed mattresses. *Id.* CVB therefore argues the downturn cannot be attributed to subject imports but instead to a marketplace shift characterized by increased boxed mattress demand and declining flat-packed mattress demand. *Id.* CVB believes that the Commission unreasonably found that there was not a segmented market between boxed and flat-packed mattresses. *Id.* at 8–17. The Commission responds that it fully considered and analyzed the data, and CVB's primary objection is simply that the Commission came to conclusions opposite CVB's preference. *See generally* Def.'s Resp. at 17–26, ECF No. 51.

The Court first analyzes three sections of the Commission's Views that were not supported by substantial evidence: (1) the discussion of specialization in the industry, (2) the characterization of mattress purchasers' specialization, and (3) the

analysis of purchaser questionnaires. Final Determination at 38, 43–44, J.A. at
124,080, 124,085–86, ECF No. 66. The Court then turns to the question of harmless
error. The Court finds that the Commission's misleading statistical summaries are
harmless error. Because the Court holds that there remains sufficient reasoning in
the Commission's Views to uphold its injury determination as supported by
substantial evidence, the determination is **SUSTAINED**.[2]

## I. The Commission's Errors

The Commission's Views contain errors that center around a common theme.
For much of its Views, the Commission employed mathematical obfuscation and
statistical chicanery to make the mattress industry appear less segmented than it
is. When it addressed producer specialization, the Commission tried to make
producers appear less specialized. To do this, it treated two pairs of companies that
merged during the period of investigation as two single companies that produced
both boxed and flat-packed mattresses, rather than as four companies that each

---

[2] The determination is sustained except with respect to Malaysia. Plaintiff CVB does not
possess standing to challenge the Commission's determination with respect to Malaysia.
Def.'s Resp. at 1, ECF No. 51. *But see* Oral Arg. Tr. at 55:5–16, ECF No. 75 (preserving
standing argument for appeal). It is well-established that each subject country is its own,
unique determination, even when the Commission cumulates imports from multiple
countries for its injury determination. *See, e.g., Shandong TTCA Biochemistry Co. v.
United States*, 34 CIT 582, 589–90 (2010) (collecting cases). A party requires standing to
challenge the determination for each country. Because CVB conceded there is no evidence
it imports mattresses from Malaysia, it cannot show any injury from the Malaysia
determination and therefore lacks standing to challenge the Commission's determination
with respect to Malaysia. Oral Arg. Tr. at 55:5–16, ECF No. 75; *see also TransUnion LLC
v. Ramirez*, 141 S. Ct. 2190, 2200 (2021) ("To have Article III standing to sue in federal
court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm.
No concrete harm, no standing.").

specialized in one or the other. To make purchasers seem less specialized, the Commission reported that eleven of nineteen purchasers bought both boxed and flat-packed mattresses but conveniently omitted that almost all of those eleven purchased far more of one packaging type than the other. Finally, the Commission omitted important context from its description of purchaser surveys, giving the impression that wholesale purchasers did not care about packaging type. Each error demonstrates the Commission's unfortunate attempt to paint a perfect picture of an unsegmented market.

## A. Producer Specialization

The Commission's first error is its analysis of producer specialization. During the period of investigation, two pairs of domestic producers merged. Final Determination at III-9–10, J.A. at 124,201–02, ECF No. 66. Throughout the Views, the Commission treated those domestic producers as four separate companies. However, in its analysis of producer specialization, it treated the producers that merged as two companies instead of four; and it gave no explanation for making the change. The reason is self-evident. It was more convenient to treat them as two companies because doing so gave the impression that more domestic producers manufacture both boxed and flat-packed mattresses.

The Commission summarized its findings regarding producer specialization:

> Although two of the three largest domestic producers of [boxed mattresses] produced no [flat-packed mattresses], the three largest producers of [flat-packed mattresses] also produced [boxed mattresses]. Nearly a quarter (12)

> of responding domestic producers produced both [flat-packed mattresses] and [boxed mattresses] in 2019, with these producers accounting for [a majority] of [boxed mattress] production that year, and nearly half (21) of all responding producers reported production of [boxed mattresses].

*Id.* at 38, J.A. at 124,080, (internal citations omitted).  To support its claims, the Commission relies primarily on Table III-1.  *Id.*  Table III-1 is a chart that lists for each U.S. producer in 2019 its share of total mattress production, boxed mattress production, and flat-packed mattress production.  *Id.* at III-3–6, J.A. at 124,195–98.

First, the Commission states that two of the three largest domestic producers of boxed mattresses produced no flat-packed mattresses.  *Id.* at 38, J.A. at 124,080.  According to the table, the three largest domestic producers of boxed mattresses are ████████████████████████, none of which produce flat-packed mattresses.  *Id.* at III-3–4, J.A. at 124,195–96.  Looking at the Commission's chart, it therefore appears that *all three* of the largest domestic boxed mattress producers manufactured no flat-packed mattresses in 2019.  However, Leggett & Platt — a flat-packed mattress producer — acquired Elite in a deal completed in January 2019.  *Id.* at 38 n.156, J.A. at 124,080.  The Commission apparently chose to treat them as one entity in 2019, allowing the Commission to say that one — rather than zero — of the three largest domestic producers of boxed mattresses also produced flat-packed mattresses.  The Commission did not explain its decision to treat the two companies as one entity, even though Elite's data was reported separately in the Commission's

own charts and Elite continued to operate separately.[3]  *See id.* at III-3–4, III-9–10, J.A. at 124,195–96, 124,201–02.  It also does not explain why it treated Elite as a separate entity everywhere else in the Views.

The Commission next states that the twelve producers that produced both kinds of mattresses represented a majority of domestic boxed mattress production in 2019.  *Id.* at 38, J.A. at 124,080.  But when the Court manually summed the data, it sums to less than a quarter, as presented by the Commission in the chart.  *Id.* at III-3–6, J.A. at 124,195–98.  The only way to reach a majority of production is to include Comfort and Elite with their respective acquirers, Tempur Sealy and Leggett & Platt.  Once again, the Commission elsewhere treats these entities as separate.   It repeatedly references fifty-three companies, not fifty-one; the acquisitions were not coextensive with the period of investigation; and the Commission treats Comfort and Elite as separate entities from Tempur Sealy and Leggett & Platt at almost every other point in its determination.  *See, e.g.*, *id.* at 37–39, J.A. at 124,079–81.  *Compare id.* at 36, n.156, J.A. at 124,080 (treating Comfort and Elite as "domestic producers [that] produced both [flat-packed] and [boxed] mattresses in 2019" to create a useful statistic), *with id.* at 69, n.305, J.A. at 124,111 (listing "domestic producers that produced [boxed mattresses] but no [flat-packed mattresses] in 2019" and including both Comfort and Elite).  No explanation for the statistical gimmick appears.

---

[3] The same is true of the Comfort/Tempur Sealy acquisition.  *See* Final Determination at III-3–6, III-9–10, J.A. at 124,195–98, 124,201–02, ECF No. 66.

Second, the Commission found that the three largest domestic producers of flat-packed mattresses also produced boxed mattresses. *Id.* at 38, J.A. at 124,080. The Commission is correct; it is strictly true that the three largest domestic producers of flat-packed mattresses also produced boxed mattresses. However, this fails to tell the whole story. Although the three companies produced both boxed and flat-packed mattresses, each produced multiples more flat-packed mattresses. The three largest domestic flat-packed mattress producers are ███████████████████ ████████████████. Each company's market share in flat-packed mattresses is at least ██████ times greater than its share of the domestic boxed mattress market. *Id.* at III-3–6, J.A. at 124,195–98.

