2024-1504, 2024-1566

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**CVB, INC.,**

*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**

*Defendant-Cross-Appellant,*

**BROOKLYN BEDDING, LLC, CORSICANA MATTRESS CO., ELITE COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES, INC., LEGGETT & PLATT, INC., INTERNATIONAL BROTHERHOOD OF TEAMSTERS, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO,**

*Defendants-Appellees.*

---

Appeal from the United States Court of International Trade in
Case No. 1:21-cv-00288-SAV, Judge Stephen Alexander Vaden

## NONCONFIDENTIAL PRINCIPAL AND RESPONSE BRIEF OF DEFENDANT-CROSS-APPELLANT UNITED STATES

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3061

ANDREA C. CASSON
Assistant General Counsel for
   Litigation
Telephone (202) 205-3061

Dated: September 30, 2024

JANE C. DEMPSEY
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone (202) 205-3142

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

STATEMENT OF RELATED CASES .............................................................. 1

JURISDICTIONAL STATEMENT ................................................................... 2

STATEMENT OF THE ISSUES ....................................................................... 3

STATEMENT OF THE CASE ........................................................................... 4

STATEMENT OF THE FACTS ......................................................................... 5

    I.     The Commission's Determinations ......................................................... 5

        A.    Domestic Like Product and Domestic Industry .......................... 5

        B.    Conditions of Competition ......................................................... 6

        C.    Volume ...................................................................................... 10

        D.    Price Effects ............................................................................. 11

        E.    Impact ....................................................................................... 13

    II.    U.S. Court of International Trade Decisions ........................................ 16

        A.    The CIT's Merits Decision ........................................................ 16

        B.    The CIT's BPI Denial Decision ................................................ 18

SUMMARY OF THE ARGUMENT ............................................................... 20

ARGUMENT ................................................................................................... 23

    I.     Standard of Review ............................................................................. 23

    II.    This Court Should Affirm the Commission's Affirmative
        Material Injury Determinations ........................................................... 26

        A.    The Commission Properly Conducted a Material
            Injury Analysis on the Domestic Industry as a
            Whole ...................................................................................... 27

B.    In Any Event, Substantial Evidence Supports the
Commission's Finding that MiBs and FPMs
Competed with Each Other in the U.S. Market ........................ 32

    1.    CVB's Accusation that the Commission
Manipulated Data to Minimize Market
Segmentation is Unwarranted ......................................... 34

        a.    The Commission's Findings
Regarding the Number of Domestic
Firms that Produced Both MiBs and
FPMs Were Supported by Substantial
Evidence ................................................. 35

        b.    The Commission's Finding that Many
Purchasers Purchased Both MiBs and
FPMs Is Supported by Substantial
Evidence ................................................. 39

        c.    The Commission's Finding that
Packaging Was Not an Important
Factor Driving Purchasing Decisions
Is Supported by Substantial Evidence ................. 40

C.    Even Accepting CVB's Market Segmentation
Arguments, the Commission Provided a
Substantially Supported Injury Analysis on
Domestic Producers of MiBs in Addition to its
Analysis on the Domestic Industry as a Whole ........................ 42

III.    This Court Should Reverse the CIT's BPI Denial
Decision ............................................................... 49

A.    The Statute Requires the CIT to Preserve the
Confidential Status of Information Treated as BPI
by the Commission .................................................... 50

B.    The Commission Properly Treated Questionnaire
Response Information as BPI Throughout its
Administrative Proceedings ....................................... 56

1.     Individual Information from Company-Specific Questionnaire Responses................................... 56

2.     Aggregate Information Calculated from Questionnaire Response Data ......................................... 59

C.     The CIT Was Statutorily Required to Preserve the Confidential Status of the Information at Issue ....................... 62

1.     The Statute, and Not the Common Law Right of Public Access, Determines Whether Information Should or Should Not be Disclosed ....................................................................... 63

2.     The Claim to Confidentiality Was Never Waived.............................................................................. 68

3.     Bracketed Subject Import Volume and Market Share Information, Calculated Using Questionnaire Response Data, Were Not Publicly Available Information ..................................... 71

CONCLUSION ....................................................................... 74

## CONFIDENTIAL MATERIAL BRACKETED

The material bracketed within the text on pages 5-8, 10-12, 42, and 72 describes sensitive nonpublic information regarding production operations, import and shipment information, and market share, financial, pricing, cost, and sales information from individual domestic producers and importers and was granted confidential treatment by the Commission. *See* 19 U.S.C § 1677f(b)(1)(A); 19 C.F.R. § 201.6(a).

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*A. Hirsh, Inc. v. United States,*
    657 F. Supp. 1297 (Ct. Int'l Trade 1987) ............................................................66

*Akzo N.V. v. U.S. Int'l Trade Comm'n,*
    808 F.2d 1471 (Fed. Cir. 1986) ............................................57, 58, 59, 66

*Altx, Inc. v. United States,*
    370 F.3d 1108 (Fed. Cir. 2004) ............................................................24

*Am. Brass v. United States,*
    699 F. Supp. 934 (Ct. Int'l Trade 1988) ............................................................54

*BIC Corp. v. United States,*
    964 F. Supp. 391 (Ct. Int'l Trade 1997) ............................................28, 29

*Binh Hoa Le v. Exeter Fin. Corp.,*
    990 F.3d 410 (5th Cir. 2021) ............................................................63

*Bradley v. Sec't of Dep't of Health & Hum. Servs.,*
    991 F.2d 1570 (Fed Cir. 1993) ............................................................32

*Brown v. Ala. Dep't of Transp.,*
    597 F.3d 1160 (11th Cir. 2010) ............................................................25

*Calabrian Corp. v. U.S. Int'l Trade Comm'n,*
    794 F. Supp. 377 (Ct. Int'l Trade 1992) ............................................................28

*Cleo, Inc. v. United States,*
    501 F.3d 1291 (Fed. Cir. 2007) ............................................23, 29

*Cogne Acciai Speciali S.P.A. v. United States,*
    29 CIT 1168 (2005) ............................................................38

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938)............................................................24

*CP Kelco US, Inc. v. United States,*
    24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014) ............................................................28

**Cases (cont'd)**                                              **Page(s)**

*DAK Americas LLC v. United States*,
    517 F. Supp. 3d 1349 (Ct. Int'l Trade 2021) ......................................11

*Depuy Synthes Prods., Inc. v. Veterinary Orthopedic Implant, Inc.*,
    990 F.3d 1364 (Fed. Cir. 2021) ..................................................24, 25

*Encon Indus., Inc. v. United States*,
    16 CIT 840 (1992) ........................................................................33

*Food Mktg. Inst. v. Argus Leader Media*,
    588 U.S. 427 (2019)..................................................................67, 68

*Full Member Subgrp. of Am. Inst. of Steel Constr., LLC v. United
    States*,
    547 F. Supp. 3d 1211 (Ct. Int'l Trade 2021) ..............................28

*Full Member Subgrp. of Am. Inst. of Steel Constr., LLC v. United
    States*,
    81 F.4th 1242 (Fed. Cir. 2023) ...............................................23, 28

*Hitachi Metals, Ltd. v. United States*,
    949 F.3d 710 (Fed. Cir. 2020) .................................................24, 31

*Hyundai Pipe Co., Ltd. v. U.S. Dep't of Commerce*,
    11 CIT 238 (1987) ........................................................................59

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
    849 F.3d 1034 (Fed. Cir. 2017) .....................................................41

*Isbrandtsen Co. v. Johnson*,
    343 U.S. 779 (1952)......................................................................65

*ITG Voma Corp. v. United States Int'l Trade Comm'n*,
    253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017), *aff'd* 753 F. App'x
    913 (Fed. Cir. 2019)......................................................................28

*Jernberg Forgings Co. v. United States*,
    598 F. Supp. 390 (Ct. Int'l Trade 1984) .......................................54

**Cases (cont'd)** **Page(s)**

*Kemira Fibres Oy v. United States*,
 858 F. Supp. 229 (Ct. Int'l Trade 1994) ............................................................53

*Loper Bright Enters. v. Raimondo*,
 603 U.S. ___, 144 S. Ct. 2244 (June 28, 2024) ................................................25

*Makita Corp. v. United States*,
 974 F. Supp. 770 (Ct. Int'l Trade 1997) ............................................................28

*Marubeni Am. Corp. v. United States*,
 35 F.3d 530 (Fed. Cir. 1994) ............................................................................25

*Matter of Krynicki*,
 983 F.2d 74 (7th Cir. 1992) ..............................................................................67

*Monsanto Co. v. United States*,
 698 F. Supp. 285 (Ct. Int'l Trade 1988) ............................................................67

*Monsanto Indus. Chems. Co. v. United States*,
 6 CIT 241 (1983) ........................................................................................66, 67

*NSK Corp. v. U.S. Int'l Trade Comm'n*,
 716 F.3d 1352 (Fed. Cir. 2013) .........................................................................35

*Nucor Corp. v. United States*,
 318 F. Supp. 2d 1207 (Ct. Int'l Trade 2004) ....................................................24

*Nucor Corp. v. United States*,
 414 F.3d 1331 (Fed. Cir. 2005) .........................................................................37

*OCP S.A. v. United States*,
 No. 21-219, Order (Ct. Int'l Trade Feb. 29, 2024) (ECF 158) ......................1, 49

*OCTAL, Inc. v. United States*,
 539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ....................................................45

*Qwest Commc's Int'l Inc. v. FCC*,
 229 F.3d 1172 (D.C. Cir. 2000)..........................................................................58

**Cases (cont'd)**                                                                           **Page(s)**

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980)...........................................................................67

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984)......................................................................67, 68

*Siemens Energy, Inc. v. United States*,
    806 F.3d 1367 (Fed. Cir. 2015) .....................................................23

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ......................................................................... 25

*Smithkline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) .....................................................26

*Timex V.I., Inc. v. United States*,
    157 F.3d 879 (Fed. Cir. 1998) .......................................................25

*Timken U.S. Corp. v. United States*,
    421 F.3d 1350 (Fed Cir. 2005) .................................................23, 24

*United States v. Texas*,
    507 U.S. 529 (1993)........................................................................65

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951)..................................................................23, 24

*U.S. Steel Corp. v. United States*,
    730 F.2d 1465 (Fed. Cir. 1984) .................................................54, 66

*U.S. Steel Grp. v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996) .......................................................31

*Wiener v. NEC Elecs., Inc.*,
    848 F. Supp. 124 (N.D. Cal. 1994)................................................66

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*,
    1978 WL 1333 (E.D. Pa. 1978) (unpublished)................................67

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                              **Page(s)**

*Zhejiang Mach. Imp. & Exp. Corp. v. United States*,
65 F.4th 1364 (Fed. Cir. 2023) ...................................................23

**Statutes**

19 U.S.C. § 1516a(a)(2)(B)(i) ....................................................23

19 U.S.C. § 1516a(b)(1)(B)(i) ....................................................23

19 U.S.C. § 1516a(b)(2)(B) ..................................................*passim*

19 U.S.C. § 1671d(b)(1) ............................................................27

19 U.S.C. § 1673d(b)(1) ............................................................27

19 U.S.C. § 1677(4)(A) .............................................................27

19 U.S.C. § 1677(7)(G)(i) ......................................................6, 45

19 U.S.C. § 1677(7)(J) ........................................................43, 44

19 U.S.C. § 1677e(c)(1)(A) ......................................................65

19 U.S.C. § 1677f......................................................................65

19 U.S.C. § 1677f(a)(4) ..............................................50, 56, 60

19 U.S.C. § 1677f(b) ................................................................19

19 U.S.C. § 1677f(b)(1) ............................................................69

19 U.S.C. § 1677f(b)(1)(A) ......................................................50

19 U.S.C. § 1677f(b)(2) ............................................................51

19 U.S.C. § 1677f(c) ................................................................53

19 U.S.C. § 1677f(c)(1) ..............................................51, 52, 53

19 U.S.C. § 1677f(i)(3)(B)........................................................24

# TABLE OF AUTHORITIES (cont'd)

**Statutes (cont'd)**                                                       **Page(s)**

28 U.S.C. § 1295(a)(5)...................................................................................2

28 U.S.C. § 1581(c) .......................................................................................2

28 U.S.C. § 2639(a)(1).................................................................................23

**Legislative Materials**

Omnibus Trade and Competitiveness Act of 1988,
    Pub. L. No. 100-418, 102 Stat. 1107 (1988) ........................................65

Trade Agreements Act of 1979,
    Pub. L. No. 96-39, 93 Stat. 144 (1979) ..........................................64, 65

Statement of Adminsitrative Action accompanying Uruguay Round
    Agreements Act, H.R. Rep. No. 103-316, vol. 1 (1994)......................24