The relative shares of boxed and flat-packed mattresses in domestic production are also important. The Commission reported that in 2019 flat-packed mattresses were the substantial majority of domestic production, and boxed mattresses were less than a quarter of domestic production. *Id.* at III-19, J.A. at 124,211. Correcting for this domestic production ratio, ███████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ███████████████████████████████████████████████████. The Commission's statement that the three largest domestic producers of flat-packed mattresses also produced boxed mattresses obscured the fact that their boxed

mattress production was ▮▮▮▮▮  The Commission is obligated to draw from the evidence all inferences the evidence reasonably demands, not just those that are convenient.  *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378 (1998) (The Commission must draw "all those inferences that the evidence fairly demands.").  The Commission failed to do so here.

Third, the Commission stated, "Nearly a quarter (12) of responding domestic producers produced both [flat-packed mattresses] and [boxed mattresses] in 2019, with these producers accounting for [a majority] of [boxed mattress] production that year[.]"  Final Determination at 38, J.A. at 124,080, ECF No. 66.  Of the twelve companies that produced both mattress types in 2019, five produced virtually none of one kind.  *Id.* at III-3–6 124,195–98 (providing data that ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ each produced far less than one percent of U.S. production of one kind of mattress).  Of the remaining seven domestic manufacturers, four have stark production differences: ▮▮▮▮▮ produced more of one type of mattress than the other by a ratio of 63-to-1; ▮▮▮▮▮ had a ratio of 74-to-1; ▮▮▮▮▮▮ had a ratio of 83-to-1; and ▮▮▮▮▮▮ had a ratio of 60-to-1.  *Id.*  Of the remaining three companies, ▮▮▮▮ had a ratio of nearly 11-to-1; ▮▮▮▮▮▮▮, of nearly 5-to-1; and the lone balanced producer, ▮▮▮▮▮ had a nearly 1-to-1 ratio.[4]  *Id.*

---

[4] Some producers manufactured more flat-packed mattresses, and others produced more boxed mattresses.  These ratios represent either flat-packed-to-boxed or boxed-to-flat-packed, depending on what packaging type the producer predominantly made.

Again, the Commission failed to provide necessary context by drawing all those inferences fairly demanded by the evidence.

The Commission must fairly analyze the data. *See Allentown Mack Sales & Serv.,* 522 U.S. at 378. Here, the evidence demanded acknowledgement that nearly every producer is highly specialized. The Commission's failure to do so was not merely "inartful." It misread the data in question. *See* Def.-Ints.' Supp. Br. at 1, ECF No. 81. The law charges the Commission with explaining how it views the evidence before it. When it changes methodologies in analyzing the data, the Commission must acknowledge and justify any inconsistent treatment. *See Wheatland Tube Co. v. United States,* 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) (reviewing courts look for "a reasoned analysis or explanation" and can only affirm when the agency's path is "reasonably discernible"). Because the Commission opportunistically combined production figures only when it found it useful to avoid CVB's market segmentation objections, the Commission has failed to support its findings on producer specialization with substantial evidence.

### B. Mattress Purchasers' Specialization

The Commission's second error is its analysis of purchaser specialization. As with producer specialization, the Commission ignored or failed to provide important context in its analysis of purchaser specialization. This gave the false impression that purchasers are indifferent about mattress packaging. Not so. Out of nineteen purchasers, only three purchased flat-packed and boxed mattresses in numbers

approaching parity. The other sixteen purchased far more of one packaging type than the other, and eight of the nineteen (42%) exclusively purchased one packaging type. The Commission papered over these statistics to make purchasers appear less specialized and therefore make the market appear less segmented.

The Commission reported that "[c]onsumer indifference towards mattress packaging is reflected in purchasing behavior at the wholesale level" in part because "[e]leven of [nineteen] responding purchasers reported purchasing and/or importing both [boxed and flat-packed mattresses]." Final Determination at 43, J.A. at 124,085, ECF No. 66. The Commission cites its purchaser questionnaires but does not provide a detailed analysis of their responses. The data demonstrate significant bifurcation in wholesale purchasing decisions. Eight of the nineteen purchasers buy only one kind of mattress packaging; and eight of the remaining eleven wholesale mattress purchasers are highly specialized. ████████ purchases one type of mattress more than another at nearly a 10-to-1 ratio; ████████ at a 15-to-1 ratio; ████████ at a 5-to-1 ratio; ████████████████ at a 12-to-1 ratio; ████████████ at a 50-to-1 ratio; ████████ at a 13-to-1 ratio; ████████ at a 62-to-1 ratio; and ████████ at a 6.5-to1 ratio. J.A. at 102,831, ECF No. 66 (██████); id. at 103,156 (██████); id. at 103,086 (████████); id. at 103,051 (██████████); id. at 102,935 (████); id. at 102,865 (██████); J.A. at 108,419, ECF No. 65



(████████████████); J.A. at 102,977, ECF No. 73 (████████).[5]  Only ████

and ████████████████ had a roughly 1-to-1 ratio with ████ at about 2-to-1.

J.A. at 103,268, ECF No. 73 (██████); *id.* at 103,122 (██████); *id.* at 111,476 (████████

████████).

The Commission must fairly analyze the data and draw all inferences the

data reasonably demands.  *See Allentown Mack Sales & Serv.,* 522 U.S. at 378.  It is

true that eleven of nineteen purchasers buy both boxed and flat-packed mattresses,

but the data once again show this statistic is misleading.  Only three of nineteen

wholesale purchasers buy boxed and flat-packed mattresses in similar quantities.

Sixteen of nineteen wholesale purchasers either purchase only one kind of mattress

packaging or purchase overwhelmingly one kind of packaging.  No reasonable

person could review this data and determine that it shows wholesale purchasers are

"indifferent" to packaging.  *See Goss Graphics Sys., Inc. v. United States,* 22 CIT

983, 1004 (1998), *aff'd,* 216 F.3d 1357 (Fed. Cir. 2000) (The Commission has

"discretion to make *reasonable* interpretations of the evidence.") (emphasis added).

Most purchasers strongly favor one packaging type over the other.  The Commission

should have acknowledged this data and provided its views.  Its failure to do so is

error.  *See Allentown Mack Sales & Serv., Inc.,* 522 U.S. at 378.

---

[5] These ratios represent either flat-packed-to-boxed or boxed-to-flat-packed, depending on
what packaging type the purchaser predominantly bought.

### C. Purchaser Survey Rankings

The Commission's third error is found in its analysis of purchaser surveys. Again, the Commission ignored or failed to provide important context that undermined the Commission's conclusion that packaging type is irrelevant to purchasers. The Commission wrote that "[a]lthough 11 purchasers reported that packaging was very important to their purchasing decisions, only two purchasers ranked packaging among the top three factors driving their purchasing decisions, consistent with the large number of purchasers reporting purchases of both [boxed and flat-packed mattresses]." Final Determination at 44, J.A. at 124,086, ECF No. 66. In a footnote, the Commission added that "[a]lthough responding purchasers were free to rank 'Packaging (i.e., [boxed] or flat packed mattresses)' among their top three purchasing factors, as among the purchasing factors enumerated in the purchasers' questionnaire, only two did so." *Id.* at 44, n.185, J.A. at 124,086.

The Commission's statements imply that the question involved ranking from a pre-selected list. It did not. The question merely provided a blank space and some examples: "Major purchasing factors. Please list, in order of their importance, the main factors your firm considers in deciding from whom to purchase mattresses (examples include availability, extension of credit, contracts, price, quality, range of supplier's product line, traditional supplier, etc.)." Despite packaging not being listed as a factor for this question, many wholesale purchasers' questionnaire responses told a more nuanced story about what drove their decisions. *See, e.g.,*

U.S. Purchasers' Questionnaire of ████████████████, J.A. at 111,481, 111,490, ECF No. 66 (listing three factors other than packaging but earlier stating that "[w]e expect the industry to continue towards [boxed mattresses] due to customer preference and convenience/portability of the product"); U.S. Purchasers' Questionnaire of ███████ J.A. at 102,902, 102,915, ECF No. 65 (listing three non-packaging factors as most important but purchasing zero boxed mattresses); U.S. Purchasers' Questionnaire of ████████████, J.A. at 103,013, 103,028, ECF No. 66 (listing three non-packaging factors as most important but purchasing zero flat-packed mattresses); U.S. Purchasers' Questionnaire of ██████████, J.A. at 103,051, 103,065 (listing "[p]roduct features and specifications" as third most important and purchasing a 50-to-1 ratio of flat-packed-to-boxed mattresses).