H. Rep. No. 100-576 (Apr. 20, 1988) ........................................................65

S. Rep. No. 96-249 (July 17, 1979) .....................................................54, 66

S. Rep. No. 100-71 (June 12, 1987).............................51, 53, 55, 59, 65

**Federal Regulatory Materials**

19 C.F.R. § 201.6(a)........................................................................55, 57, 72

19 C.F.R. § 201.6(g) ............................................................................55, 56

19 C.F.R. § 207.7 ........................................................................................56

**U.S. Court of International Trade Rules**

Ct. Int'l Trade Rule 5(g) ...........................................................19, 62, 69

Ct. Int'l Trade Rule 11 ............................................................................49

**TABLE OF AUTHORITIES (cont'd)**

**U.S. International Trade Commission Publications**                    **Page(s)**

*An Introduction to Administrative Protective Order Practice in Import Injury Investigations*, USITC Pub. 5280 (5th ed. Jan. 2022) ......................60, 61

*Antidumping and Countervailing Duty Handbook*, USITC Pub. 4540 (14th ed. June 2015)................................................60, 61, 73

*Blast Furnace Coke from China and Japan*, Inv. Nos. 731-TA-951-952 (Prelim.) (Remand), USITC Pub. 3619 (Aug. 2003) ................................................................................................29, 30

*Mattresses from China*, Inv. No. 731-TA-1424 (Final), USITC Pub. 5000 (Dec. 2019) ..............8, 14, 20

*Outboard Engines from Japan*, Inv. No. 731-TA-1069 (Final), USITC Pub. 3752 (Feb. 2005)...................29, 30

*Uncoated Groundwood Paper from Canada*, Inv. Nos. 701-TA-584, 731-TA-1382 (Final), USITC Pub. 4822 (Sept. 2018) ................................................................................................29, 30

**STATEMENT OF RELATED CASES**

In addition to the related cases cited by counsel for Plaintiff-Appellant CVB, Inc. ("CVB"), counsel for Defendant-Cross-Appellant the U.S. International Trade Commission ("Commission") identifies the following pending case that may be directly affected by the Court's decision in the pending cross-appeal by the Commission:

1. *OCP S.A. v. United States*, Consol. Court No. 21-219 (Ct. Int'l Trade).

# JURISDICTIONAL STATEMENT

Pursuant to Rule 28(a)(5) of the Rules of this Court, counsel for Defendant-Cross-Appellant states that this Court's jurisdiction rests upon the following bases:

(a) The U.S. Court of International Trade ("CIT") possessed jurisdiction to entertain this underlying action pursuant to 28 U.S.C. § 1581(c).

(b) The statutory basis for this Court's jurisdiction to entertain this appeal and cross-appeal is 28 U.S.C. § 1295(a)(5).

(c) The CIT sustained the Commission's final affirmative material injury determinations on December 19, 2023 ("Merits Decision"). Subsequently, on January 8, 2024, the CIT denied the parties' joint motion to accord confidential treatment to the business proprietary information ("BPI") contained within the Merits Decision ("BPI Denial Decision").

(d) Pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B), Plaintiff-Appellant CVB timely filed its appeal challenging the CIT's Merits Decision to this Court on February 15, 2024, and the Commission timely filed its cross-appeal challenging the CIT's BPI Denial Decision on March 7, 2024.

# STATEMENT OF THE ISSUES

CVB appeals the Merits Decision in *CVB, Inc. v. United States*, 675 F. Supp. 3d 1324 (Ct. Int'l Trade 2023), in which the court affirmed the Commission's unanimous final affirmative material injury determinations in *Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam*, Inv. Nos. 701-TA-645 and 731-TA-1495-1501 (Final), USITC Pub. 5191 (May 2021). Appx001-047. The Commission submits that the single encompassing issue in CVB's appeal is appropriately framed as:

> Whether the Commission's determination that the domestic industry was materially injured by reason of unfairly traded imports of mattresses from the subject countries is supported by substantial evidence and otherwise in accordance with law.

The Commission cross-appeals the CIT's BPI Denial Decision set out in *CVB, Inc. v. United States*, 681 F. Supp. 3d 1313 (Ct. Int'l Trade 2024). Appx048-066. Although the statute, 19 U.S.C. § 1516a(b)(2)(B), required the CIT to preserve the confidential status of BPI designated as such by the Commission, the court publicly disclosed BPI in its Merits Decision and denied the parties' joint motion to redact and accord confidential treatment to such information. The Commission submits that the issue raised in its cross-appeal is:

> Whether the CIT abused its discretion in denying the parties' joint motion to redact information submitted to the Commission under a promise of confidentiality and

determined by the Commission to constitute BPI in accordance with the governing statute and regulations.

## STATEMENT OF THE CASE

In March 2020, seven domestic mattress producers and two unions representing workers at domestic mattress facilities filed a countervailing duty petition covering mattresses from China and antidumping duty petitions covering mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam. Appx80000-80001. In May 2021, the Commission issued unanimous affirmative final determinations that an industry in the United States was materially injured by reason of subject imports that the Department of Commerce ("Commerce") determined were subsidized and sold in the United States at less than fair value. Appx124045-124115.[1]

CVB, a U.S. importer of subject merchandise, appealed the Commission's final determinations to the CIT. In December 2023, the CIT issued its Merits Decision in which it sustained the Commission's determinations. Appx001-047.

In its Merits Decision, however, the CIT did not bracket any of the designated BPI. In light of the clear statutory protection afforded to BPI in trade cases, the parties jointly filed a motion respectfully requesting that the CIT retract

---

[1] The confidential version of the Commission's Views and Report are found at Appx124045-124115 and Appx124117-124570, respectively. The public version of the Views and Report is contained in USITC Pub. 5191, Appx14727-15238.

the public opinion and accord confidential treatment to the BPI. Appx618-672. In January 2024, the CIT issued its BPI Denial Decision in which it denied the parties' joint motion in all respects. Appx052-070.

CVB's appeal and the Commission's cross-appeal to this Court followed.

## STATEMENT OF THE FACTS

## I. The Commission's Determinations

As discussed above, the Commission determined that an industry in the United States was materially injured by reason of imports of mattresses from the subject countries.

### A. Domestic Like Product and Domestic Industry

The Commission defined a single domestic like product consisting of all mattresses within the scope of the investigations, and the domestic industry as all domestic producers of that product, except for two producers [ firm name ] and [ firm name ] that were excluded pursuant to the related parties provision because their primary interests were in importation rather than domestic production. Appx124047-124067.

The Commission observed that during the January 2017-September 2020 period of investigation ("POI"), the U.S. mattress market was comprised of a large variety of mattresses, including innerspring (made of a core of densely packed rows of metal springs), non-innerspring (comprised of a single slab or multiple

layers of foam), and hybrid mattresses (made of metal springs and one or more layers of foam), with all three types of mattresses packaged and shipped as flat packed mattresses ("FPMs") and packaged in a box ("MiBs").  Appx124052, Appx124080.  The Commission found that notwithstanding the various mattress types, all mattresses consisted of the same basic components:  (1) a core, which provided the main support system of the mattress; (2) upholstery material surrounding the core; and (3) ticking, or the cover/outermost layer of fabric enclosing the core.  Appx124051.

### B.    Conditions of Competition[2]

The Commission found several distinct conditions of competition for the U.S. mattresses market.  It found that demand for mattresses, which was tied to housing sales and economic activity, increased over the POI.  Appx124077-124079.  It observed that while consumption trends differed by mattress type, overall apparent U.S. consumption increased by [ ## ] percent from 2017 to 2019, and was [ ## ] percent higher in January to September 2020 ("interim 2020") than in January to September 2019 ("interim 2019").  The Commission further noted

---

[2] As required by section 771(7)(G)(i) of the Tariff Act, the Commission cumulated mattress imports from all subject countries after determining that mattress imports from each subject country were above the applicable three percent statutory negligibility threshold and the statutory criteria for cumulation were satisfied (*i.e.*, the petitions were filed on the same day and a reasonable overlap in competition existed between subject imports and the domestic like product). Appx124067-124073.

that notwithstanding declining consumption for FPMs, a majority of responding domestic producers, importers, and purchasers reported that demand for FPMs was stable or increasing. Appx124078. In addition, FPMs continued to account for a larger share of apparent U.S. consumption than MiBs throughout the POI. Appx124078.

Regarding supply, the Commission found that domestic producers and U.S. importers supplied all types of mattresses packaged as FPMs and MiBs during the POI. Appx124079-124080, Appx124083. While importers had an economic incentive to primarily import MiBs rather than FPMs due to their smaller size, which minimized ocean freight, inland transportation, and warehousing costs, domestic firms had production facilities located across 36 states allowing them to operate on a "just-in-time" delivery model for their mattresses.[3] Appx124079-124080, Appx124108-124109.

The Commission additionally noted a shift in subject import supply in 2019. It observed that in 2017 and 2018, subject imports from China accounted for over [ ## ] percent of cumulated subject imports in the U.S. market. However, between 2018 and 2019, following imposition of duties on mattresses from China under

---

[3] Most domestic industry shipments (83.7 percent) were produced to order with an average lead time of five days and most importer shipments (95.2 percent) were sold from inventory with a similar average lead time of five days. Appx124087.

section 301 of the Trade Act of 1974 ("section 301 duties") in 2018 and

provisional measures in *Mattresses from China*, Inv. No. 731-TA-1424 (Final),

USITC Pub. 5000 (Dec. 2019) ("*Mattresses I*"), in 2019, subject imports from

China declined precipitously while imports from the other subject countries

increased [ ## ] percent. Appx124081-124082. This occurred as many

Chinese-owned mattress producers switched their production of U.S.-bound

exports to facilities in Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey,

and Vietnam. Appx124081-124082.

Next, the Commission found that domestically-produced mattresses and

subject imports had a moderately high degree of substitutability. It observed that

most responding U.S. producers, importers, and purchasers reported that domestic

and subject mattresses were always or frequently interchangeable, and most

responding purchasers also reported that mattresses from domestic and subject

sources were comparable with respect to all 26 purchasing factors (including with

respect to packaging types and ability to ship by common carrier). Appx124083.

While noting that subject imports were more often shipped as MiBs and domestic

mattresses more often shipped as FPMs, the Commission found that the domestic

industry shipped substantial quantities of both MiBs and FPMs, and that there were

substantial volumes of subject imports of FPMs. Appx124083. In addition,

domestically-produced mattresses and subject imports were sold through the same

channels of distribution, primarily to retailers, including brick-and-mortar, online, and omni-channel retailers, with substantial overlap between the top ten customers reported by responding domestic producers and importers.  Appx124087-124088.

The Commission found that MiBs and FPMs competed with each other in the U.S. market.  Appx124083-124086.  As it observed, MiBs and FPMs were produced to the same general specifications, and were functionally interchangeable once unpackaged.  Appx124083-124084.  Sleep studies indicated that packaging was among the least important purchasing factors for consumers, and respondents conceded that consumers cross-shopped between MiBs and FPMs.  Appx124084-124085.  The behavior of retailers and wholesalers who purchased directly from producers or importers reflected this consumer indifference toward mattress packaging.  Eleven of 19 responding purchasers, including many of the largest purchasers, reported purchasing or importing both MiBs and FPMs.  Appx124085-124086.  Further, retailers displayed MiBs and FPMs side-by-side without distinction, online retailers did not offer search filters for packaging type, and only two of 19 responding purchasers ranked packaging as one of the three most important purchasing factors for mattresses.  Appx124085-124086.

The Commission further found that price was an important purchasing factor for mattresses.  Responding purchasers ranked price as one of the three most important purchasing factors more than any other factor except quality, and price

was among the most frequently cited factors as being very important, along with factors such as availability, quality, delivery time, and reliability of supply. Appx124086-124087.  Four purchasers also reported that they usually or always purchased the lowest priced mattresses, while 16 reported that they sometimes did. Appx124086-124087.

## C.    Volume

The Commission next found that the volume and increase in volume of cumulated subject imports were significant, both absolutely and relative to apparent U.S. consumption.  Subject imports increased from 5.5 million units in 2017 to 7.0 million units in 2018 and 7.8 million units in 2019; their volume was higher in interim 2020 at 7.4 million units than in interim 2019 at 5.3 million units. Appx124090.  As subject imports increased by 40.6 percent over the full years of the POI, they also increased their U.S. shipments and share of apparent U.S. consumption from [ ## ] percent in 2017 to [ ## ] percent in 2019. Appx124090.  The Commission noted that the domestic industry's POI loss in market share ([ ## ] percentage points) was nearly equivalent to the gain in market share by subject imports ([ ## ] percentage points).  Appx124090.  Similarly, a comparison of market share during the 2019 and 2020 interim periods showed that subject imports gained [ ## ] percentage points while the domestic industry lost [ ## ] percentage points.  Appx124090.