Although it is not the Court's domain to reweigh the evidence, it is the Court's domain to require that the Commission weigh *all* the evidence in the record — not just the evidence that supports its decision. *See Nippon Steel Corp.*, 337 F.3d at 1379 (requiring examination of "the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence") (internal quotation omitted). The manufacturers' data combined with the wholesale purchasers' data tell a much more complicated story than the Commission's initial line that packaging is irrelevant. It was error to not examine this data on the record and explain what it meant for the Commission's ultimate decision. *See In re NuVasive, Inc.*, 842 F.3d at 1382 (requiring the ITC to "examine

the relevant data and articulate a satisfactory explanation for its action[,]" so that it provides "a rational connection between the facts found and the choice made"). The only thing the Commission has proven is the truth of the adage that "There are three kinds of lies: Lies, Damned Lies, and Statistics." Mark Twain, *Chapters from My Autobiography – XX*, NORTH AMERICAN REVIEW 465, 471 (July 5, 1907).[6]

## II. Harmless Error

The Commission need not have gone to such lengths to avoid addressing the segmentation in the U.S. mattress market. When the Commission finally engaged with CVB's arguments and addressed the domestic boxed mattress industry as a distinct segment, the Commission found injury to that segment. These findings are supported by substantial evidence. Contrary to CVB's assertions, the Commission did not need to go further and conduct a formal market segmentation analysis. Because, even with the Commission's errors, there is still substantial evidence to support the Commission's ultimate injury finding, the Commission's errors were harmless. It is on this basis that the Court will sustain the Commission's Final Determination.

## A. Legal Standard

The principle of harmless error applies to judicial review of agency action. *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978) ("Administrative decisions should be set aside . . . only for

---

[6] Twain attributes this adage to British Prime Minister Benjamin Disraeli.

substantial procedural or substantive reasons[.]"); *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996) ("It is well settled that principles of harmless error apply to the review of agency proceedings."). Injury determinations by the Commission are no different. *See, e.g.*, *CP Kelco US, Inc. v. United States*, 38 CIT 1511, 1529–31 (2014) (applying the principle of harmless error to an injury determination by the Commission), *aff'd*, 623 F. App'x 1012 (Fed. Cir. 2015).

The touchstone of the harmless error inquiry is prejudice. If the errors did not change the ultimate result of the agency action, they are harmless. Put another way, if the Commission's injury determination is still supported by substantial evidence — even with the errors — the errors are harmless; and the Commission's determination may be sustained. *See Belton Indus., Inc. v. United States*, 6 F.3d 756, 761 (Fed. Cir. 1993) ("Commerce's violation did not prejudice appellees. Accordingly, Commerce's violation was harmless error."); *CP Kelco US*, 38 CIT at 1529 (finding any potential error harmless because "[the Commission's] ultimate injury finding would not have changed"). The Court thus looks past the Commission's clumsy efforts to dodge CVB's arguments and now examines where the Commission squarely addressed CVB's objections regarding harm to domestic boxed mattress manufacturers.

## B. The Commission's Errors Were Harmless

In the final pages of its Views, the Commission found that — even when examining only domestic producers who exclusively manufactured boxed mattresses

— subject imports injured the domestic industry. The Commission forthrightly acknowledged that domestic boxed mattress manufacturers "improved their performance" during the period of investigation, but it found that these manufacturers could have performed even better if not for the subject imports. Final Determination at 69–73, J.A. at 124,111–114, ECF No. 66. In support, the Commission pointed to the low capacity utilization of domestic boxed mattress factories, which it attributed to the subject imports. *Id.* Substantial evidence supports this portion of the Commission's Views, and it is enough to sustain the Commission's ultimate injury finding. *See* 19 U.S.C. § 1677(7)(B) (requiring findings as to volume, price effects, and impact to sustain a material injury determination). Accordingly, the final section of the Commission's analysis renders its earlier errors harmless.

When the Commission finally turned to addressing CVB's arguments and examined domestic producers of boxed mattresses, it found subject imports injured those producers. Final Determination at 69–70, J.A. at 124,111–112, ECF No. 66. The Commission observed that these producers improved their performance during the period of investigation. *Id.* This improvement was expected because boxed mattress imports from China decreased dramatically in the wake of an antidumping order, and the domestic industry invested in increasing boxed mattress production capacity. *Id.* at 69–72, J.A. at 124,111–14. However, the Commission found that, but for the subject imports "displac[ing] domestic industry shipments . . . and

depress[ing] domestic like product prices to a significant degree," domestic boxed mattress producers would have improved their performance even more. *Id.* at 70, J.A. at 124,112.

In particular, the Commission pointed to domestic manufacturers' excess production capacity at a time when the market for boxed mattresses grew. *Id.* at 70–71, J.A. at 124,112–113. Capacity utilization "remained low over the [period of investigation]" and decreased from 2019 to 2020. *Id.* at 70, J.A. at 124,112. Although domestic producers of boxed mattresses grew their share of U.S. mattress consumption, importers saw their share of the market grow more — even as domestic producers had unused capacity. *Id.* at 71, J.A. at 124,113.

The Commission concluded that low-priced imports caused this excess domestic manufacturing capacity. *Id.* at 70–72, J.A. at 124,112–114. It also rejected arguments that factors other than price explained the low utilization of domestic manufacturing plants. *Id.* at 70, n.308, J.A. at 124,112. The Commission found a "moderately high degree of substitutability" between domestically produced mattresses and imports based on reports from domestic producers, importers, and purchasers. *Id.* at 28–29, J.A. at 124,070–71. The majority of responding purchasers said domestic boxed mattresses and imports were similar "in terms of product range, quality, and reliability of supply," undercutting any argument that a deficiency in one of those factors explained imports' advantage. *Id.* at 70, n.308, J.A. at 124,112. The Commission also noted domestic producers' low rate of

warranty claims, indicating the quality of their products. *Id.* These findings

undermine the argument that low quality, and not subject imports, led to low

capacity utilization. *Compare* Pl.'s Supp. Br. at 9, ECF No. 84 ("[T]he Commission

merely assumes that the cause of the unused capacity was subject imports, and not

some other cause such as . . . an inability to produce [boxed mattresses] to the same

standard as importing producers."), *with* Final Determination at 70, n.308, J.A. at

124,112, ECF No. 66 (finding that "[n]on-price differences cannot explain the . . .

low rates of capacity utilization because a majority of responding purchasers

reported that domestically produced mattresses were comparable to subject imports

in . . . quality" and "domestic producers of [boxed mattresses] experienced low

warranty return rates").

When comparing the use of available manufacturing capacity between flat-

packed mattress manufacturers and boxed mattress manufacturers, the

Commission determined that boxed mattress manufacturers had more unused

manufacturing capacity. Final Determination at 70, n.308, J.A. at 124,112, ECF

No. 66. This discredits raw material shortages as a cause of the low utilization

because flat-packed and boxed mattresses use similar inputs so that any raw

material shortage should have affected both similarly. *Compare* Pl.'s Supp. Br. at 9,

ECF No. 84 ("[T]he Commission merely assumes that the cause of the unused

capacity was subject imports, and not some other cause such as raw material

shortages[.]"), *with* Final Determination at 70, n.308, J.A. at 124,112, ECF No. 66

("While we recognize that the domestic [boxed mattress] producers' reduced rate of capacity utilization in interim 2020 partly reflects raw material shortages, their capacity utilization rates remained low . . . relative to domestic [flat-packed mattress] producers . . . and there is no evidence that [boxed mattress] producers were incapable of utilizing more of their reported capacity[.]"). It also undercuts CVB's argument that examining domestic boxed mattress manufacturers separately would lead to a determination of no injury. *See* Pl.'s Supp. Br. at 1–2, ECF No. 84. At least for capacity utilization, treating domestic boxed mattress producers separately hurts rather than helps CVB.