### D.    Price Effects

The Commission found that subject imports also had significant price

effects.  Examining the pricing data for eight mattress products, subject imports

undersold the domestic like product in [ ## ] of [ ## ] quarterly comparisons, or

in [ ## ] percent of comparisons, at margins averaging [ ## ] percent.[4]  The

quarters with underselling accounted for [ ## ] percent of the reported volume of

subject imports in the pricing data.  Appx124092.  The Commission also collected

purchase cost data for the same pricing product definitions, and these data similarly

indicated that subject imports had a lower price-cost differential in [ ## ] of

[ ## ] quarterly comparisons involving [ ## ] percent of subject import units in

these data, and at price-cost differentials averaging [ ## ] percent.[5]  Appx124092-

124094.

Reiterating the moderately high substitutability between subject imports and

the domestic like product and the importance of price in purchasing decisions, the

Commission observed that seven purchasers reported that subject imports were

---

[4] The pricing products were comprised of three mattress products shipped as MiBs, four mattress products shipped as FPMs, and one mattress product that did not specify packaging.  Appx124091-124092.

[5] The Commission uses the term "price data" to refer to U.S. importers' and domestic producers' sales price for shipments to unrelated customers and the term "purchase cost data" to refer to the landed duty-paid ("LDP") value of imports made by U.S. importers for their internal consumption or retail sale.  *See DAK Americas LLC v. United States*, 517 F. Supp. 3d 1349, 1356 (Ct. Int'l Trade 2021).

lower priced than the domestic like product, and further that responding purchasers had reduced their share of purchases of the domestic like product by [ ## ] percentage points while increasing their share of purchases of subject mattresses by [ ## ] percentage points between 2017 and 2019.  Appx124094 (n.225).  While acknowledging that few responding purchasers confirmed switching purchases from the domestic product to subject imports because of price, the Commission explained that the questionnaire evidence nonetheless indicated that purchasers at the wholesale/retail level as well as consumers found price to be an important factor, that purchasers had shifted purchases from the domestic industry to subject imports during the POI, and that the pricing data showed subject imports to be lower-priced.  Appx124094-124095.  Based on the foregoing, the Commission found that subject imports significantly undersold the domestic like product and that this significant underselling contributed to subject imports gaining sales and market share at the domestic industry's expense.  Appx124094-124095.

The Commission further found that the significant and growing quantity of low-priced subject imports depressed prices to a significant degree.[6]  It noted that for six of the eight pricing production definitions, domestic producers' prices declined between the first and last quarters of the POI.  These price declines

---

[6] The Commission also considered whether subject imports had suppressed prices for the domestic like product to a significant degree, but ultimately did not reach a conclusion on this issue.  Appx124098 (n.238).

occurred as apparent U.S. consumption increased, nonsubject imports' share of that consumption declined, and the domestic industry's production costs increased. Appx124095. The Commission considered arguments that factors other than subject imports explained domestic price declines, including declining demand for FPMs. It found this argument was inconsistent with domestic price increases for two of the four FPM pricing products and questionnaire responses indicating that purchasers did not perceive demand for FPMs to be declining. Appx124096-124097.

The Commission concluded that because cumulated subject imports significantly undersold the domestic like product leading to lost sales and significant price depression, subject imports had significant adverse price effects. Appx124098.

### E. Impact

Finally, the Commission found that cumulated subject imports had a significant impact on the domestic industry. Appx124099-124107. Despite strong and growing demand in the U.S. market between 2017 and 2019, the domestic industry experienced declining capacity, production, capacity utilization, employment, and U.S. shipments. As significantly increasing volumes of subject imports undersold the domestic product and depressed domestic prices to a significant degree, the domestic industry experienced stagnant net sales, revenues,

and gross profits, as well as declining operating income and net income. Appx124105-124106. Notwithstanding some improvement in the domestic industry's performance in 2019, its performance remained below that of 2017, and increases in performance factors in interim 2020 compared to interim 2019 were less than would be expected during a period of strong demand growth and imposition of the *Mattresses I* antidumping duty order on mattresses from China in December 2019. Appx124106-124107. As the domestic industry continued to lose market share to subject imports, the industry's production and U.S. shipments were flat in interim 2020 compared with interim 2019, while its capacity utilization rate and employment were lower. Appx124107.

The Commission considered respondents' market segmentation arguments, including their claim that the Commission should focus its impact analysis on domestic producers of MiBs, which allegedly competed more directly with subject imports than domestic producers of FPMs. The Commission referred again to the evidence showing that MiBs were interchangeable and competed with FPMs in the U.S. market. Appx124107-124108. The Commission found that given the importance of price to purchasers, purchasers were encouraged to purchase subject imports due to their significantly lower prices instead of domestically-produced FPMs and MiBs. Appx124110-124111.

Although the Commission properly conducted an analysis of the impact of subject imports on the domestic industry as a whole, the Commission nevertheless also considered the impact of subject imports on domestic producers that exclusively produced MiBs. As the Commission found, the domestic MiB producers' capacity utilization remained low over the POI, despite the industry's substantial investments in MiB capacity and increasing apparent U.S. consumption. Moreover, subject imports depressed domestic MiB prices to a significant degree. Thus, the Commission found that the performance of domestic MiB producers would have been stronger, with greater sales revenues and operating and net income than they achieved during the POI, but for subject import competition. Appx124111-124114.

In addition to allegations of market segmentation between MiBs and FPMs, the Commission considered the effects of demand trends, nonsubject imports, and raw material shortages on the domestic industry so as not to attribute injury from these other factors to the subject imports, but it found that none of these other alleged factors explained declines in the domestic industry's performance during the POI. Appx124112-124113 (n.308), Appx124114 -124115.

Based on all of the foregoing, the Commission determined that an industry in the United States was materially injured by reason of subject mattresses. Appx124115.

## II.    U.S. Court of International Trade Decisions

### D.    The CIT's Merits Decision

In June 2021, CVB filed its appeal to the CIT.  Appx082.  On December 19, 2023, the CIT issued its decision, in which it sustained the Commission's affirmative material injury determinations.  Appx001-047.  In doing so, the court opined that the Commission made certain errors in its findings regarding market segmentation, but ultimately held that such errors were harmless.  Appx001-042.

Specifically, the CIT, embarking on what amounted to its own fact-finding exercise, held that, contrary to the Commission's findings, the record showed that producers and purchasers were specialized in their production and purchases of MiBs and FPMs, respectively.  The court dismissed the Commission's analysis as "mathematical obfuscation and statistical chicanery to make the mattress industry appear less segmented than it is."  Appx024.  The CIT held that the Commission erred by treating two pairs of companies that merged during the POI as two single companies that produced both MiBs and FPMs, rather than as four companies that each specialized in one or the other.  The CIT further assumed that the Commission intentionally omitted information that many of the companies producing both mattress types produced more of one kind than the other.  Appx024-030.  According to the CIT, the Commission also failed to provide "important context" concerning its findings as to the minimal relevance of

packaging in purchasers' decision, and sought to make purchasers seem less specialized than they were by not informing that almost all of the eleven purchasers of both MiBs and FPMs purchased more of one packaging type than the other.  Appx030-035.

The CIT ultimately ruled, however, that the Commission's "errors" were harmless.  Appx035-042.  The court held that the Commission's Views provided a substantially supported analysis addressing the harm caused by subject imports to the segment of the domestic industry producing MiBs.  The court thus sustained the Commission's alternative finding that domestic MiB producers would have improved their performance even more but for the subject imports displacing domestic industry shipments and depressing domestic prices to a significant degree.  The CIT noted, in particular, that domestic MiB producers had excess production capacity at a time when the market for boxed mattresses grew. Appx038.  Based on the Commission's discussion of the impact of subject imports on domestic producers of MiBs, the court affirmed the Commission's determination that the domestic industry was materially injured by reason of subject imports.  Appx042.  In doing so, the CIT further held that, as CVB itself acknowledged, the Commission was not required to conduct a market segmentation analysis.  Appx042-045.

### E. The CIT's BPI Denial Decision

On December 19, 2023, the same day the CIT issued its Merits Decision, the Commission contacted the court's case manager to alert that the opinion contained extensive unredacted BPI. The case manager, however, responded that in the court's view, the opinion did not contain BPI and that the opinion would "remain posted as-is." Appx554-555.

The next day, on December 20, 2023, the Commission, with agreement from the other parties, filed a letter with the CIT requesting that it temporarily retract the public opinion to allow the parties the opportunity to confer and submit comments regarding the BPI. Appx557-558. Instead of addressing the request, the CIT issued a paperless order directing the parties to file a motion. Appx092.

On December 22, 2023, the parties jointly filed a motion specifically identifying the BPI contained in the Merits Decision and requesting that the court accord confidential treatment to such information. Appx559-613. As the motion detailed, the BPI at issue generally fell into two categories: (1) sensitive information from individual producer and purchaser questionnaire responses that had been submitted to, and treated by the Commission, as confidential; and (2) subject import volume and market share information, calculated from questionnaire response information, which was similarly treated as confidential. Appx559-613.

On January 8, 2024, the court issued its BPI Denial Decision. Appx048-066. While recognizing that 19 U.S.C. § 1677f(b) governs the Commission's treatment of BPI, the CIT held that information from individual producer and purchaser questionnaire responses were instead public because the questionnaire responses had not been individually bracketed as required by Ct. Int'l Trade Rule 5(g).[7] Notwithstanding that each page of the questionnaire responses contained a "Business Proprietary" stamp and the questionnaire responses were filed with the court under seal as part of the confidential joint appendix, the CIT reasoned that the absence of bracketing for each individual piece of information meant that "any claim to confidentiality was waived long ago." Appx053-054. With respect to subject import volume and market share information, the court held that despite being identified by the Commission as BPI and accordingly bracketed by the Commission and the parties in their brief and other submissions, the information was nonetheless available in public sources and therefore failed to qualify as BPI. The court further held that, in any event, it had "couche{d} its language" through use of words like "roughly," "about," and "at least," such that its references to the

---

[7] Court of Int'l Trade Rule 5(g), which pertains to the serving and filing of pleadings and other papers, states that "{a}ny paper containing confidential or business proprietary information must identify that information by enclosing it in brackets."

bracketed data did not reveal the exact nature of the information.  Appx058-062.

The court thus denied the parties' joint motion in all respects.

## SUMMARY OF THE ARGUMENT

The Court conducts a *de novo* review of the Commission's determinations and should sustain the Commission's final affirmative material injury determinations on the basis of a single domestic industry.  The Commission's determinations are supported by substantial evidence and otherwise in accordance with law.  The record demonstrates that after imposition of section 301 duties and provisional measures in *Mattresses I*, mattress imports from China declined precipitously while mattress imports from the other subject countries surged.  The significant and increasing volume of subject imports that were substitutable with the domestic like product undersold the domestic like product and depressed prices to a significant degree, causing the domestic industry to lose sales and market share to subject imports and forcing domestic producers to reduce prices.  Despite strong and growing demand for mattresses in the U.S. market, the domestic industry experienced declining capacity, production, capacity utilization, employment, and U.S. shipments due to low-priced subject imports.  Further, the domestic industry experienced stagnant net sales, revenues, and gross profits, as well as declining operating and net income.

CVB provides no basis, factual or legal, to disturb the Commission's determinations. CVB's arguments center around its preferred view that MiBs and FPMs competed in separate market segments, and that domestic producers of MiBs were not injured by subject imports, which were comprised primarily of MiBs. As an initial matter, however, the statute directs the Commission to conduct a material injury analysis on the domestic industry as a whole. Here, the Commission defined a single domestic like product consisting of MiBs and FPMs, and, therefore, a single domestic industry that included domestic producers of MiBs and FPMs. The Commission was therefore not obligated to conduct a segmented market analysis on MiBs and FPMs. The Commission, in any event, carefully considered the record evidence and made substantially supported findings that, contrary to CVB's arguments, subject imports not only competed against domestically-produced MiBs, but also domestically-produced FPMs. The Commission then provided a comprehensive material injury analysis addressing the significant and increasing volume of subject imports that had significant price effects and impact on the domestic industry as a whole.

Even if this Court determines that substantial evidence does not support the Commission's analysis of injury to a single domestic industry, it should sustain the Commission's determinations. In addition to its injury analysis on a single domestic industry, the Commission provided an analysis finding that subject

imports caused injury to the subset of the industry producing only MiBs. The CIT upheld this additional analysis as being supported by substantial evidence, and this Court should do the same.

In sum, CVB's challenges amount to an effort to have this Court reweigh the evidence. This Court should reject CVB's request for the Court to substitute its preferred analysis for the Commission's well-supported and reasoned findings and affirm the Commission's determinations.

Although this Court should affirm the CIT's Merits Decision, it should modify the final judgment for the limited purpose of reversing the CIT's BPI Denial Decision. During the administrative proceedings, the Commission properly acted within its statutory and regulatory authority to assure that questionnaire response information and other sensitive information identifiable to individual firms would be treated as BPI. The CIT's disclosure of such information based upon its stance that the questionnaire responses were not individually bracketed as required under the court's rules or that similar information was, in the court's view, publicly available, cannot be squared with the mandatory language of the statute requiring the court to preserve the confidential status of that information. 19 U.S.C. § 1516a(b)(2)(B).