Plaintiff points to prior decisions of this Court affirming Commission determinations of no injury where the domestic industry grew during the period of investigation and suggests the same result should apply here. *See* Pl.'s Supp. Br. at 7–8, ECF No. 84. Not so. That the Commission could have come to a different conclusion does not mean its conclusion here was unsupported by substantial evidence. *See Vermont Yankee*, 435 U.S. at 558 (administrative review is supposed to "insure a fully informed and well-considered decision, not necessarily a decision the judge[] . . . would have reached"). The standard of review the Court must apply is determinative. As the Supreme Court has explained, "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). Further, the law

prohibits the Commission from finding that there is no material injury to an industry "merely because . . . the performance of that industry has recently improved." 19 U.S.C. § 1677(7)(J). The Commission can find injury to the domestic industry even when the domestic industry's performance improved by some metrics over the course of the period of investigation. *See, e.g.*, *OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1311–13 (CIT 2021) (affirming the Commission's finding of injury despite an increase in profit for the domestic industry during the period of investigation when other factors, including capacity utilization, suggest injury). Indeed, § 1677(7)(C)(iii) directs the Commission to evaluate "all relevant economic factors" when conducting its impact analysis, including "actual and potential negative effects on. . . growth[.]" The statute allows the Commission to consider whether the domestic industry grew less than it otherwise would have. *Cf.* 19 U.S.C. § 1677(7)(J) ("The Commission may not determine that there is no material injury or threat of material injury to an industry in the United States merely because that industry is profitable or because the performance of that industry has recently improved.").

For sixty-nine pages, the Commission dodges and ducks to avoid separately addressing domestic boxed mattress producers as CVB argued it should. The Commission buried important information and engaged in statistical chicanery. *See* Oral Arg. Tr. at 29:7–14, ECF No. 75 (describing the Commission's actions as "mathematical legerdemain"). The Commission persisted with its strategy even

after oral argument.  *See* Def.'s Supp. Br. at 4–5, n.6, ECF No. 79 (only acknowledging in a footnote that the Commission's disparate treatment of companies that merged during the period of investigation resulted in a threefold increase in the percentage of domestic mattresses produced by companies making both flat-packed and boxed mattresses); *see also* Pl.'s Supp. Br. at 3–4, ECF No. 84. None of this was necessary.  In the final section of its Views, the Commission addressed CVB's argument and reached the same ultimate finding of injury in a manner that satisfies the substantial evidence standard.  Rather than attempting to paint a perfect picture, the Commission could have addressed CVB's arguments directly from the beginning.  Instead, the Commission prevails only because of the final section of its Views and the harmless error principle.  Candor should be option one, not the last resort.

### C. The Commission Was Not Required to Conduct a Formal Market Segmentation Analysis

In a final argument, CVB says that the Commission needed to conduct a "proper market segmentation analysis" to satisfy its statutory obligation to "evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry."  Pl.'s Supp. Br. at 5, ECF No. 84 (quoting 19 U.S.C. § 1677(7)(C)(iii)). CVB acknowledges the many cases holding the Commission need not conduct a formal market segmentation analysis but nonetheless argues that such an analysis was necessary here.  *See id.*; Def.'s Supp. Br. at 6–7, ECF No. 79 (listing cases).

Courts will defer to the Commission's methodology when it is reasonable, even if a plaintiff presents a reasonable alternative. *JMC Steel Grp. v. United States*, 39 CIT 649, 657 (2015) ("It is not enough for Plaintiffs simply to proffer an alternate methodology to that relied upon by the agency, even if that alternate methodology is reasonable and not inconsistent with the statute."). Because the Commission reasonably found that subject imports injured the domestic industry, the Commission satisfied its statutory obligations. *See supra* Section II-B.

Absent a statutory command, this Court cannot force a specific methodology onto the Commission. *See Vermont Yankee*, 435 U.S. at 546–47 (instructing courts not to mandate procedures beyond those explicitly required by Congress); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015) (citing *Vermont Yankee* and abrogating a doctrine that "imposes on agencies an obligation beyond" the Administrative Procedure Act's requirements); *U.S. Steel Grp.*, 96 F.3d at 1362 ("This court has no independent authority to tell the Commission how to do its job. We can only direct the Commission to follow the dictates of its statutory mandate. So long as the Commission's analysis does not violate any statute and is not otherwise arbitrary and capricious, the Commission may perform its duties in the way it believes most suitable."). Instead, the Court asks whether the Commission's methodology complied with the relevant statutes and finds substantial evidentiary support. *See U.S. Steel Grp.*, 96 F.3d at 1362. Here, it did.

No statute requires the Commission to conduct a market segmentation analysis. The Commission cites many cases holding that it was not obligated to conduct a market segmentation analysis. *See* Def.'s Supp. Br. at 6–7 (listing cases); *see also Full Member Subgroup of Am. Inst. of Steel Constr., LLC v. United States*, 547 F. Supp. 3d 1211, 1233 (CIT 2021) ("[T]he Commission was not required to analyze the impact of subject imports on different segments of the domestic industry."), *aff'd*, No. 2022-1176, 2023 WL 5761126 (Fed. Cir. Sept. 7, 2023); *ITG Voma Corp. v. United States Int'l Trade Comm'n*, 253 F. Supp. 3d 1339, 1354 (CIT 2017) (rejecting an argument that the Commission was required to engage in a market segmentation analysis because "the law imposes no such requirement"), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019). CVB meanwhile cites no caselaw to support its stance. The statute instructs the Commission to "evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). This general instruction does not obligate the Commission to use any specific methodology. *See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. United States*, 348 F. Supp. 3d 1328, 1333 (CIT 2018) ("The statute does not provide further guidance, giving the Commission discretion to assess the conditions of competition in a particular industry."). Finding no support in caselaw or statutory text, the Court finds the Commission was not required to conduct a formal market segmentation

analysis.  The final section of its Views addressed imports' effects on the domestic

boxed mattress market segment separately and that suffices.

## CONCLUSION

The Commission's determinations are reviewed under the substantial

evidence standard.   19 U.S.C. § 1516a(b)(1)(B)(i).   Here, the Commission's errors

were needless but ultimately harmless.   When the Commission stopped trying to

dodge the issue and instead directly addressed harm to domestic boxed mattress

manufacturers, it made the necessary findings to have its decision supported by

substantial evidence.   It is on this basis that the Commission's final affirmative

injury determination is **SUSTAINED**, and Plaintiff's Motion for Judgment on the

Agency Record is respectfully **DENIED**.


                                        /s/      Stephen Alexander Vaden
                                                       Judge


Dated: December 19, 2023
          New York, New York

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CVB, INC.,<br><br>       *Plaintiff,*<br><br>v.<br><br>UNITED STATES,<br><br>       *Defendant,*<br><br>   *and*<br><br>BROOKLYN BEDDING, LLC, *et al.,*<br><br>       *Defendant-Intervenors.* | Before: Stephen Alexander Vaden,<br>Judge<br><br>Court No. 1:21-cv-00288 (SAV) |

## <u>JUDGMENT</u>

In accordance with the Opinion issued this day, and after due deliberation, it is hereby

**ORDERED** that the challenged portions of the International Trade Commission's final affirmative injury determination in *Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam*, 86 Fed. Reg. 26,545 (ITC May 14, 2021) are **SUSTAINED**[1]; and it is further

---

[1] The determination is sustained except with respect to Malaysia. The Court makes no decision about the determination with respect to Malaysia because Plaintiff CVB lacks standing to challenge the Malaysia portion of the determination.

      **ORDERED** that Plaintiff's Motion for Judgment on the Agency Record, ECF

No. 48, is **DENIED**.