## ARGUMENT

### III.  Standard of Review

Two standards of review apply to this appeal and cross-appeal.  First, the Court reviews *de novo* the CIT's judgments on the agency record.  *Full Member Subgrp. of Am. Inst. of Steel Constr., LLC v. United States*, 81 F.4th 1242, 1251 (Fed. Cir. 2023) (citing *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354 (Fed Cir. 2005)).  In doing so, the Court applies the same standard of review applied by the CIT when it reviews the Commission's determinations, which means that this Court again assesses whether the Commission's determination is supported by substantial evidence or otherwise not in accordance with the law.  *Id.* (citing *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 65 F.4th 1364, 1369 (Fed. Cir. 2023); 19 U.S.C. §§ 1516a(b)(1)(B)(i), 1516a(a)(2)(B)(i)).[8]  Although this Court performs anew the lower court's review on appeal, this Court has stated that it will give "great weight to 'the informed opinion of the Court of International Trade.'"  *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1369 (Fed. Cir. 2015) (quoting *Universal Camera Corp. v. NLRB*,

---

[8] The Commission's determinations are presumed to be correct, and the burden is on the party challenging a determination to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).

340 U.S. 474, 477 (1951)).  It need not be a preponderance, but must be "more than a scintilla."  *Id*. (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Under the substantial evidence standard, this Court will affirm the Commission's determination if it is supported by the record as a whole, even if some evidence detracts from the Commission's conclusion.  *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 716 (Fed. Cir. 2020) (citing *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).

The Commission "is presumed to have considered all of the evidence on the record," and is "not required to explicitly address every piece of evidence presented by the parties" during an investigation.  *Nucor Corp. v. United States*, 318 F. Supp. 2d 1207, 1247 (Ct. Int'l Trade 2004) (quotation omitted).  Instead, the Commission need only address the "issues material to {its} determination" so that the "path of the agency may reasonably be discerned."  Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No, 103-316, vol. 1, at 892 (1994); 19 U.S.C. § 1677f(i)(3)(B); *Timken*, 421 F.3d at 1354.  While a party "may disagree with the conclusions drawn by the Commission and offer reasonable, alternate explanations . . . , it is not the role of this court to refind the facts or interpose {its} own determinations."  *Altx*, 370 F.3d at 1123-24.

Second, this Court reviews the lower court's refusal to seal or redact for abuse of discretion.  *See, e.g.*, *Deputy Synthes Prods., Inc. v. Veterinary Orthopedic*

*Implant, Inc.*, 990 F.3d 1364, 1369 (Fed. Cir. 2021). A lower court abuses its discretion if its decision rests on a legal error or a clearly erroneous finding of fact. *See id.* (citing *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010)). The question of whether the lower court applied the correct legal standard is a question of law reviewed *de novo. See, e.g., Marubeni Am. Corp. v. United State*s, 35 F.3d 530, 534 (Fed. Cir. 1994).

To determine whether the information at issue should have been treated as BPI, the Court must consider the applicable statutory provisions. "{C}ourts use every tool at their disposal to determine the best reading of the statute and resolve {any} ambiguity." *Loper Bright Enters v. Raimondo*, 603 U.S. ___, ___, 144 S. Ct. 2244, 2266 (June 28, 2024). Beyond the statute's text, the tools of statutory construction to ascertain Congress's purpose and intent include the statute's legislative history, the statute's structure, and the canons of statutory construction. *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998). Furthermore, the Supreme Court continues to recognize that courts should be informed by agencies' expertise, interpretation and experience with statutes that Congress entrusted them to administer. *Loper Bright*, 603 U.S. at ___, 144 S. Ct. at 2263, 2267 (citing, *e.g.*, *Skidmore v. Swift & Co.,* 323 U.S. 134, 139-40 (1944)).

## IV. This Court Should Affirm the Commission's Affirmative Material Injury Determinations

On appeal, CVB challenges only the Commission's factual findings with respect to competition between MiBs and FPMs and the impact of subject imports, which consisted primarily of MiBs, on domestic producers of MiBs.[9] In CVB's view, domestic producers and U.S. purchasers were specialized and focused their production and purchases on either MiBs and FPMs, and the Commission was therefore required to separately examine the impact of subject imports, consisting primarily of MiBs, on domestic producers of MiBs. CVB acknowledges that the Commission's Views included this separate injury analysis on the domestic MiB producers, but CVB claims that this analysis was unsupported by substantial evidence.

CVB's appeal fails up front because the Commission was not statutorily required to conduct a segmented market analysis with respect to MiBs and FPMs. To the contrary, the statute directs the Commission to conduct a material injury analysis on the domestic industry as a whole, which in these investigations was comprised of domestic producers of MiBs and FPMs. These domestic producers competed directly against subject imports, which consisted primarily of MiBs but

---

[9] CVB has abandoned the other challenges to volume and price effects that it raised before the CIT. *See Smithkline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.").

also substantial quantities of FPMs. In any event, the Commission thoroughly addressed CVB's market segmentation arguments and made findings on these issues that were supported by substantial evidence.

### A. The Commission Properly Conducted a Material Injury Analysis on the Domestic Industry as a Whole

Under the statutory scheme, the Commission is charged with determining whether the imported merchandise in question materially injures or threatens to materially injure an industry in the United States. 19 U.S.C. §§ 1671d(b)(1) and 1673d(b)(1). In turn, the statute defines "industry" as "the producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." 19 U.S.C. § 1677(4)(A).

In these investigations, the Commission defined a single domestic like product encompassing all mattresses within the scope of the investigations, including domestically-produced FPMs and domestically-produced MiBs, and thus a single domestic industry comprising all domestic producers of mattresses, including firms that packaged mattresses as FPMs, firms that packaged mattresses as MiBs, and firms that packaged mattresses in both formats. The Commission then properly conducted a material injury analysis on this single domestic industry.

The statutory mandate requiring the Commission to analyze injury to the domestic industry as a whole defies CVB's arguments that the Commission must

conduct a segmented injury analysis of domestic producers of MiBs and FPMs. *See Full Member Subgrp. of Am. Inst. of Steel Constr., LLC v. United States*, 547 F. Supp. 3d 1211, 1232-33 (Ct. Int'l Trade 2021) ("The Commission adopted Petitioner's argument that the domestic industry was singular; therefore, the Commission was not required to analyze the impact of subject imports on different segments of the domestic industry."), *aff'd*, 81 F.4th 1242 (Fed. Cir. 2023); *ITG Voma Corp. v. U.S. Int'l Trade Comm'n,* 253 F. Supp. 3d 1339, 1354 (Ct. Int'l Trade 2017) ("{T}he law imposes no . . . requirement on the Commission . . . to engage in a segmented analysis."), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019). Indeed, doing otherwise would "thwart the Commission's statutory duty, which is to determine whether the entire industry, not particular producers, has been injured." *CP Kelco, Inc. v. United States*, 24 F. Supp. 3d 1337, 1346 (Ct. Int'l Trade 2014); *see also Calabrian Corp. v. U.S. Int'l Trade Comm'n*, 794 F. Supp. 377, 385 (Ct. Int'l Trade 1992) ("That Congress intended for the Commission to consider the entire industry is clear.").

Indeed, even where customer demand or physical differences might support a finding of market segments, the statute does not require that the Commission undertake a segmented market analysis. *See Makita Corp. v. United States*, 974 F. Supp. 770, 778 (Ct. Int'l Trade 1997); *BIC Corp. v. United States*, 964 F. Supp. 391, 397-98 (Ct. Int'l Trade 1997) (finding that market segments "may differ

according to context" and that reviewing courts have thus "deferred to the Commission's findings regarding the existence and importance of such segments"). And while the Commission has in the past examined market segments, those prior investigations are readily distinguishable.

CVB cites, for example, *Blast Furnace Coke from China and Japan*, Inv. Nos. 731-TA-951-952 (Prelim.) (Remand), USITC Pub. 3619 (Aug. 2003); *Outboard Engines from Japan*, Inv. No. 731-TA-1069 (Final), USITC Pub. 3752 (Feb. 2005); and *Uncoated Groundwood Paper from Canada*, Inv. Nos. 701-TA-584, 731-TA-1382 (Final), USITC Pub. 4822 (Sept. 2018). CVBBr. at 26, 36-37. Putting aside that each Commission investigation is *sui generis,* with the particular facts and evidence of each case determining the outcome, *Cleo*, 501 F.3d at 1299, those prior determinations simply highlight why any differences between MiBs and FPMs were insufficient to support a segmented analysis in these investigations.

In those prior investigations, the Commission found that competition between subject imports and the domestic like product was attenuated due to differences in purchasers or product availability. Specifically, in *Blast Furnace Coke*, domestic producers sold their entire output through contracts typically lasting for one to three years, and often to only one customer, which was often located nearby or adjacent to the producers' coke battery, avoiding freight costs

and degradation from moving the coke. USITC Pub. 3619 at 3-8. Importers, on the other hand, sold subject imports to steel plants distant from most domestic producers, with lower inland freight costs from ports to those plants. *Id.* In *Outboard Engines*, the Commission found "significant differences" in the domestic industry's and importers' product offerings, and that the increase in subject imports were concentrated in four-stroke engines not being produced by the domestic industry. USITC Pub. 3752 at 14, 24. Finally, in *Uncoated Groundwood Paper*, the Commission found that there was lack of availability of a particular paper product from the domestic industry in some regions of the United States, which contributed to the market share shift to subject imports. USITC Pub. 4822 at 24, 38.

In contrast to those prior determinations, the record here showed an overlap in competition between the domestic industry and importers. Domestic producers and importers offered the same mattress products, including innerspring, foam, and hybrid mattresses in all sizes, and sold substantial quantities of both MiBs and FPMs. Appx124070-124071, Appx124083. Consistent with this, market participants reported on the similarities between the domestic like product and subject imports. Appx124083. Nearly all responding domestic producers and most responding importers and purchasers reported that imports from each subject country were always or frequently interchangeable with domestically-produced

mattresses.  Appx124083.  The vast majority of responding purchasers also reported that mattresses from domestic and subject sources were comparable with respect to all 26 factors that influenced their purchasing decisions.  Appx124083.  In addition to offering the same mattress products, the domestic industry and importers reported selling mattresses in all geographic market areas of the United States and to many of the same purchasers.  As the Commission found, there was "substantial overlap between the lists of top ten purchasers reported by responding domestic producers and importers" as "reflected by the vast majority of responding purchasers (16 of 22) that purchased both domestic and subject imported mattresses."  Appx124071, Appx124087-124088.  These Commission findings, which CVB does not challenge, demonstrate that the domestic like product and subject imports competed meaningfully with each other in the U.S. market.

Based on the foregoing, the Commission's injury analysis on the domestic industry as a whole and resultant affirmative determinations should be affirmed. *Hitachi Metals*, 949 F.3d at 716 (The court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion") (quotation omitted); *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1363-65 (Fed. Cir. 1996) (notwithstanding that certain subsidiary findings were unsupported by the record,

other evidence, taken as a whole, was sufficient to support the ultimate conclusion).

**B.    In Any Event, Substantial Evidence Supports the Commission's Finding that MiBs and FPMs Competed with Each Other in the U.S. Market**

The Commission's findings pertaining to competition between MiBs and FPMs are, in any event, factually supported by substantial record evidence and further bolsters the Commission's ultimate conclusion of material injury. Appx124083-124084. Indeed, MiBs and FPMs consisted of all mattress types and sizes and were functionally interchangeable such that purchasers cross-shopped between the two products on the basis of price. Appx124052, Appx124083-124084.

As the record showed, MiBs and FPMs were physically similar products aside from their packaging. Domestic producers of these products testified that the design and components used to produce MIBs and FPMs were the same, except for minor tweaks that were made to insert mattresses into a box. Appx124083-124084, Appx12312-12314, Appx12333, 12346-12347; *see Bradley v. Sec'y of Dep't of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed Cir. 1993) ("The fact-finder has broad discretion in determining credibility" and such "credibility determinations are virtually unreviewable") (quotation omitted). A representative for CVB also conceded that MiBs and FPMs were identical once unpackaged such

that consumers often considered both MiBs and FPMs in making their purchasing decisions.[10]  Appx124084, Appx12366.