      **SO ORDERED.**

                    /s/      Stephen Alexander Vaden
                                    Judge

Dated: <u>December 19, 2023   </u>
      New York, New York

# Tab 2

**Opinion denying the Defendant's Joint Motion to Retract the Court's Public Slip Opinion and Accord Confidential Treatment to Alleged Business Propriety Information Contained Therein**

Slip Op. No. 24-2

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CVB, INC., | |
| *Plaintiff,* | |
| v. | Before: Stephen Alexander Vaden, Judge |
| UNITED STATES, | |
| *Defendant,* | Court No. 1:21-cv-00288 (SAV) |
| and | |
| BROOKLYN BEDDING, LLC, *et al.,* | |
| *Defendant-Intervenors.* | |

## <u>OPINION</u>

[Denying the Defendant's Joint Motion to Retract the Court's Public Slip Opinion and Accord Confidential Treatment to Alleged Business Proprietary Information Contained Therein.]

Dated: January 8, 2024

*Geoffrey M. Goodale*, Duane Morris, LLP, of Washington, DC, for Plaintiff CVB, Inc. With him on the briefs were *Andrew R. Sperl*, *Nathan J. Heeter*, and *Lauren E. Wyszomierski*, Duane Morris, LLP, and *Stephen G. Larson*, *Robert C. O'Brien*, and *Paul A. Rigali*, Larson LLP, of Los Angeles, CA.

*Jane C. Dempsey*, Office of the General Counsel, United States International Trade Commission, of Washington, DC, for Defendant United States. With her on the briefs were *Dominic Bianchi*, General Counsel; *Andrea C. Casson*, Assistant General Counsel for Litigation; and *Brian R. Soiset*, Attorney-Advisor.

*Mary Jane Alves*, Cassidy Levy Kent (USA) LLP, of Washington, DC, for Defendant-Intervenors Brooklyn Bedding, LLC; Corsicana Mattress Company; Elite Comfort Solutions; FXI, Inc.; Innocor, Inc.; Kolcraft Enterprises, Inc.; Leggett & Platt, Inc.; the International Brotherhood of Teamsters; and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers

International Union, AFL-CIO.  With her on the briefs were *Yohai Baisburd* and *Sydney Reed.*

**Vaden, Judge:**  On December 19, 2023, the Court issued a public slip opinion in the underlying case affirming the United States International Trade Commission's (the Commission) affirmative injury finding.  *CVB, Inc. v. United States*, 47 CIT __, 2023 Ct. Intl. Trade LEXIS 189, Slip Op. 2023-184.  Shortly thereafter, the Commission notified the Court it believed the public opinion contained unredacted business proprietary information.  Def.'s Letter, ECF No. 90.  Before the Court is the Commission's Joint Motion to Retract the Court's Public Slip Opinion and Accord Confidential Treatment to Business Proprietary Information Contained Therein (Motion to Retract), ECF No. 93.  For the reasons set forth below, the Court respectfully **DENIES** the Motion.

## BACKGROUND

The underlying case involves a challenge to the Commission's final affirmative injury determination in its investigation of mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam.  *See CVB*, 2023 Ct. Intl. Trade LEXIS 189, at *1–2.  The Slip Opinion outlined numerous errors by the Commission but found the errors were ultimately harmless and sustained the Commission's final determination.  *See id.* at *52.  To explain what the Court characterized as the Commission's "mathematical obfuscation and statistical chicanery[,]" the Court illustrated how responses to various questionnaires contained in the record and a chart from the Commission's final

determination showed the opposite of what the Commission claimed they did. *See id.* at *30–43.

After the Court released its opinion, the Commission contacted the Court by telephone and email to express concerns that the opinion revealed confidential business proprietary information. The next day, the Commission filed a Letter to the Court on official Commission letterhead requesting that the Court retract its opinion because the Commission "identified business proprietary information" in the opinion. Def.'s letter at 1, ECF No. 90. The Court issued a Paperless Order the same day informing the parties that a written motion was the appropriate way to raise any concerns regarding confidential or business proprietary information. ECF No. 91. After business hours on Friday, December 22, the Commission filed the Joint Motion. Motion to Retract, ECF No. 93.

## LEGAL STANDARDS

USCIT Rule 5(g) governs filings containing confidential or business proprietary information. Rule 5(g)'s mandate is as clear as it is broad: "Any paper containing confidential or business proprietary information must identify that information by enclosing it in brackets." The rule serves three purposes. First, the rule protects confidential and business proprietary information by clearly identifying it for the parties and the Court. Second, the rule promotes transparency and public access to judicial records by requiring parties to designate precisely what information is confidential. Parties cannot protect information *en masse* by

stamping a label atop every page.  Instead, they must excise only that information which is truly confidential, allowing the public to view everything else.  *See* USCIT R. 5(g).  Finally, the rule promotes judicial efficiency by providing the Court with one record it examines to adjudicate the case.  Bracketing allows the Court to look at one place to see the entire record the agency considered and know what portion of that record the parties claim is confidential without having to move back and forth between different sources.

The Court's rules do not define what constitutes confidential or business proprietary information.  19 U.S.C. § 1677f(b) governs the Commission's treatment of business proprietary information.  Information submitted to the Commission "which is designated as proprietary by the person submitting the information shall not be disclosed to any person without the consent of the person submitting the information[.]"  19 U.S.C. § 1677f(b)(1)(A).  Information is neither confidential nor business proprietary if it is publicly available.  *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019) (defining confidential information as information that is "private" or "secret") (citing Webster's Seventh New Collegiate Dictionary 174 (1963)); *see also* 19 U.S.C. § 1677f(b)(2) (the Commission can determine a party's designation of information as proprietary is unwarranted based on the information's "nature and extent … or its availability from public sources"). *Cf. Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("Information that is public knowledge … cannot be a trade secret.") (internal citations omitted).

Merely claiming information is confidential does not make it so. Were that true, a party could designate anything it wanted as confidential. Even when the parties agree to secrecy, courts are "duty-bound to protect public access to judicial proceedings and records." *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 417 (5th Cir. 2021). Where the parties lack any incentive to defend the public's right of access, the Court must balance that right with the need for confidentiality. *Id.* at 419. Transparency — not secrecy — is the default rule. *Id.* at 417.

## DISCUSSION

The Motion asks the Court to retract its Slip Opinion and issue a new confidential opinion with forty-four sets of brackets in place of information contained in the original Slip Opinion. *See* Motion to Retract Attach. A, ECF No. 93. The objected-to information falls into two broad categories, company names and numerical approximations. First, the Motion to Retract objects to the Slip Opinion's naming of the companies that responded to the Commission's questionnaires. *See, e.g.*, *id.* at 2–4 (requesting the Court remove the names of various companies). This information is not confidential because the Commission failed to abide by USCIT Rule 5(g) when designating information as confidential or business proprietary. *See id.* at 3 (admitting the cited pages "were not individually bracketed"). Second, the Motion to Retract objects to the Court's usage of approximations to summarize information the Commission did properly bracket according to USCIT Rule 5(g). *See, e.g.*, *id.* at 1–2 (objecting to various numerical approximations). This portion of

the Motion fails because the information is publicly available, the Court's approximations do not "closely track" the Commission's figures as the Motion to Retract suggests, or both. *Id.* at 1. The Motion's motley approach to redaction demonstrates the importance of properly designating information as confidential under USCIT Rule 5(g) and maintaining a consistent approach to what constitutes confidential or business proprietary information. *Compare id.* at 1–2 (objecting to company names and production ratios), *with id.* at 2–3 (objecting to company names but *not* purchase ratios). The Commission can best encourage voluntary cooperation from companies and protect allegedly confidential information by following the rules. *Cf. id.* at 2–3 (explaining why protecting confidential information is important to the Commission).