Further supporting the Commission's finding that MiBs and FPMs competed with each other are information provided by purchasers in their questionnaire responses.  Most responding purchasers ranked price, not packaging, within the top three factors influencing their purchasing decisions more often than any other factor except quality.  Appx124086, Appx124179.  Thus, many purchasers were not committed to purchasing either MiBs or FPMs.  Appx124109.  Rather, as the Commission found, most responding purchasers (11 of 19) reported purchasing

---

[10] The Commission disagrees with CVB's statement in the "Factual Background" section of its opening brief that MiBs and FPMs are "significantly different products."  CVBBr. at 6-8.  As an initial matter, CVB's claims of significant differences conflict with the Commission's finding of a single domestic like product.  Notably, CVB never argued that MiBs and FPMs were separate domestic like products, Appx124052-124054, which, had this been found by the Commission, would have ensured separate injury analyses for the MiB and FPM industries.  *Encon Indus., Inc. v. United States*, 16 CIT 840, 842 (1992) (rejecting plaintiff's attempt to force separate market-segment based injury analysis, referring to it as a "back-door way of saying that the 'like product' determination . . . is wrong.").  Nor does the evidence support CVB's claims.  To the contrary, as discussed, the Commission found that these products were physically similar except for packaging.  Appx124084.  While CVB relies upon conflicting statements and information provided by Ashley and Classic as supporting its argument, CVBBr. at 6-9, the Commission weighed these firms' responses but found them unpersuasive in light of the record evidence detailed above.  Moreover, investments made by domestic producers to grow their MiB capacity do not indicate significant differences in products as CVB claims, CVBBr. at 9, but rather simply show that the industry strove to supply the complete range of mattress products packaged in both formats.  Appx12309-12314.

both MiBs and FPMs. Appx124085. These firms included many of the largest responding purchasers, which purchased significant volumes of FPMs in addition to MiBs in 2019. Appx124085-124086.

The Commission found that purchasers' behavior reflected consumer demand, which also did not place significant importance on packaging. Appx124085-124086. As the Commission found, numerous sleep studies indicated that packaging was among the least important purchasing factors for consumers. Appx124085, Appx114732-114767, Appx114980-114990. Thus, as consumers cross-shopped between MiBs and FPMs, major wholesale purchasers purchased MiBs and FPMs and displayed these products side by side on their showcase floors and ecommerce websites. Appx124085-124086, Appx12272-12273, Appx12325, Appx114772-114890.

In sum, substantial evidence supports the Commission's finding that MiBs and FPMs, which were comprised of the same mattress types and sizes, competed with each other in the U.S. market.

### 2. CVB's Accusation that the Commission Manipulated Data to Minimize Market Segmentation Is Unwarranted

Relying upon the CIT's Merits Decision, which opined that the Commission erred by not acknowledging domestic producer and purchaser specialization in MiBs or FPMs, CVB argues that the Commission "manipulated record evidence" to minimize the attenuation of competition between MiBs and FPMs. CVBBr. at

25-27. CVB fails to provide any proof of improper agency consideration of the evidence, and its accusation is unwarranted and should be rejected. Rather, CVB simply seeks to have this Court reweigh the evidence in a manner that favors its market segmentation claims. Ultimately, the Commission has discretion to weigh the significance of certain pieces of evidence when making its findings. *NSK Corp. v. U.S. Int'l Trade Comm'n*, 716 F.3d 1352, 1366 (Fed. Cir. 2013) ("It is the Commission's task to evaluate the evidence it collects during its investigation, and decisions such as the weight to be assigned to a particular piece of evidence, lie at the core of that evaluative process.") (quotation omitted). It did so reasonably here.

### a. The Commission's Findings Regarding the Number of Domestic Firms that Produced Both MiBs and FPMs Were Supported by Substantial Evidence

CVB challenges the following Commission findings regarding the number of domestic producers that produced both MiBs and FPMs: (1) "two of the three largest domestic producers of boxed mattresses produced no flat packed mattresses;" (2) "the three largest producers of flat-packed mattresses also produced boxed mattresses;" and (3) "{n}early a quarter (12) of responding domestic producers produced both flat-packed mattresses and boxed mattresses in 2019, with these producers accounting for a majority of boxed mattress production that year." CVBBr. at 27-30. All three findings, however, accurately depict the

record evidence as compiled from questionnaire responses submitted by domestic producers and set forth in Table III-1 of the Staff Report. Appx124080, Appx124195-124198.

CVB simply takes issue with how the Commission presented data regarding two pairs of domestic producers that had merged during the POI. CVBBr. at 28-29. Specifically, Table III-1, which sets forth each domestic producer's share of production of MiBs and FPMs in 2019 (the last full year of the POI), reported production data separately for each of the four companies at issue because they had completed separate questionnaire responses.[11] While CVB would have preferred the Commission treat the production operations of those four companies separately, the Commission combined their data in its Views to reflect their respective mergers in discussing domestic supply in 2019. Appx124080. Far from constituting a "statistical gimmick" to "give the impression that more domestic producers manufacture both boxed and flat-packed mattresses" as CVB claims, CVBBr. at 28 (echoing the language of the CIT), the Commission reasonably combined the data because the acquisitions had already occurred, one in mid-2018 and the other in January 2019. The Commission therefore considered these four

---

[11] As petitioners' counsel explained, separate questionnaire responses were provided to the Commission in part to "facilitate the Commission's verification," and also gave it "the opportunity to look at the individual data and then segregate them or aggregate them." Appx487.

companies as two companies that produced both MiBs and FPMs in 2019. Appx503-506, Appx514-518. The Commission was not underhanded about it as CVB claims. Rather, the Commission was forthright by specifically explaining its reasoning in a corresponding footnote in its Views such that the path to its finding was reasonably discernable. Appx124080 (n.156) ("Although MiB producers Comfort and Elite completed separate domestic producers' questionnaire responses, Tempur Sealy Acquired Comfort in 2018 and Leggett & Platt acquired Elite in 2019."); *see Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005) (upholding Commission determination because the agency's decisional path was reasonably discernible).

CVB also complains that the Commission "painted a misleading picture" of the market by failing to acknowledge that producers were specialized in producing either MiBs or FPMs. CVBBr. at 29-30. Although CVB acknowledges that certain domestic firms produced both MiBs and FPMs, it argues that these producers' production ratios of MiBs and FPMs (which CVB derived from their reported production quantities) show that they produced "multiples more" of one kind than the other. CVBBr. at 29. The differing degrees to which these companies packaged mattresses as MiBs versus FPMs, however, do nothing to discredit the Commission's finding that 12 domestic producers produced and shipped mattresses in both boxed and flat forms. As noted, MiBs and FPMs

consisted of the same types of mattresses, produced from the same components utilizing the same designs. Appx124084. All that substantially differed was that to package MiBs, U.S. producers required machines that compressed and rolled mattresses to be inserted into a box. Appx124140. Thus, in focusing on production ratios, CVB misses the important point that regardless of whether they produced more of one type than the other, these 12 domestic producers had the capability to produce both MiBs and FPMs, and in fact did so and shipped them to U.S. purchasers during the POI.

In any event, production ratios are not essential to the Commission's statutorily required injury analysis on the domestic industry as a whole. That is because, as discussed above, the domestic industry consisted of all domestic producers of mattresses, including those that produced only one mattress type and those that produced both MiBs and FPMs. Thus, any error in the Commission's failure to acknowledge domestic producers' alleged specialization in either MiBs or FPMs would not impact its ultimate conclusion of affirmative material injury. *Cogne Acciai Speciali S.P.A. v. United States*, 29 CIT 1168, 1180-81 & 1185 (2005) (upholding the Commission's determination notwithstanding its failure to adequately address respondent's argument because "this shortcoming was not so central to the Final Determination's ultimate conclusion" and that "{s}ubstantial record evidence, taken as a whole, supports the ITC's determination").

### b. The Commission's Finding that Many Purchasers Purchased Both MiBs and FPMs is Supported by Substantial Evidence

Similarly unavailing is CVB's challenge to the Commission's finding that "eleven of nineteen responding purchasers reported purchasing and/or importing both {boxed and flat-packed mattresses}." Appx124085. Based upon the purchasers' purchasing ratios of MiBs and FPMs, CVB argues that there was "significant polarization" and "specialization" of purchasers. CVBBr. at 30-32. CVB has again provided no basis for disturbing the Commission's finding.

CVB's reliance upon purchasers' purchasing ratios is unavailing because rather than showing that purchasers were "specialized," the purchasing ratios reduce the actual substantial quantities of MiBs and FPMs purchased by these purchasers. *See, e.g.*, Appx124852, Appx124686, Appx124728, Appx124783, Appx124907. As the Commission found, the purchasers' questionnaire responses showed that most responding purchasers, including many of the largest firms, reported purchasing significant volumes of FPMs in addition to MiBs. Appx124085-124086. Thus, contrary to CVB's claim, the Commission's finding was supported by substantial record evidence.

Moreover, like its challenge to the Commission's findings regarding domestic production, CVB's claim with respect to purchasers' purchases again overlooks that the Commission is required to analyze injury on the domestic

industry as a whole.  Thus, the relevant inquiry is not whether purchasers

purchased FPMs and MiBs, but rather, whether they purchased mattress products

from both domestic producers and U.S. importers.  On this point, the Commission

found that domestically-produced mattresses and subject imports were sold

through the same channels of distribution, primarily to retailers, but also to end-

users.  Appx124087.  It additionally found that domestic producers and importers

competed for sales to the same purchasers, with "substantial overlap between the

lists of top ten purchasers reported by responding domestic producers and

importers" as "reflected by the vast majority of responding purchasers (16 of 22)

that purchased both domestic and subject imported mattresses."  Appx124087-

124088.

> ### c. The Commission's Finding that Packaging Was Not an Important Factor Driving Purchasing Decisions Is Supported by Substantial Evidence

CVB also makes various unavailing arguments challenging the

Commission's finding that packaging was not an important factor in purchasing

decisions.  CVBBr. at 32-33.

First, CVB argues that the Commission did not provide "important context"

with respect to its finding that "only two purchasers ranked packaging among the

top three factors driving their purchasing decision."  CVBBr. at 32.  In CVB's

view, the Commission's finding falsely suggested that the question required

purchasers to rank the top three factors from a pre-selected list.  CVBBr. at 32.

But nowhere did the Commission allude to a pre-selected list nor did it suggest that

one existed.  Appx124086.  In fact, the Commission regularly asks this same

question regarding purchasers' top three purchasing factors in the same open-

ended format across all investigations.  In doing so, the Commission leaves it to

purchasers to freely provide their responses rather than limiting their choices to a

pre-selected list.  *See, e.g.*, Appx124596.  In any event, CVB fails to explain the

logic of how inclusion of this additional context is even important or affects the

Commission's finding that packaging was not an important factor in purchasing

decisions.

Second, CVB contends that "the purchaser questionnaires – when

considered in their totality, as the Commission was required to do – reflect the

importance that consumers place on packaging."  CVBBr. at 32-33.  CVB's

argument, however, is devoid of any supporting information contained in the

questionnaire responses that would negate the categorical responses provided by

purchasers regarding the top three factors driving their purchasing decisions, which

did not include packaging.  This Court should reject CVB's unsubstantiated and

conclusory argument.  CVBBr. at 32-33; *see Icon Health & Fitness, Inc. v. Strava,*

*Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017) ("Attorney argument is not evidence.").

Finally, CVB argues that the sleep studies referenced by the Commission do not support the Commission's finding that packaging was relatively unimportant to consumers. CVBBr. at 33. In support, CVB cites only to one study, arguing that it indicated that [ ### ] percent of consumers reported that a retailer's sales of MiBs drove their purchasing decision. *See id.* (citing Appx114990). Not only does this percentile demonstrate that a minority of the purchasers indicated packaging to be a decision driver, but CVB overlooks that the same study found packaging to be the least important out of the 29 factors cited, with price being the most important in determining the sale. Appx114990. As the Commission further detailed, the other sleep studies on the record likewise demonstrated how packaging was among the least important factors to consumers. Appx124085, Appx114731-114767, Appx114979-114990.

> **C. Even Accepting CVB's Market Segmentation Arguments, the Commission Provided a Substantially Supported Injury Analysis on Domestic Producers of MiBs in Addition to its Analysis on the Domestic Industry as a Whole**

Even accepting CVB's claims that the market was segmented between FPMs and MiBs, and that the Commission was required to conduct a segmented analysis focused on domestic producers of MiBs, the Commission provided this analysis in addition to its statutorily proper analysis of the impact on the domestic industry as a whole. Appx124111-124114.

Specifically, the Commission detailed in its Views how subject imports of MiBs increased significantly in volume in each year of the POI. Appx124113. As the Commission found, these significant and increasing volumes of subject MiBs displaced domestic industry shipments from the U.S. market and depressed prices of the domestic like product to a significant degree. Appx124112. Despite a substantial increase in apparent U.S. consumption of MiBs during the POI, the domestic producers' MiB capacity utilization remained low over the POI. Appx124112. Consequently, these domestic producers of MiBs could have had greater sales revenues and operating and net income than they did during the POI but for subject import competition. Appx124113-124114. Notably, in upholding the Commission's affirmative material injury determinations, the CIT held that this additional analysis on injury to domestic MiB producers was supported by substantial evidence. Appx036-042.