### A. Company Names

The Motion to Retract asks the Court to censor the names of "non-party purchasers that voluntarily provided questionnaire responses"[1] to the Commission. *Id.* at 2. According to the Motion, the Commission views the "entirety of purchaser questionnaire responses, including the identity of those purchasers" as confidential business proprietary information. *Id.* However, the responses to the purchaser

---

[1] Although the Motion to Retract characterizes the responses as voluntary, the questionnaire itself does not. The questionnaire states a response "is mandatory and failure to reply as directed can result in a subpoena or other order to compel the submission of records or information in your firm's possession." Blank "U.S. – Purchaser" Questionnaire at 1, U.S. Int'l Trade Comm'n, https://bit.ly/3vjf04h (last visited Jan. 8, 2024). This is not the only inconsistency between what the Commission represents in the Motion to Retract and what the Commission's own questionnaires say. *See infra* note 4.

questionnaires were not bracketed in accordance with USCIT Rule 5(g), meaning any claim to confidentiality was waived long ago.

USCIT Rule 5(g) requires that "[a]ny paper containing confidential or business proprietary information must identify that information by enclosing it in brackets." Counsel and the parties are responsible for complying with the Court's rules and orders regarding the redaction of sensitive information. *Cf.* In re E-Government Act of 2002 and Privacy Redaction, Admin. Order No. 08-01, at 2 (CIT May 2, 2008, amend. Nov. 25, 2008, eff. Jan. 1, 2009), https://www.cit.uscourts.gov/sites/cit/files/AO-08-01.pdf ("It is the responsibility of counsel and the parties to be sure that all filings comply with the Court's Rules, orders, or notices regarding the redaction of personal data identifiers or other sensitive information."). The Commission admits that it did not bracket the purchaser questionnaires filed with the Court. Motion to Retract Attach. A at 3, ECF No. 93. The Motion to Retract makes three excuses for this. First, it asserts that the company names were bracketed in the Commission's index to the record. *Id.* Second, it notes that the Commission stamped a "Business Proprietary" label atop the pages of the questionnaires. *Id.* Third, it makes veiled excuses about the length of the administrative record. *See id.* (describing the confidential joint appendix as "voluminous").

The Motion's first excuse is that the Commission bracketed the company names in the index it filed with the confidential joint appendix. This is half true

but of no consequence.  The index does contain brackets in place of the names of the companies that responded to the questionnaires; but instead of brackets around the purportedly confidential information (*e.g.,* "[company name]"), the index contains brackets around empty space (*e.g.,* "[      ]").  *See, e.g.*, Confidential J.A. Index at 39–40, ECF No. 66.  That is how the public version of a document should be bracketed, not the confidential version.  *See* USCIT R. 5(g) ("A non-confidential version in which the confidential or business proprietary information is deleted must accompany a confidential version of a paper.").  This detail is crucial because it means that, even if the Court exercised extra diligence and searched the entire confidential joint appendix to confirm a company's name was not designated as confidential anywhere, it would not locate the place where the Commission supposedly designated the company name as confidential because the blank space in place of the company name would not show up in a search.  Disregarding the parties' error does them no service, as bracketing information somewhere else in the record does not magically afford protection across the entire record.

The second excuse proffered is the "business proprietary" label stamped at the top of the questionnaire pages.  Motion to Retract Attach. A at 3, ECF No. 93.  This label, which is often partially obscured by the stamping mechanism of the Court's e-filing system, is exactly the type of blanket designation that USCIT Rule 5(g) prohibits.  Rule 5(g) does not allow parties to designate information as confidential by labelling an entire page.  Indeed, even Government officials

classifying a document for national security reasons must indicate "which portions are classified … and which portions are unclassified." Exec. Order No. 13,526, 75 Fed. Reg. 707, 710 (Dec. 29, 2009). Looking at the Commission's questionnaires, it is apparent why blanket designation is disfavored. One question asks, in essence, whether the responding company is a brick-and-mortar or online retailer. Blank "U.S. – Purchaser" Questionnaire at 9, U.S. Int'l Trade Comm'n, https://bit.ly/3vjf04h (last visited Jan. 8, 2023).[2] Surely it is no secret whether a company has physical storefronts or whether it sells mattresses online. Allowing blanket designation like the Motion to Retract requests is incompatible with a system where public access to judicial proceedings is the default rule. *See Binh Hoa Le*, 990 F.3d at 417.

Finally, the Commission makes numerous allusions to the length of the administrative record to justify its failure to abide by USCIT Rule 5(g). *See, e.g.*, Motion to Retract at 2, ECF No. 93 (noting the length of the confidential record); Motion to Retract Attach. A at 3, ECF No. 93 (twice describing the record as "voluminous" while explaining that the Commission "inadvertently" failed to bracket large swaths of the record it now claims contain confidential information). Courts may not use administrative burden to justify denying public access to judicial records. *In re Leopold to Unseal Certain Elec. Surveillance Applications &*

---

[2] A blank version of the purchaser questionnaire in this investigation is available for download on the Commission's website at the listed URL.

*Ords.*, 964 F.3d 1121, 1134 (D.C. Cir. 2020) (Garland, J.). Neither can quasi-judicial agencies like the Commission.

The Commission and the other parties missed multiple opportunities to raise concerns about this information earlier. If the parties believed the company names were confidential, the parties should have bracketed that information. *See* USCIT R. 5(g). Some of the information to which the Motion to Retract objects was discussed in open court at oral argument. *See, e.g.*, Oral Arg. Tr. at 25:5–26:16, ECF No. 75 (discussing specific companies by name and their product mixes). If the parties believed this information was confidential, they should have raised that concern during oral argument or on reviewing the transcript. *See* Admin. Order No. 02-01 at 8, 20 (outlining the procedures for breaches involving confidential information); Def.'s Public Req. for Redaction, *United States v. Aegis Security Ins. Co.*, No. 1:20-cv-03628 (CIT Jan. 2, 2024), ECF No. 132 (requesting redaction of allegedly confidential information in an oral argument transcript). It is strange that only now, after an opinion some may characterize as less than complimentary, does the Commission demand secrecy. If it was fine to discuss unbracketed company names in a public court session, it is fine to do the same in a written public opinion. The Commission's request to redact the names of the responding companies is therefore **DENIED**.

### B.       The Court's Use of Approximations

The second category of information to which the Motion to Retract objects is the Court's use of numerical approximations to describe the general conditions of the mattress market. *See generally* Motion to Retract Attach. A at 1–2, ECF No. 93. This includes the origin of imports, relative share of imported and domestic mattresses in the market, and the segmented nature of mattress production and purchasing. *See id.*

As a preliminary matter, the Court doubts that much of the allegedly confidential information the Commission did properly bracket qualifies as confidential by the Commission's own definition[3] or by any reasonable understanding of the terms "confidential" or "business proprietary." The Commission's own questionnaires state "[t]he commercial and financial data furnished in response to this questionnaire *that reveal the individual operations of your firm* will be treated as confidential" and that "general characterizations of numerical business proprietary information (such as discussion of trends)" will be treated as confidential information only for good cause.[4] Blank "U.S. – Purchaser" Questionnaire at 4 (emphasis added). Yet the Motion to Retract objects to public

---

[3] The Commission's rules do not necessarily govern the Court, but information that fails to satisfy the Commission's standards for confidentiality is unlikely to satisfy the Court's standards.

[4] In the Motion to Retract, the Commission claims that it considers "the entirety of purchaser questionnaire responses" to be business confidential information. Motion to Retract Attach. A at 3, ECF No. 93. Once again, the Commission's own questionnaires are at war with its Motion. *Cf. supra* note 1.

discussion of the general market trends of declining Chinese imports and rising imports from other countries. *See* Motion to Retract Attach. A at 1, ECF No. 93. That is precisely the type of information the Commission's questionnaires acknowledge is not confidential or business proprietary. It does not reveal the individual operations of any company and is instead a general discussion of broad market trends. The same goes for the Slip Opinion's description of the respective market shares of imported and domestically produced mattresses. *See CVB*, 2023 Ct. Intl. Trade LEXIS 189, at *4, *10–11.