CVB claims otherwise, arguing that the Commission's analysis ignored the improving performance of domestic producers of MiBs. CVBBr. at 39-41. CVB, however, overlooks the statute's specific prohibition against basing a negative material injury determination on the mere fact that the domestic industry is profitable or has recently improved its performance. The statute expressly states that the Commission "may not determine that there is no material injury or threat of material injury to an industry in the United States merely because that industry

is profitable or because the performance of that industry has recently improved."
19 U.S.C. 1677(7)(J).  Consequently, CVB's focus on the industry's improving performance is misplaced.

Putting aside the legal unsustainability of CVB's argument, its argument fails on the facts as well.  The Commission not only considered, but discussed the improvements for domestic producers of MiBs, and how subject imports were nevertheless still a cause of injury to these producers.  As the Commission explained, the observed improvements in these firms' indicia would have been larger but for subject imports:

> Domestic producers of MiBs improved their performance by most measures during the period of investigation, as would be expected in light of the domestic industry's increases in U.S. shipments of MiBs and its substantial investments in MiB capacity during the period of investigation.  Nevertheless, the performance of domestic MiB producers would have been appreciably stronger during the period of investigation but for the significant volume and increase in volume of low-priced subject imports that displaced domestic industry shipments from the U.S. market and depressed domestic like product prices to a significant degree, including the prices of MiB products.  Moreover, despite the substantial increase in apparent U.S. consumption of MiBs during the period of investigation, domestic producers' MiB capacity utilization remained low over the POI.  Capacity utilization was 57.2 percent in 2017, 62.0 percent in 2018, and 60.3 percent in 2019, and 49.8 percent in interim 2020, down from 64.7 percent in interim 2019.

Appx124111-124112 (citations in footnotes omitted).

Additionally, CVB argues that the Commission's injury analysis was flawed because "the Commission's {price decline} calculations do not accurately reflect the price effects on MiB products for the majority of Subject Countries entering the market because, for all but China, there is virtually no pricing data until Q1 of 2019 at the earliest." CVBBr. at 41-42. CVB's argument fails because the statute requires that if the criteria for cumulation are satisfied, as they were here, the Commission must cumulate subject imports from each source for its present material injury analysis, including its price effects analysis.[12] Appx124070-124073; 19 U.S.C. § 1677(7)(G)(i) (the Commission "shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries"); *see OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1298-99 (Ct. Int'l Trade 2021) (court looked to cumulated data as discussed in the Commission's Views, not solely the Omani data preferred by plaintiff). Consequently, the Commission correctly examined prices of mattress imports from all subject countries on a cumulated basis across the entire POI. Appx124095.

Furthermore, CVB's argument is predicated on facts inconsistent with the Commission's uncontested findings concerning cumulation. As the Commission

---

[12] Notably, CVB did not argue against cumulation during the Commission or court proceedings. Appx124069. In fact, respondents, including CVB, specifically argued the opposite, if the Commission found that the cumulation criteria were met, it should treat all subject imports the same. Appx124069.

discussed in its cumulation analysis, subject imports from each country offered a complete range of mattresses, were always or frequently interchangeable with each other, and were comparable with respect to all purchasing factors. Appx124070-124071. The Commission further observed that the shift in subject imports from China to other subject countries occurred after the imposition of antidumping and section 301 duties on imports of mattresses from China in 2018 and 2019, and that many of the foreign producers in Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam were related to the same China-based firms. Appx124081-124082. Thus, opposite to CVB's argument to conduct a disaggregated price analysis that excluded prices of imports from China, the record indicates that imports from all of the subject countries were largely of the same product, with the same specifications, and produced by related firms, supporting the appropriateness of the Commission's price depression analysis on prices of cumulated subject imports.

CVB also tries to place blame on factors other than the significant volume of low-priced subject imports as the cause of the domestic MiB producers' low capacity utilization rates. First, CVB points to raw material shortages. CVBBr. at 42-45. The Commission considered this argument and found that raw material shortages arose primarily in interim 2020 and stemmed from COVID-19 related disruptions. Yet, domestic MiB producers' capacity utilization rates were low

throughout the POI, with rates of 57.2 percent in 2017, 62.0 percent in 2018, and 60.3 percent in 2019. Appx124112. Consequently, raw material shortages did not explain the inability of MiB producers in utilizing more of their reported capacity to supply the U.S. market. Appx124112 (n.308).

CVB also blames domestic producers' rapid expansion of MiB capacity as resulting in the low capacity utilization rates. CVBBr. at 44-45. But the record does not support CVB's argument. The domestic producers' questionnaire instructions requested "average production capacity" defined as "{t}he level of production that your establishment{s} could reasonably expected to attain during the specified periods." Appx124112-124113 (n.308) (quoting questionnaires). Thus, responding domestic producers reported, and certified as accurate, the MiB capacity that they could have reasonably utilized for production of MiBs. Appx124112-124113 (n.308). Given the increasing apparent U.S. consumption for MiBs and the substitutability between the domestic like product and subject imports, the Commission reasonably found that domestic producers could have used more of their capacity to increase U.S. shipments than they did during the POI but for subject import competition. Appx124113.

Finally, CVB argues that subject imports were superior to the domestic like product, and that these differences in quality explain the domestic MiB producers' low capacity utilization rates. CVBBr. at 45 (citing to Appx14857, which

discusses how seven of 26 responding importers indicated that subject imports, especially from China and/or Vietnam, were superior to product from the United States). CVB's citation to this selective evidence ignores the substantial record evidence indicating that imports from subject sources and the domestic like product were both comparable and interchangeable. The vast majority of responding purchasers indicated that the domestic like product and mattresses from each of the subject countries, including China and Vietnam, were comparable with respect to all purchasing factors, including quality. Appx124182-124184. Additionally, majorities of responding U.S. producers, U.S. importers, and purchasers reported that mattresses produced in the United States were always or frequently interchangeable with mattresses from the subject countries, including China and Vietnam. Appx124185.

In sum, and as the CIT properly found, the Commission's additional injury analysis on domestic MiB producers is supported by substantial evidence. Appx036-042. Thus, regardless of whether the Commission erred in not acknowledging producer and purchaser specialization as discussed above, the Commission's additional analysis and its ultimate conclusion of material injury by reason of subject imports should be affirmed.

### III. This Court Should Reverse the CIT's BPI Denial Decision

The CIT's Merits Decision publicly disclosed sensitive proprietary information that the Commission properly, and consistent with its statutory and regulatory obligations, treated as BPI throughout its administrative proceedings. The BPI at issue generally falls into two categories: (1) confidential questionnaire response information regarding individual U.S. producers' production operations and U.S. purchaser names; and (2) subject import volume and market share information, calculated using questionnaire response data. Appx559-613. In the proceedings before the CIT, the parties agreed that the information at issue was BPI and treated the information as such in their CIT submissions. Concerned at what they initially believed to be an oversight by the lower court, the parties jointly filed a motion identifying and requesting confidential treatment for the specific BPI discussed in the court's Merits Decision. The CIT abused its discretion in denying the parties' joint request.[13]

---

[13] Further exacerbating its error, the CIT subsequently relied upon its BPI Denial Decision to order counsel for the Commission and other counsel to appear before it in another case, *OCP S.A. v. United States*, to address the propriety of Rule 11 sanctions for what the court opined was the Commission's possible "fail{ure} to heed CVB's warning" on "the law's expectations regarding redaction of allegedly confidential information" in the remand determinations and remand record filed in that case. Consol. No. 21-219, Order at 5 (Ct. Int'l Trade Feb. 29, 2024) (ECF 158).

## A.    The Statute Requires the CIT to Preserve the Confidential Status of Information Treated as BPI by the Commission

Congress established a comprehensive statutory scheme regarding the collection and protection of BPI.  This scheme directs the Commission to protect BPI submitted to it during the course of its investigations and additionally requires the CIT to maintain the confidential status of BPI designated as such by the Commission in any ensuing action before the court.

Addressing the Commission's obligations, section 777f(b)(1)(A) unambiguously provides in pertinent part that:

> Except as provided in subsection (a)(4)(A) and subsection (c), information submitted to the administering authority or the Commission which is designated as proprietary by the person submitting the information ***shall not be disclosed*** to any person without the consent of the person submitting the information. . . .

19 U.S.C § 1677f(b)(1)(A) (emphasis added).  In other words, the Commission is prohibited from disclosing information designated as BPI by the submitter, except under the three following circumstances specified by the statute: (1) information that "is disclosed in a form which cannot be associated with, or otherwise be used to identify, operations of a particular person," 19 U.S.C. § 1677f(a)(4)(A); (2) it is disclosed to interested parties who are parties to a proceeding under a protective

order, 19 U.S.C. § 1677f(c)(1); or (3) the Commission receives consent of the person submitting the information.[14]

In protecting information designated as proprietary by submitters in the first instance, the statute further provides submitters the right to have the submitted information returned rather than disclosed to the public if the Commission determines that the request for proprietary treatment is unwarranted:

> If . . . the Commission determines, on the basis of the nature and extent of the information or its availability from public sources, that designation of any information as proprietary is unwarranted, then it shall notify the person who submitted it and ask for an explanation of the reasons for the designation. Unless that person persuades the administering authority or the Commission that the designation is warranted, or withdraws the designation, the administering authority or the Commission, as the case may be, shall return it to the party submitting it. In a case in which the administering authority or the Commission returns the information to the person submitting it, the person may thereafter submit other material concerning the subject matter of the returned information if the submission is made within the time otherwise provided for submitting such material.

19 U.S.C. § 1677f(b)(2).

---

[14] Congress acknowledged that "the bulk of the information collected by the ITC and on which it bases its decisions consists of confidential business information submitted by domestic producers, importers, and purchasers," and that the "best insurance that the ITC will be able to obtain the information it needs for its investigations is its reputation for strictly maintaining the confidentiality of information submitted to it." S. Rep. No. 100-71 at 112, 114 (June 12, 1987).

Congress established this framework to provide protection to information submitted by all sources, many of whom are not parties to the proceeding. But recognizing the due process rights of parties appearing before the Commission, the statute balanced these competing interests for disclosure and protection by providing for disclosure under a protective order:

> (A) In general
>
> Upon receipt of an application (before or after receipt of the information requested) which describes in general terms the information requested and sets forth the reasons for the request, the administering authority or the Commission shall make all business proprietary information presented to, or obtained by it, during a proceeding (except privileged information, classified information, and specific information of a type for which there is a clear and compelling need to withhold from disclosure) available to interested parties who are parties to the proceeding under a protective order described in subparagraph (B), regardless of when the information is submitted during a proceeding….
>
> \*     \*     \*
>
> (B) Protective order
>
> The protective order under which information is made available shall contain such requirements as the administering authority or the Commission may determine by regulation to be appropriate. The administering authority and the Commission shall provide by regulation for such sanctions as the administering authority and the Commission determine to be appropriate, including disbarment from practice before the agency.

19 U.S.C. § 1677f(c)(1)(A)-(B); *see also Kemira Fibres Oy v. United States*, 858 F. Supp. 229, 234 (Ct. Int'l Trade 1994) (the balance between Commerce's investigatory needs and a party's need for confidentiality is achieved through proprietary information safeguards under, *inter alia*, 1677f(c)).[15]

Importantly, the statute extends the robust protection afforded to BPI in the Commission's proceedings to actions before the CIT. Specifically, 19 U.S.C. § 1516a(b)(2)(B) requires that:

> The confidential or privileged status accorded to any documents, comments, or information shall be preserved in any action under this section. Notwithstanding the preceding sentence, the court may examine, in camera, the confidential or privileged material, and may disclose such material under such terms and conditions as it may order.

Thus, the court on appeal must treat as confidential all information that was treated as confidential in the proceedings before the Commission, unless the submitter consents to its disclosure. While the second sentence of the statute allows disclosure of information under such "terms" and "conditions" as the court may order, Congress intended that such "terms" and "conditions" are those relating to a

---

[15] Congress recognized the Commission's "legitimate concern that the availability under protective order of domestic firms' closely guarded financial information may have a 'chilling effect' on the willingness of some firms to supply information voluntarily," and therefore authorized the use of "strong sanctions," including disbarment or suspension from practice before the Commission, against any person found in violation of the protective order. S. Rep. No. 100-71 at 113-14.

protective order.  S. Rep. No. 96-249 at 248 (July 17, 1979) ("Special provision would be made in subsection (b)(2)(B) for preserving the confidential or privileged status of any materials contained in this record, including, where the court determines it would be appropriate, the disclosure of the privileged or confidential material *only* under the terms of a protective order.") (emphasis added).

Consistent with this congressional intent, this Court and the CIT have applied the second sentence of 19 U.S.C. § 1516a(b)(2)(B) as a way to control access to confidential information by parties to the proceedings and within the confines of a protective order.  *See, e.g.*, *U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed. Cir. 1984) (determining whether the CIT erred in denying in-house counsel access to confidential information under a protective order); *Am. Brass v. United States*, 699 F. Supp. 934 (Ct. Int'l Trade 1988) (deciding whether plaintiffs were entitled to access to certain proprietary information under a proper protective order); *Jernberg Forgings Co. v. United States*, 598 F. Supp. 390 (Ct. Int'l Trade 1984) (deciding plaintiffs' motion for discovery of confidential information under a judicial protective order).  Importantly, although the court may disclose BPI under such terms and conditions as it may order, such disclosure would still preserve the proprietary status of the information.