Much of the information on market trends and market share is publicly available. The decline in Chinese imports and concurrent rise in imports from other countries is well documented. *See, e.g.*, David Perry, *China's Mattress Import Share Falls to 1% in August*, Furniture Today (Oct. 8, 2019), https://bit.ly/4aFKfH9 (reporting Chinese mattresses were 82 percent of imports in January 2019 and 1 percent in August 2019); David Perry, *Mattress Alliance, Petitioners Square Off Over Antidumping*, Furniture Today (Apr. 13, 2020), https://bit.ly/3H3wmVE (reporting Vietnam, Thailand, Turkey, Serbia, Malaysia, Indonesia, and Cambodia collectively account for 83.3 percent of mattress imports). Information about the relative market share of imports and the domestic industry is also available from general interest newspapers. Nathan Bomey, *Chinese 'Dumping' Has Slashed Mattress Prices, but at a Cost to the U.S. Bedding Industry*, USA Today (Dec. 19, 2019), https://bit.ly/47qssRn (stating Chinese imports in 2018 were "equivalent to

about one-third of total mattress production capacity in the United States."). The Court will not redact information as confidential that some of the responding parties themselves have freely provided to the press. *See, e.g.*, David Perry, *Mattress Alliance, Petitioners Square Off Over Antidumping*, FURNITURE TODAY (Apr. 13, 2020), https://bit.ly/3H3wmVE (quoting Ashley Furniture Vice President Brian Adams saying imports from Vietnam, Thailand, Turkey, Serbia, Malaysia, Indonesia, and Cambodia make up "22 [percent] of the U.S. mattress market" and "83.3 [percent] of all mattress imports"). Although the parties claim that knowledge of Ashley Furniture's lopsided mattress production is "sensitive," Ashley's Vice President Brian Adams testified at the Commission's *public* hearing and stated that Ashley had shifted "almost exclusively to [boxed mattresses], both in our purchases and in our production." *Compare* Motion to Retract Attach. A at 2, ECF No. 93, *with* Statement of Brian Adams at 143:25–144:5, J.A. at 7,569, ECF No. 60, *and CVB*, 2023 Ct. Intl. Trade LEXIS 189, at \*36 ("Of the twelve companies that produced both mattress types in 2019, five produced virtually none of one kind" and "Ashley … produced far less than one percent of U.S. production of one kind of mattress."). Because this information is publicly available, it fails to qualify as confidential or business proprietary information. *See Food Mktg. Inst.*, 139 S. Ct. at 2363.

Even if information is confidential or business proprietary, the Court's use of approximations appropriately summarizes the information without revealing exact

figures.  *See* Blank "U.S. – Purchaser" Questionnaire at 4 ("general characterizations of numerical business proprietary information" will be treated as confidential only for good cause).  Some of the objections raised border on frivolity. For instance, the Motion to Retract objects to the Court's use of the phrase "thousands of percent[.]"  Motion to Retract Attach. A at 1, ECF No. 93; *see also CVB*, 2023 Ct. Intl. Trade LEXIS 189, at *4.  Thousands of percent can mean anything from 2,000 percent to 999,999 percent.  Such a wide range can hardly tip off a reader to anything approaching the exact number the Commission bracketed. The same goes for the term "negligible."  *Compare* Motion to Retract Attach. A at 2, ECF No. 93, *with CVB*, 2023 Ct. Intl. Trade LEXIS 189, at *36.  The word negligible is comparative.  *See* Webster's Second New International Dictionary 1638 (1956) (defining negligible as "that may be neglected or disregarded"); *Negligible*, Oxford English Dictionary, https://bit.ly/3NRiW2R (defining negligible as "so small or insignificant as not to be worth considering").  That a company's market share of boxed mattress production is negligible compared to its unknown share of flat-packed mattress production does not reveal the actual market share percentage for either.  *Compare* Motion to Retract Attach. A at 2, ECF No. 93, *with CVB*, 2023 Ct. Intl. Trade LEXIS 189, at *35–36.

Elsewhere, the Court similarly couches its language to avoid exactness.  The Slip Opinion uses words like "roughly," "about," and "at least" to indicate that the numbers given are merely a rough approximation.  *See, e.g.*, *CVB*, 2023 Ct. Intl.

Trade LEXIS 189, at *4, *10, *35, *39.  It also uses ratios to demonstrate the lopsided nature of domestic mattress production without revealing the raw production figures.  *Id.* at *35–37.  Ballpark figures like these provide enough information for the reader to understand the case without revealing any confidential or business proprietary information.  Because these general summaries do not reveal such information, they need not be redacted.

## C.    The Virtues of Transparency

The American tradition of public access to judicial proceedings dates back not merely to the founding, or even to the English common law, but all the way back to Ancient Rome.  *Binh Hoa Le*, 990 F.3d at 418 ("The principle traces back to Roman law, where trials were *res publica* — public affairs.").  Legal arguments and judicial decisions are meant to be public because "American courts are not private tribunals summoned to resolve disputes confidentially at taxpayer expense." *Id.* at 421.  This is especially true when the courts resolve disputes to which the Government is a party, affecting the entire citizenry.  Like a student taking a math test, courts are expected to show their work.  The public does not and should not accept final answers to complicated questions on faith alone.  *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 595 (1980) (Brennan, J., concurring) ("Closed trials breed suspicion of prejudice and arbitrariness, which in turn spawns disrespect for law.").

Although the Court adjudicates the Motion to Retract based on the law and the facts currently before it, this is not the first time the Commission has taken a

questionable position on transparency before the Court.  The Commission took a similar tact in a high-profile case involving fertilizer imports.  *See generally OCP S.A. v. United States*, 658 F. Supp. 3d 1297 (CIT 2023).  In a conference prior to oral argument, the Court noted that more than one hundred members of Congress had formally commented on the Commission's decision.  Despite the public interest in the case, the Commission urged the Court to hold the entire oral argument in closed session.  Audio Recording:  Conference Call Regarding Oral Argument at 24:33–50 (June 7, 2022), ECF No. 144.[5]  This would bar attendance by not only the public but also all non-lawyers, including corporate officers of the parties to the case.  The Commission's counsel urged this route because she believed business proprietary information "underline[d] all the aspects and all the disputes" in the case.  *Id.* at 29:05–15.  The Court decided to hold a public oral argument with a confidential session at the end if necessary.  *Id.* at 33:00–35:00.  The transcript of the eventual oral argument was 229 pages.  *See* Confidential Oral Arg. Tr., ECF No. 130.  The public portion comprised 192 of those pages.  *See* Public Oral Arg. Tr., ECF No. 129.  The opinion dispensing with the case was entirely public.  *Compare* Audio Recording:  Conference Call at 24:33–50 (Commission counsel claiming it would be impossible to conduct a public hearing on the matter), *with OCP S.A.*, 658 F. Supp. 3d at 1297–1324 (28 reporter pages of opinion, none of which are confidential).

---

[5] The ECF Numbers in this citation and the remaining citations in this paragraph correspond to docket entries in the *OCP* case, not this case.  The Court Number for *OCP* is 1:21-cv-00219.

As with *OCP*, the Commission's decision in this matter and in the related petitions regarding mattresses from China drew public attention. Multiple media outlets published reports or editorials about the antidumping petitions. *See, e.g.*, Derek Miller & Miles Hansen, *Will Biden 'Go to the Mattresses' on Trade Policy?* THE HILL (Feb. 23, 2021), https://bit.ly/3NPsHOQ. Numerous local outlets reported the petitions' potential effects on businesses. *See, e.g.*, Dennis Romboy, *Mattress Fight: Utah Firm Says 'Corporate Warfare' Threatens to Blunt Filling Critical Coronavirus Needs*, DESERET NEWS (Apr. 18, 2020), https://bit.ly/3tEcxBa. Senators on both sides of the political aisle publicly commented on the petitions and how the Commission handled them. *See, e.g., id.* (Senator Mike Lee of Utah); *Brown, Blunt Applaud Trade Commission Ruling on Mattress Antidumping Investigation* (July 6, 2021), https://bit.ly/48EUdXr (Senators Sherrod Brown of Ohio and Roy Blunt of Missouri). When faced with public attention, the Commission's reflexive action appears to be to stifle public access to the judicial review of its decisions.