It is within this statutory framework that the Commission promulgated rules defining the information that constitutes confidential business information and

concerning the submission and protection of such information.[16]  In particular,

Commission Rule 201.6(a) defines the information that constitutes confidential

BPI.  First, the information must be:

> {I}nformation which concerns or relates to the trade secrets, processes, operations, style of works, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, or amount or source of any income, profits, losses or expenditures of any person, firm, partnership, corporation, or other organization, or other information of commercial value. . . .

19 C.F.R. § 201.6(a).  Second the disclosure of such information must be:

> {L}ikely to have the effect of either (1) "impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions," or (2) "causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained," unless the Commission is required by law to disclose such information.

*Id*.  Commission Rule 201.6(g) also provides that in the event that any business

information submitted to the Commission is not entitled to confidential treatment,

the submitter is permitted to withdraw the submitted information within five days

of the denial of confidential treatment, unless the information is the subject of a

---

[16] Congress granted the Commission "broad authority to frame such regulations as are necessary to ensure maximum possible access to information without impeding the ITC's ability to complete its investigations within the tight time limits for investigation provided by statute."  S. Rep. No. 100-71 at 113.

Freedom of Information Act ("FOIA") request, or judicial discovery proceedings.[17]

19 C.F.R. § 201.6(g).  In addition, Commission Rule 207.7 provides for the limited

disclosure of BPI to authorized applicants under an administrative protective order.

19 C.F.R. § 207.7.

**B.**   **The Commission Properly Treated Questionnaire Response Information as BPI Throughout its Administrative Proceedings**

The Commission properly treated information from questionnaire responses

as BPI, and the CIT was statutorily required to preserve the confidential status of

that information.  19 U.S.C. § 1516a(b)(2)(B).

**1.**   **Individual Information from Company-Specific Questionnaire Responses**

The information contained in questionnaire responses submitted by domestic

producers, U.S. importers, foreign producers, and purchasers in the underlying

investigations met the statute's definition of non-disclosable BPI, *i.e.*, data

"designated as proprietary by the person submitting the information" that can be

"associated with, or otherwise be used to identify, operations of a particular

person."  19 U.S.C. § 1677f(a)(4)(A)-(B).  Indeed, each page of the questionnaire

responses was stamped as containing "business proprietary" information.

Moreover, the responses were individual in nature as they were firm-specific and

---

[17] It is only if the information in question is not withdrawn in the five day period, that it may be treated as public information.  19 C.F.R. § 201.6(g).

contained granular and detailed data spanning several years with respect to a firm's "processes, operations, style of works, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, or amount or source of any income, profits, losses, or expenditures." 19 C.F.R. § 201.6(a); *see, e.g.*, Appx89656-89699.

In addition to falling within the delineated category of non-disclosable BPI, the questionnaire response data also satisfied the needs addressed by Commission Rule 201.6(a) to protect information, the disclosure of which was likely to have the effect of "impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions, or causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained." 19 C.F.R. § 201.6(a).

As this Court has recognized, the submission of sensitive company-specific data through questionnaires is an integral part of the Commission's investigative process, *see Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1483 (Fed. Cir. 1986), and the Commission has historically treated questionnaire information as BPI. In turn, the trade bar has understood and developed expectations, which they have relayed to their clients, about the strict protections that the Commission will

afford to such information.[18] In these investigations, 53 domestic producers, 49 U.S. importers, 16 foreign producers, and 22 purchasers, many of which were not parties to the investigations, voluntarily submitted questionnaire responses. Appx124046, Appx124094. In doing so, the responding firms certified to allowing disclosure of the information requested *only* to authorized applicants under the protective order. *See, e.g.*, Appx89475, Appx89478.

Disclosure of questionnaire response information, which was submitted by firms under the expectation that their information would be kept confidential, therefore raises legitimate concerns that information could fall into a competitor's hands. Indeed, the questionnaire responses contained substantial amounts of sensitive data with respect to the specific product being investigated. The disclosure of such sensitive information therefore "undoubtedly ha{s} a chilling effect on the parties' willingness to provide the confidential information essential to the Commission's fact finding processes." *Akzo N.V.*, 808 F.2d at 1483.[19]

---

[18] Firms are entitled to rely on the reasonable expectation of consistent proprietary treatment. *See Qwest Commc's Int'l Inc. v. FCC*, 229 F.3d 1172, 1184 (D.C. Cir. 2000) (in submitting certain data, the company "was entitled to rely on the {FCC}'s announced policy and precedent on how it would handle confidential audit information" and "similarly entitled to assurances that the unprecedented disclosures would be consistent with the standards that the {FCC} has set for itself").

[19] Congress also recognized the "burden imposed on the ITC by the strict investigatory deadlines, particularly in preliminary 45-day investigations," and that the "best insurance that the ITC will be able to obtain the information it needs for

Disclosure of questionnaire responses also has the likely effect of causing substantial harm to the competitive position of the firms involved. This Court discussed the potential dangers in revealing confidential material, stating that "{o}bviously, where confidential material is disclosed to . . . a competitor, the risk of the competitor's obtaining an unfair business advantage may be substantially increased." *Id.*; *see also Hyundai Pipe Co., Ltd. v. U.S. Dep't of Commerce*, 11 CIT 238, 243 (1987) (recognizing the irreparable harm that could come from the inadvertent or advertent use of confidential information, stating that "caution must be, and is, the guidepost in dealing both with sensitive information and the sensitivities of those who obtain access to it"). Consequently, this Court had endorsed the Commission's conservative position in the "optimum shielding of business information." *Akzo*, 808 F.2d at 1483.

In light of the foregoing, the Commission properly treated the information contained in the questionnaire responses as BPI.

### 2. Aggregate Information Calculated from Questionnaire Response Data

Likewise, the Commission properly treated subject import volume and market share information, calculated using the confidential import and U.S. shipment data reported by U.S. producers and U.S. importers in their questionnaire

---

its investigations is its reputation for strictly maintaining the confidentiality of information submitted to it." S. Rep. No. 100-71 at 113-14.

responses, as BPI and appropriately bracketed such information in its Views and Staff Report. Appx124079, Appx124081-124082, Appx124228-124229, Appx124259-124260.

As discussed above, the statute prohibits the Commission from disclosing information designated as BPI by the submitter, except if it "is disclosed in a form which cannot be associated with, or otherwise be used to identify, operations of a particular person," 19 U.S.C. § 1677f(a)(4). To minimize risk of inadvertent disclosure of BPI of a particular firm, the Commission not only treats individual questionnaire response information as BPI, but it also follows its longstanding policies regarding data aggregated from information provided in the questionnaire responses. These policies are set forth in the Commission's publicly available handbooks, *Antidumping and Countervailing Duty Handbook*, USITC Pub. 4540 (14th ed. June 2015) ("AD/CVD Handbook") and *An Introduction to Administrative Protective Order Practice in Import Injury Investigations*, USITC Pub. 5280 (6th ed. Jan. 2022) ("APO Handbook").[20]

Page 13 of the Commission's APO Handbook states:

> The Commission has established criteria as to when it will treat as proprietary aggregate business information – that is, information that pertains collectively to more than one company. Aggregate business information pertaining to

---

[20] The AD/CVD Handbook and APO Handbook are available on the Commission's website at: www.usitc.gov/trade_remedy/documents/handbook.pdf and www.usitc.gov/publications/701_731/pub5280.pdf.

> fewer than three companies generally is treated as proprietary. Information pertaining to three or more companies generally is treated as publishable, unless two companies account for more than 90 percent of the data, or unless one company accounts for more than 75 percent of the data.

The Commission provides the same guidance on page II-26 of its AD/CVD Handbook. The rationale for this practice is straightforward. For data derived from the information of two firms, each of those firms would be able to back out its own information from the total shown, thereby revealing the confidential information held by their sole competitor. For information involving three or more firms, one of which is individually dominant (accounting for more than 75 percent of the data) or two of which are jointly dominant (accounting for more than 90 percent of the data), revealing the total data would enable a firm to back out its own data and deduce close estimates of commercial information about competitors.

The Commission consistently applies these guidelines across all investigations, and it did so in these underlying investigations. For at least one time period in the series of data collected, a dominant U.S. importer accounted for over 90 percent of mattress imports from nonsubject countries and several subject countries, including China. *See, e.g.*, Appx124224-124230. While the Commission publicly disclosed the total volume of cumulated subject imports, it bracketed information with respect to the volume of subject imports from China, subject imports from each of the other subject countries, and nonsubject imports.

Doing otherwise would have allowed the dominant importer of each of those datasets to back out its data and deduce information regarding its competitors. Appx124081-124082, Appx124228-124229.

For the same reasons, the Commission bracketed market share information. Appx124079, Appx124259-124260. In particular, the Commission bracketed market shares of nonsubject imports because, as noted above, one dominant importer accounted for over 90 percent of nonsubject imports. As a consequence, the Commission also had to bracket market shares of subject imports and the domestic industry because that information, had they been public, could have been subtracted from total apparent U.S. consumption to arrive at nonsubject import market shares.

## F. The CIT Was Statutorily Required to Preserve the Confidential Status of the Information at Issue

The CIT was statutorily required to preserve the confidential status of the questionnaire response information treated as BPI by the Commission. 19 U.S.C. § 1516a(b)(2)(B). In holding otherwise, the CIT erred in three ways: (1) the court relied upon the common law right of public access to judicial records rather than the clear statutory language requiring the court to preserve the confidential status of information treated as BPI by the Commission during its proceedings; (2) the court incorrectly held that because the questionnaire responses were not individually bracketed in accordance with Ct. Int'l Trade Rule 5(g), the claim to

confidentiality was waived; and (3) the court incorrectly held that bracketed information regarding subject import volume and market shares were available from public sources and did not qualify as BPI.  Appx048-066.

### 1. The Statute, and Not the Common Law Right of Public Access, Determines Whether Information Should or Should Not be Disclosed

In guiding its consideration of the joint parties' request for confidential treatment of BPI, the CIT erroneously applied the common law right of public access to judicial records articulated in *Binh Hoa Le v. Exeter Finance Corp.*, 990 F.3d 410, 417 (5th Cir. 2021).  *See* Appx050-052 ("Even when the parties agree to secrecy, courts are 'duty-bound to protect public access to judicial proceedings and records.'") (quoting *Binh Hoa*).

The CIT's reliance upon *Binh Hoa*, however, is misplaced.  *Binh Hoa* involved a protective order under which private parties to a breach of contract action labeled documents as confidential for "no discernable reason other than both parties wanted it that way."  990 F.3d at 417.  Criticizing the district court's agreement to the parties' requested protective order, the U.S. Court of Appeals for the Fifth Circuit discussed the right of public access to judicial proceedings.  That court particularly admonished the parties' failure to cite any authority for sealing the documents.  *See id.* at 420.  In stark contrast to the protective order in *Binh Hoa*, the administrative protective order at issue in these investigations was

implemented pursuant to clear statutory authority.  As discussed, Congress developed a comprehensive scheme balancing protection of BPI with meaningful access to parties appearing before the Commission only through a protective order.

Although, as noted by the CIT, transparency is certainly an important touchstone of our judicial system, Congress clearly intended to foreclose public disclosure of information properly treated as BPI during the Commission's administrative proceedings, unless such protections are waived by the submitters of that information.  Indeed, beyond the statute's provisions, the relevant legislative history regarding the release of BPI in antidumping and countervailing duty investigations underscores Congress's intent to shield BPI from disclosure except to parties under a protective order.

Congress first allowed for the release of confidential information in trade remedy investigations under a protective order in 1979.  In doing so, however, the statute's language contemplated that BPI would generally not be released.  Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144, 187 ("1979 Act") ("Except as provided {herein}, information submitted to . . . the Commission which is designated as confidential by the person submitting it shall not be disclosed to any other person . . . without the consent of the person submitting it.").  Congress provided for only limited and discretionary release of confidential information under the protective order, stating:

> Upon receipt of an application, which describes with particularity the information requested and sets forth the reasons for the request, the administering authority and the Commission may make confidential information submitted by another other party to the investigation available under a protective order . . . .

*Id*. at 188 (codified in then-section 1677e(c)(1)(A)). In 1988, Congress, recognizing the difficulties that the failure to release confidential information created for parties to the ITC's investigation, amended this provision to broaden disclosure, but hinged on the guarantee that confidential information could only be disclosed under the cover a protective order. S. Rep. No. 100-71 at 111-112 (June 12, 1987); *see also* H. Rep. No. 100-576 at 622-623 (Apr. 20, 1988). These amendments continue to form the basis of present law, as set forth in 19 U.S.C. § 1677f. *See* Omnibus Trade and Competitiveness Act of 1988, § 1332(2), Pub. L. No. 100-418, 102 Stat. 1107, 1207-09 (1988).