Although the Commission is not an elected body, it is part of the executive branch and is accountable to the people through their elected representatives. The Commission's actions, like the Court's, are not merely academic. An injury finding can make goods more expensive for consumers across the nation. A finding of no injury can close factories and destroy manufacturing jobs. Companies affected by this investigation claimed the Commission's decision could result in job losses. *See, e.g.*, Romboy, *Mattress Fight*, DESERET NEWS (Apr. 18, 2020), https://bit.ly/3tEcxBa

(Mattress company Malouf claiming the petition in this case "threatens to shut down its business and leave 1,200 workers … without jobs").  When someone loses his livelihood as a result of Government action, he has a right to know how and why the Government took that action.  Neither administrative agencies nor this Court can hide from scrutiny by censoring information.  Citizens can only hold their Government accountable if they know what that Government is doing.  *See Bien Hoa Le*, 990 F.3d at 417 ("[B]ecause 'We the People' are not meant to be bystanders, the default expectation is transparency — that what happens in the halls of government happens in public view."); *Matter of Krynicki*, 983 F.2d 74, 75 (7th Cir. 1992) ("What happens in the halls of government is presumptively open to public scrutiny.").  Though the Commission may be an "independent" agency, it is not immune to legal and democratic accountability.  *Cf.* 19 U.S.C. §§ 1330, 1333(g).  The Constitution governs all branches of the Government — even the administrative state.  *See Loper Bright Enters., Inc. v. Raimondo*, 45 F.4th 359 (D.C. Cir. 2022), *cert. granted in part sub nom. Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023); *Relentless, Inc. v. Dep't of Com.*, 62 F.4th 621 (1st Cir.), *cert. granted in part sub nom. Relentless, Inc. v. Dep't of Com.*, 144 S. Ct. 325 (2023).

## CONCLUSION

Transparency is a touchstone of our judicial system.  Only information that is truly confidential may be concealed from the public.  Parties are expected to diligently follow the rules regarding confidentiality to promote public access to the

Court No. 1:21-cv-00288 (SAV)                                      Page 19

judiciary, protection of confidential information, and judicial efficiency.  Because the

parties failed to abide by the Court's rules and object to statements by the Court

that are not confidential, the Motion to Retract is **DENIED**.

 

 

Stephen Alexander Vaden, Judge

Dated: _January 8, 2024_
      New York, New York

# Tab 3

**International Trade Commission's Final Determination in Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam (as published in Federal Register)**

Commission, without further notice to the respondent, to find the facts to be as alleged in the complaint and this notice and to enter an initial determination and a final determination containing such findings, and may result in the issuance of an exclusion order or a cease and desist order or both directed against the respondent.

By order of the Commission.

Issued: May 11, 2021.

**Lisa Barton,**

*Secretary to the Commission.*

[FR Doc. 2021–10233 Filed 5–13–21; 8:45 am]

**BILLING CODE 7020–02–P**

---

## INTERNATIONAL TRADE COMMISSION

[Investigation Nos. 701–TA–645 and 731–TA–1495–1501 (Final)]

### Mattresses From Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam

**Determinations**

On the basis of the record[1] developed in the subject investigations, the United States International Trade Commission ("Commission") determines, pursuant to the Tariff Act of 1930 ("the Act"), that an industry in the United States is materially injured by reason of imports of mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam, provided for in subheadings 9404.21.00, 9404.29.10, 9404.29.90, 9401.40.00, and 9401.90.50 of the Harmonized Tariff Schedule of the United States, that have been found by the U.S. Department of Commerce ("Commerce") to be sold in the United States at less than fair value ("LTFV"), and by reason of imports of mattresses from China that have been found by Commerce to be subsidized by the government of China.

**Background**

The Commission instituted these investigations effective March 31, 2020, following receipt of petitions filed with the Commission and Commerce by Brooklyn Bedding (Phoenix, Arizona), Corsicana Mattress Company (Dallas, Texas), Elite Comfort Solutions (Newnan, Georgia), FXI, Inc. (Media, Pennsylvania), Innocor, Inc. (Media, Pennsylvania), Kolcraft Enterprises, Inc. (Chicago, Illinois), Leggett & Platt, Incorporated (Carthage, Missouri), the International Brotherhood of Teamsters (Washington, DC), and United Steel,

Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO (Washington, DC). The final phase of the investigations was scheduled by the Commission following notification of preliminary determinations by Commerce that imports of mattresses from China were subsidized within the meaning of section 703(b) of the Act (19 U.S.C. 1671b(b)) and imports of mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam were sold at LTFV within the meaning of 733(b) of the Act (19 U.S.C. 1673b(b)). Notice of the scheduling of the final phase of the Commission's investigations and of a public hearing to be held in connection therewith was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the **Federal Register** on November 27, 2020 (85 FR 76105). In light of the restrictions on access to the Commission building due to the COVID–19 pandemic, the Commission conducted its hearing through written testimony and video conference on March 18, 2020. All persons who requested the opportunity were permitted to participate.

The Commission made these determinations pursuant to §§ 705(b) and 735(b) of the Act (19 U.S.C. 1671d(b) and 19 U.S.C. 1673d(b)). It completed and filed its determinations in these investigations on May 10, 2021. The views of the Commission are contained in USITC Publication 5191 (May 2021), entitled *Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam: Investigation Nos. 701–TA–645 and 731–TA–1495–1501 (Final).*

By order of the Commission.

Issued: May 10, 2021.

**Lisa Barton,**

*Secretary to the Commission.*

[FR Doc. 2021–10165 Filed 5–13–21; 8:45 am]

**BILLING CODE 7020–02–P**

---

## INTERNATIONAL TRADE COMMISSION

[Investigation Nos. 701–TA–521 and 731–TA–1252–1255 and 1257 (Review)]

### Steel Nails From Korea, Malaysia, Oman, Taiwan, and Vietnam; Scheduling of Expedited Five-Year Reviews

**AGENCY:** United States International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** The Commission hereby gives notice of the scheduling of expedited reviews pursuant to the Tariff Act of 1930 ("the Act") to determine whether revocation of the countervailing and antidumping duty orders on steel nails from Korea, Malaysia, Oman, Taiwan, and Vietnam would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time.

**DATES:** September 4, 2020.

**FOR FURTHER INFORMATION CONTACT:** Alejandro Orozco (202–205–3177), Office of Investigations, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436. Hearing-impaired persons can obtain information on this matter by contacting the Commission's TDD terminal on 202–205–1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at 202–205–2000. General information concerning the Commission may also be obtained by accessing its internet server (*https://www.usitc.gov*). The public record for these reviews may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov.*

**SUPPLEMENTARY INFORMATION:**

*Background.*—On September 4, 2020, the Commission determined that the domestic interested party group response to its notice of institution (84 FR 33195, June 1, 2020) of the subject five-year reviews was adequate and that the respondent interested party group response was inadequate. The Commission did not find any other circumstances that would warrant conducting full reviews.[1] Accordingly, the Commission determined that it would conduct expedited reviews pursuant to section 751(c)(3) of the Tariff Act of 1930 (19 U.S.C. 1675(c)(3)).

For further information concerning the conduct of these reviews and rules of general application, consult the Commission's Rules of Practice and Procedure, part 201, subparts A and B (19 CFR part 201), and part 207, subparts A, D, E, and F (19 CFR part 207).

Please note the Secretary's Office will accept only electronic filings at this time. Filings must be made through the Commission's Electronic Document Information System (EDIS, *https://edis.usitc.gov*). No in-person paper-based filings or paper copies of any

---

[1] The record is defined in § 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).

[1] A record of the Commissioners' votes is available from the Office of the Secretary and at the Commission's website.