Additionally, Congress intended that protection of BPI under the protective order would extend to proceedings before the court. 19 U.S.C. § 1516a(b)(2)(B) ("The confidential or privileged status accorded to any documents, comments, or information shall be preserved in any action under this section."); *see also United States v. Texas*, 507 U.S. 529, 534 (1993) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.") (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)). As the CIT

explained in *A. Hirsh, Inc. v. United States*, 657 F. Supp. 1297 (Ct. Int'l Trade 1987), "Congress included in the Trade Agreements Act of 1979 . . . a '{s}pecial provision . . . for preserving the confidential or privileged status of any materials contained in th{e} record'" to guard against the irreparable harm caused by a competitor obtaining an unfair business advantage through use of confidential information during the judicial review process. *Id.* at 1300 (quoting S. Rep. No. 96-249 at 248).

Thus, "{c}onsistent with congressional concern over confidentiality, caution is the necessary approach when ordering disclosure." *Id.* at 1300 (citing, *inter alia*, *Akzo*, 808 F.2d at 1483 and *U.S. Steel*, 730 F.2d at 1467). This is especially so where the due process rights of parties to the investigation are fully addressed by allowing their counsel to have access to all BPI under a protective order. As one district court noted in denying access to such BPI to a private plaintiff:

> The Department {of Commerce} and the U.S. International Trade Commission rely heavily on proprietary information submitted by both U.S. and foreign parties in order to conduct their antidumping duty investigations. Permitting private plaintiffs access to proprietary information and documents submitted during the course of those agencies' antidumping proceedings would create a powerful disincentive for those parties to provide the agencies with submitted proprietary information in future antidumping investigations.

*Wiener v. NEC Elecs., Inc.*, 848 F. Supp. 124, 127 (N.D. Cal. 1994) (citing

*Monsanto Indus. Chems. Co. v. United States,* 6 CIT 241, 243 (1983) ("Release of

such requested sensitive confidential documents . . . without compelling reasons surely dampens the propensity of foreign producers to divulge confidential information in future trade cases.")); *see also Monsanto Co. v. United States*, 698 F. Supp. 285, 289 (Ct. Int'l Trade 1988) (holding that "{t}here is no absolute right to a public version of questionnaire responses containing ranged numerical data for all items of information"); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 1978 WL 1333, at *3 (E.D. Pa. 1978) (rejecting private plaintiffs' request for access to confidential documents submitted by a non-party to the Commission during the Commission's antidumping investigation).

The CIT's additional reliance upon *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019), and *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), as support for its BPI Denial Decision is also misplaced.[21] Appx051. These cases analyzed the protection of certain classes of information under different statutes instead of the applicable statutory scheme for trade investigations. *Food Marketing*, 588 U.S. at 430, 434-35 (addressing "commercial or financial

---

[21] The CIT also cites to *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 595 (1980), and *Matter of Krynicki*, 983 F.2d 74, 75 (7th Cir. 1992), but those cases are not pertinent. *See* Appx062, Appx065. *Richmond Newspaper* involved defendant's request that his criminal trial for murder be closed to the public and *Krynicki* addressed the parties' request that the whole appeal – briefs, record, and oral argument – be sealed. The parties here never made any such request. Rather, their request for confidential treatment was narrowly tailored and focused only on BPI covered by the statute.

information" under FOIA); *Ruckelshaus*, 467 U.S. at 1010-13 (addressing "trade secret" under the Federal Insecticide, Fungicide, and Rodenticide Act). In any event, *Food Marketing* supports an opposite proposition to disclosure here, holding that the class of business or commercial information entitled to statutory protection should not be construed narrowly. Indeed, in that case, the Supreme Court rejected appellant's arguments that the "commercial or financial information" language contained in exemption 4 to FOIA should be interpreted as requiring a showing that release of information would lead to substantial competitive harm. *See Food Marketing*, 588 U.S. at 439. The Supreme Court held that the statute nowhere added such a limitation and "where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." *Id.* at 439-440. Reversing the judgment of the court of appeals, the Supreme Court ultimately held that certain data from individual grocery retailers constituted "confidential" commercial information exempt from disclosure. *Id.*

### 2. The Claim to Confidentiality Was Never Waived

In addition to being improperly guided by the common law right of public access to judicial records to justify its disclosure of the BPI at issue, the CIT erroneously held that the "claim to confidentiality" for producer and purchaser

questionnaire responses was waived because the questionnaire responses, which were filed with the CIT under seal as part of the confidential joint appendix, were not individually bracketed pursuant to Ct. Int'l Trade Rule 5(g). Appx053-057.

The statute makes clear that waiver occurs only when submitters of the BPI consent to the information's disclosure. 19 U.S.C § 1677f(b)(1). Here, notwithstanding that the questionnaire responses were not individually bracketed, none of the submitters of the BPI at issue ever waived their claim to the information's confidentiality. To the contrary, and pursuant to the Commission's customary and longstanding treatment of questionnaire responses as BPI, U.S. producers, importers, purchasers, and foreign producers submitted their responses in confidence, with the expectation that their information would be kept private. As previously noted, each page of the questionnaire contains a "Business Proprietary" stamp and each responding firm certified to the disclosure of BPI contained within a questionnaire response only to authorized individuals. *See, e.g.*, Appx89656-89699. Additionally the questionnaire responses were filed under seal with the CIT as part of the confidential joint appendix. Appx560.

The CIT reasons that "{s}ome of the information to which the Motion to Retract objects was discussed in open court at oral argument." Appx057. The portion of the argument transcript to which the CIT cites, however, reflects the court's discussion regarding only two U.S. producers, Elite and Leggett & Platt,

that were represented by petitioners' counsel at the hearing, and no discussion with respect to BPI regarding the other 11 U.S. producers and 13 U.S. purchasers disclosed in the court's Merits Decision.  Appx442.  And while petitioners' counsel to Elite and Leggett & Platt could certainly consent to disclosure of their clients' BPI, the exact nature of the information discussed at argument regarding these companies differed significantly from the granular information contained in the CIT's Merits Decision, and for which the parties jointly requested confidential treatment.  *Compare* Appx442 and Appx564-567.

Perplexingly, with respect to the names of responding U.S. purchasers, which the Merits Decision disclosed within the context of information provided in their questionnaire responses, the CIT acknowledged that the index to the confidential joint appendix individually bracketed their names.  Appx054-055.  Yet, the CIT refused to preserve their confidentiality, relying upon its flawed view that bracketing was of "no consequence" because the index had inserted a blank space in between the brackets as opposed to the insertion of the purchaser's name (*i.e.*, [ __ ]).  The court reasoned that the blank space in place of the company name was "crucial" because the court would not be able to locate the place where the Commission supposedly designated the company name as confidential.  Appx054-055.  The CIT overlooks, however, that CVB rectified this inadvertent bracketing issue after the court raised it at oral argument.  After argument and pursuant to the

court's order, CVB submitted a supplemental joint appendix under seal containing *all* U.S. purchaser questionnaire responses, properly bracketing each purchaser's name in the confidential index, and clearly indicating on the cover and on each following page, "Business Proprietary Information Contained Throughout Entire Document." Appx090 (docket entry 73), Appx423-434, Appx124571-125358. The court's reasoning, in any event, fails to appreciate that the confidentiality of the information was never waived, and the statute itself protected this information from being publicly disclosed.

### 3. Bracketed Subject Import Volume and Market Share Information, Calculated Using Questionnaire Response Data, Were Not Publicly Available Information

Finally, the CIT erroneously held that bracketed information regarding subject import volumes and market shares were publicly reported by other sources and consequently did not qualify for confidential treatment. Appx058-060. Citing to a handful of non-record news articles, the CIT refused to "redact information as confidential that some of the responding parties themselves have freely provided to the press." Appx059-060.

The CIT misapprehends that unlike the "market trends and market share" publicly reported by the cited news articles, the bracketed import volume and market share information contained in the Commission's Views and Report were uniquely calculated using specific BPI reported by individual U.S. producers and

U.S. importers in their questionnaire responses. As explained above, while

aggregate in nature, the Commission treated the information as BPI because there

was one dominant U.S. importer that accounted for over 90 percent of mattress

imports from nonsubject countries and for mattress imports from several of the

subject countries, including China. While somewhat similar information may have

been publicly reported by the cited news articles, this public information did not

reflect the tailored information derived from confidential questionnaire responses

that constituted BPI relied upon by the Commission.

The CIT's additional explanation that "{e}ven if information is confidential

or business proprietary, the Court's use of approximations appropriately

summarizes the information without revealing exact figures," should also be

rejected. Appx060-062. Some of the CIT's use of numerical characterizations to

"summarize" numerical data, however, represented the same protected statistical

data in alternative numeric fashion (*e.g.*, [ ## ] in place of [ ## ] percent),

thereby directly revealing the protected information. Appx564-567. It is precisely

this reason that the Commission generally does not disclose any statistical BPI,

except to discuss non-numerical trends in the data. 19 C.F.R. § 201.6(a) (stating

that "{n}onnumerical characterizations of numerical confidential business

information (e.g., discussion of trends) will be treated as confidential business

information only at the request of the submitter for good cause shown"); *see also*

AD/CVD Handbook at II-26 ("In no case will the Commission disclose individual company data, although it may discuss trends in individual company data as well."). Couching language through use of words like "roughly," "about," and "at least" to refer to the BPI, as the CIT did, also does not alter the fact that the alternative numerical figures utilized by the CIT disclosed the confidential information bracketed by the Commission. Appx061-062. In sum, none of the CIT's explanations justifies disclosure of the BPI at issue.

To be clear, the Commission has an interest in presenting information and argument in a public manner. It holds a public hearing to receive testimony and argument, independently researches publicly available information concerning the product, producers, and market trends that it adds to the public record, and releases public versions of its Staff Report and Views. The Commission, however, must safeguard confidential BPI as required by the statute, and the CIT must preserve the confidential status of that information. The CIT abused its discretion in denying the parties' joint motion to accord confidential treatment to the BPI at issue. In addition to impacting the Commission's ability to collect questionnaire responses, the nonconsensual disclosure of questionnaire response information that was understood to be BPI deprived the submitters of information of protections afforded by Congress, including the ability to have that information returned rather than disclosed. The CIT's BPI Denial Decision should therefore be reversed.

# CONCLUSION

For the foregoing reasons, the Commission respectfully requests that this Court affirm the CIT's final judgment on the grounds set forth in this brief, but that the final judgment be modified for the limited purpose of reversing the CIT's BPI Denial Decision.

Respectfully submitted,

Dominic L. Bianchi
General Counsel

Andrea C. Casson
Assistant General Counsel for Litigation

*/s/ Jane C. Dempsey*
Jane C. Dempsey
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Tel: (202) 205-3142
Jane.Dempsey@usitc.gov

*Counsel for Defendant-Cross-Appellant*
*United States*

September 30, 2024

## CERTIFICATE OF COMPLIANCE WITH CONFIDENTIALITY REQUIREMENTS

This brief complies with the limitations and requirements related to confidential information set forth in Fed. Cir. R. 28(d).  This brief contains 26 words (including numbers) marked as confidential, as identified and described in the Table of Contents.

*/s/ Jane C. Dempsey*
Jane C. Dempsey
Attorney for Defendant-Cross-Appellant
United States

Office of General Counsel
U.S. International Trade Commission
500 E Street, SW, Suite 707
Washington, DC  20436
tel. (202) 205-3142
fax (202) 205-3111
Jane.Dempsey@usitc.gov

Dated:  September 30, 2024

**CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
AND TYPE STYLE REQUIREMENTS**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(b). The brief contains 16,023 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

*/s/ Jane C. Dempsey*
Jane C. Dempsey
Attorney for Defendant-Cross-Appellant
United States

Office of General Counsel
U.S. International Trade Commission
500 E Street, SW, Suite 707
Washington, DC  20436
tel. (202) 205-3142
fax (202) 205-3111
Jane.Dempsey@usitc.gov

Dated:  September 30, 2024

**CERTIFICATE OF SERVICE**

I, Jane C. Dempsey, hereby certify on this 30th day of September 2024 that

true and correct copies of the attached **NONCONFIDENTIAL PRINCIPAL**

**AND RESPONSE BRIEF OF DEFENDANT-CROSS-APPELLANT UNITED**

**STATES** were served upon counsel of record via the Court's electronic filing

system, CM/ECF.

<div style="margin-left: 40%;">

*/s/ Jane C. Dempsey*

Jane C. Dempsey
Attorney for Defendant-Cross-Appellant
United States

Office of General Counsel
U.S. International Trade Commission
500 E Street, SW, Suite 707
Washington, DC  20436
tel. (202) 205-3142
fax (202) 205-3111
Jane.Dempsey@usitc.gov

</div>